## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KASSEM HEJEIJ, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 1:19-01921 (TFH) |
| ANDREA M. GACKI, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    The International Emergency Economic Powers Act ............................................ 3

    B.    Sanctions Against Terrorists And Their Supporters ............................................. 4

    C.    OFAC's Designation Of Hejeij ............................................................................ 6

    D.    Hejeij's Request For Removal From The SDN List .............................................. 8

    E.    OFAC's Denial Of Hejeij's Request.................................................................... 11

    F.    Procedural History .............................................................................................. 14

LEGAL STANDARDS OF REVIEW ............................................................................... 15

DISCUSSION .................................................................................................................... 17

I.     OFAC's Decision Was Not Arbitrary, Capricious, Or An Abuse Of Discretion ............ 17

    A.    OFAC's Decision Is Entitled To Substantial Deference...................................... 17

    B.    OFAC's Well-Reasoned Decision Easily Satisfies The APA's Standard ........... 18

II.    OFAC Has Not Unlawfully Delayed Any Action ........................................................... 23

III.   OFAC's Decisions Accord With The Fifth Amendment.................................................. 26

    A.    Hejeij Cannot Assert Constitutional Rights........................................................ 27

    B.    Hejeij's Fifth Amendment Due Process Arguments Fail On The Merits............. 29

        1.    OFAC Has Provided Hejeij With Unclassified Evidence, Which
            Adequately Notifies Him Of The Bases Of OFAC's Decisions............... 29

        2.    Hejeij Has Had A Meaningful Opportunity To Contest The
            Propriety And Adequacy Of The Evidence Relied On By OFAC........... 34

IV.   Hejeij Was Provided With Sufficient Notice Under the APA ......................................... 35

CONCLUSION................................................................................................................... 36

# TABLE OF AUTHORITIES

**CASES**

*32 County Sovereignty Committee v. Department of State*,
  292 F.3d 797 (D.C. Cir. 2002) ................................................................................. 27

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ................................................................................. 34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................. 16, 28

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*,
  564 F.3d 462 (D.C. Cir. 2009) ................................................................................. 28

*Ass'n of Irritated Residents v. EPA*,
  494 F.3d 1027 (D.C. Cir. 2007) ................................................................................. 26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................. 16

*Camp v. Pitts*,
  411 U.S. 138 (1973)................................................................................. 35

*Chem. Mfrs. Ass'n v. EPA*,
  26 F. Supp. 2d 180 (D.D.C. 1998) ................................................................................. 25

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)................................................................................. 17

*Conant v. Wells Fargo Bank, N.A.*,
  60 F. Supp. 3d 99 (D.D.C. 2014)................................................................................. 16, 28

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981)................................................................................. 3

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988)................................................................................. 34

*Ellsberg v. Mitchell*,
  709 F.2d 51 (D.C. Cir. 1983) ................................................................................. 34

*Fares v. Smith*,
  901 F.3d 315 (D.C. Cir. 2018) ................................................................................. 33

*FBME Bank Ltd. v. Lew*,
    125 F. Supp. 3d 109 (D.D.C. 2015) .......................................................... 34, 35, 36

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)................................................................................................... 17

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ..................................................................................... 24

*Gilbert v. Homar*,
    520 U.S. 924 (1997)................................................................................................... 29

*Halkin v. Helms*,
    598 F.2d 1 (D.C. Cir. 1978) ...................................................................................... 34

*Hinton v. Corr. Corp. of Am.*,
    624 F. Supp. 2d 45 (D.D.C. 2009) ........................................................................... 16

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)....................................................................................................... 18

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002),
    *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ............................................................... *passim*

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) .................................................................................. 18

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ................................................................... 27, 29, 33

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950)................................................................................................... 27

*Joumaa v. Mnuchin*,
    No. 17-cv-2780, 2019 WL 1559453 (D.D.C. Apr. 10, 2019),
    *appeal filed*, No. 19-5166 (D.C. Cir. June 6, 2019)................................................ 28

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) ...................................................................... *passim*

*Khadr v. United States*,
    529 F.3d 1112 (D.C. Cir. 2008) ................................................................................ 15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)................................................................................................... 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................ 18, 21

*N. Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ................................................................................ 23

*National Council of Resistance of Iran v. Department of State*,
  251 F.3d 192 (D.C. Cir. 2001) ........................................................................... 27, 33

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................................ 24, 25

*Orlov v. Howard*,
  523 F. Supp. 2d 30 (D.D.C. 2007) .......................................................................... 26

*Orvis v. Brownell*,
  345 U.S. 183 (1953) ................................................................................................... 3

*Prisology v. Fed. Bureau of Prisons*,
  74 F. Supp. 3d 88 (D.D.C. 2014),
  *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017) .................................................................... 15

*Propper v. Clark*,
  337 U.S. 472 (1949) ................................................................................................... 3

*Regan v. Wald*,
  468 U.S. 222 (1984) ................................................................................................... 3

*Salisbury v. United States*,
  690 F.2d 966 (D.C. Cir. 1982) ................................................................................ 34

*Small Refiner Lead Phase-Down Task Force v. U.S. EPA*,
  705 F.2d 506 (D.C. Cir. 1983) .......................................................................... 22, 23

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................................................. 29

*Sulemane v. Mnuchin*,
  No. 16-cv-1822, 2019 WL 77428 (D.D.C. Jan. 2, 2019) ....................................... 35

*United States v. Chem. Found. Inc.*,
  272 U.S. 1 (1926) .............................................................................................. 21, 35

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ......................................................................................... 27, 28

iv

*Williams v. Lew*,
   819 F.3d 466 (D.C. Cir. 2016) ................................................................................. 28

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ........................................................................ 18

*Zevallos v. Obama*,
   10 F. Supp. 3d 111 (D.D.C. 2014),
   *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) ............................................................... *passim*

## STATUTES

5 U.S.C. § 551 ........................................................................................................ 24, 25

5 U.S.C. § 701 ............................................................................................................. 24

5 U.S.C. § 704 ............................................................................................................. 24

5 U.S.C. § 706 ..................................................................................................... *passim*

5 U.S.C. §§ 701-706 ...................................................................................................... 2

22 U.S.C. § 287c ........................................................................................................... 4

50 U.S.C. § 1701 ........................................................................................................... 3

50 U.S.C. § 1702 ............................................................................................. 4, 6, 28, 33

50 U.S.C. §§ 1701-1708 ........................................................................................... 1, 25

50 U.S.C.A. § 4305 ....................................................................................................... 3

65th Cong. Ch. 106, 40 Stat. 411 (codified as amended at 50 U.S.C.A. §§ 4301-4341) ................ 3

## REGULATIONS

31 C.F.R. § 501.807 .............................................................................................. 6, 25, 34

31 C.F.R. § 594.310 ...................................................................................................... 5

31 C.F.R. § 594.802 ...................................................................................................... 5

67 Fed. Reg. 12,633 (Mar. 19, 2002) ............................................................................. 6

81 Fed. Reg. 73,474 (Oct. 25, 2016) .............................................................................. 8

## RULES

Fed. R. Civ. P. 12 ....................................................................................... *passim*

Fed. R. Civ. P. 56 ................................................................... 16, 26, 35, 36

Local Civ. R. 7 ............................................................................................ 6

## OTHER AUTHORITIES

Exec. Order No. 12,978, 60 Fed. Reg. 54,579 (Oct. 21, 1995) ..................... 4

Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ........................... *passim*

Exec. Order No. 13,284, 68 Fed. Reg. 4075 (Jan. 28, 2003) ........................... 5

Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005) ..................... 4

Exec. Order No. 13,886, 84 Fed. Reg. 48,041 (Sept. 9, 2019) ..................... 5

https://www.treasury.gov/ofac/downloads/sdnlist.pdf................................... 6

https://www.treasury.gov/press-center/press-releases/Pages/jl0587.aspx ..................................... 8

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540 ............................... 3

## INTRODUCTION

Pursuant to Article II of the Constitution, as well as powers conferred on him by Congress in the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1708 ("IEEPA"), the President has the authority to impose economic sanctions on persons and entities in response to declared national emergencies.  In the wake of the September 11, 2001 terrorist attacks on the United States, the President declared a national emergency and issued Executive Order No. 13224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ("EO 13224"), to confront the threat posed by terrorists and their supporters.  Acting in accordance with this authority, on June 10, 2015, the Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated Plaintiff Kassem Hejeij as a Specially Designated Global Terrorist ("SDGT"), thereby blocking all of Hejeij's property and interests in property in the United States or in the possession or control of a U.S. person.  OFAC's decision was based on its conclusion—following an investigation that included review of open source and classified reporting—that Hejeij provides support and services to the terrorist group Hizballah.  As OFAC explained, Hejeij maintained direct ties with senior elements in Hizballah and supported the group for many years through his involvement with Middle East and Africa Bank ("MEAB"), a financial institution that Hejeij founded and managed.

Hejeij subsequently petitioned OFAC to reconsider his designation and remove him from the list of Specially Designated Nationals and Blocked Persons ("SDN List").  As part of its reconsideration process, OFAC requested that Hejeij submit additional information in support of his petition, which he provided in initial and supplemental responses.  After reviewing Hejeij's submissions, as well as other information available to the agency, OFAC determined that Hejeij

failed to negate the basis for his designation or demonstrate a change in circumstances.  OFAC therefore denied Hejeij's petition on August 29, 2019.

Hejeij now challenges OFAC's decisions pursuant to the Fifth Amendment to the Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  The theories he advances, however, are all without merit.  First, Hejeij contends that he does not meet the basis for designation under EO 13224 and that OFAC's denial decision is thus arbitrary and capricious.  But Hejeij's conclusory and self-serving denials do nothing to undermine the reasonableness of OFAC's decision, which is fully supported by the administrative record.  Second, Hejeij argues that OFAC has unreasonably delayed its response to his request to enter into an agreement to remove him from the SDN List.  This claim fails on multiple grounds; not only is it moot because OFAC declined to enter into a terms of removal agreement by virtue of denying Hejeij's petition for reconsideration, but Hejeij has failed to identify an agency action subject to review under the APA.  Third, according to Hejeij, OFAC has not provided him adequate notice of the bases for either its June 10, 2015 designation decision or its August 29, 2019 denial decision.  But as a foreign national without substantial contacts with the United States, Hejeij cannot assert any rights under the Fifth Amendment.  Moreover, whether viewed through the lens of the Constitution or the APA, the information disclosed by OFAC—including detailed unclassified summaries of otherwise classified information—more than adequately apprised Hejeij of the reasons for OFAC's decisions, which Hejeij can continue to contest.

Accordingly, and for the reasons discussed more fully below, the Court should dismiss Hejeij's claims or, in the alternative, grant summary judgment in favor of Defendants.

## BACKGROUND

**A.     The International Emergency Economic Powers Act**

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* 65th Cong. Ch. 106, 40 Stat. 411, 411-16 (codified as amended at 50 U.S.C.A. §§ 4301-4341).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C.A. § 4305(b)(1); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).  Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze an entity's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

In 1977, Congress amended TWEA and enacted IEEPA.  *See* S. Rep. No. 95-466, at 1-2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declared national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).  Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed sanctions on many countries, including Iran, Burma, and North Korea, as well as on individuals, such as narcotics traffickers, proliferators of weapons of mass destruction, and, as relevant here, terrorists and their supporters. *See, e.g.*, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia"); Exec. Order No. 13382, 70 Fed. Reg. 38567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters); Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" U.S. national security).

### B.     Sanctions Against Terrorists And Their Supporters

Shortly after the September 11, 2001 terrorist attacks, the President issued EO 13224 pursuant to IEEPA.  EO 13224, Preamble.[1]  In doing so, the President determined that "grave acts of terrorism and threats of terrorism committed by foreign terrorists . . . and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the

---

[1] The President also invoked the United Nations Participation Act.  EO 13224, Preamble.  That statute authorizes the President to implement measures adopted by the United Nations Security Council pursuant to Article 41 of the U.N. charter.  *See* 22 U.S.C. § 287c.

United States." *Id.* Accordingly, the President "declare[d] a national emergency to deal with

that threat." *Id.* The President further "f[ound] that because of the pervasiveness and

expansiveness of the financial foundation of foreign terrorists, financial sanctions may be

appropriate for those foreign persons that support or otherwise associate with these foreign

terrorists." *Id.* Consistent with these pronouncements, the President blocked all property and

interests in property of persons listed in the Annex to EO 13224, which included 27 foreign

terrorists, terrorist organizations, and their supporters. *Id.* § 1 & Annex.

      EO 13224 further authorized the Secretary of the Treasury, in consultation with the

Secretary of State and the Attorney General, to designate "persons" (defined as individuals or

entities) whose property or interests in property should be blocked because they, *inter alia*, "act

for or on behalf of" designated terrorists, or because they "assist in, sponsor, or provide financial,

material, or technological support for, or financial or other services to or in support of" such

persons. *Id.* § 1(c)-(d)(i).[2]  The Order also authorized the Secretary of the Treasury, in

consultation with the Secretary of State, to "take such actions, including the promulgation of

rules and regulations, and to employ all powers granted to the President by IEEPA . . . as may be

necessary to carry out the purposes of this order," and to re-delegate such functions as needed.

*Id.* § 7. The Secretary of the Treasury has delegated his authority under EO 13224 to OFAC.  31

C.F.R. § 594.802.

      Persons designated by OFAC pursuant to EO 13224 are referred to as SDGTs.  31 C.F.R.

§ 594.310.  OFAC maintains a list of such individuals or entities whose assets are blocked

---

[2] These provisions of EO 13224 were subsequently amended to provide for a consultative role for the Secretary of Homeland Security.  Exec. Order No. 13284, § 4, 68 Fed. Reg. 4075 (Jan. 28, 2003).  Since OFAC denied Hejeij's petition, these provisions have been further amended. Exec. Order No. 13886, § 1, 84 Fed. Reg. 48041 (Sept. 9, 2019).

pursuant to EO 13224 (or other sanctions-related authorities); this list is known as the SDN List. *See* https://www.treasury.gov/ofac/downloads/sdnlist.pdf.  Once designated, a SDGT may at any time "seek administrative reconsideration" of the designation, or may "assert that the circumstances resulting in the designation no longer apply."  31 C.F.R. § 501.807.  In doing so, the SDGT "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation."  *Id.* § 501.807(a).  Additionally, the SDGT may request a meeting with OFAC.  31 C.F.R. § 501.807(c).  After conducting a review, OFAC will "provide a written decision" to the SDGT. *Id.* § 501.807(d).  OFAC's regulations do not limit the number of times a SDGT may seek to challenge his designation administratively.  *See generally id.* § 501.807.

## C.     OFAC's Designation Of Hejeij

On June 10, 2015, OFAC designated multiple Lebanese businessmen and their companies pursuant to EO 13224 for supporting and providing services to the financial operations and terrorist activities of Hizballah.  Administrative Record ("A.R.") at 0020-21, 0142-45; *see* EO 13224, § 1(d).[3]  Among the designated individuals was Kassem Hejeij.  A.R. at 0020-21, 0142-45.[4]  As OFAC explained, "Hejeij is a Lebanese businessman that maintains

---

[3] The government designated Hizballah pursuant to EO 13224 on October 31, 2001.  67 Fed. Reg. 12633, 12634 (Mar. 19, 2002).

[4] The information described here and below pertains to unclassified information only.  As OFAC's decision was based in part on classified and law enforcement sensitive information, Defendants intend to lodge with the Court, on an *ex parte*, *in camera* basis, a copy of the unredacted record, as well as an affidavit explaining their assertions of the law enforcement privilege, when the parties file the joint appendix required by Local Civil Rule 7(n).  *See* 50 U.S.C. § 1702(c).  Defendants respectfully refer the Court to pages 0005-15 of the administrative record and the exhibits cited therein for a description of the key information considered by OFAC that supports its decisions.

direct ties to Hizballah organizational elements," *id.* at 0021, and he "has provided support to [Hizballah] for a number of years through [MEAB], including by investing in civilian infrastructure that [Hizballah] uses in Lebanon and Iraq," *id.* at 0232.   Specifically, OFAC found that "[i]n mid-2013, a Hizballah finance official met with [] Hejeij, and Hejeij agreed to make changes to bank accounts held by individuals, entities, or charitable institutions affiliated with Hizballah so as to hide ties between money laundering and Hizballah."  *Id.* at 0229.   As part of this scheme, "Hejeij agreed to begin transferring accounts at MEAB that were registered to Hizballah-affiliated individuals or entities to new accounts under different names."  *Id.*   Later in 2013, Hejeij managed commercial ventures in Iraq on behalf of Hizballah, "includ[ing] various energy-related ventures in Iraq as well as certain business activities in Africa and South America used to finance Hizballah."  *Id.*   Revenues from these ventures "were then remitted to Hizballah."  *Id.*   During this time, Hejeij was also "working to open [MEAB] branches . . . in Iraq for Hizballah."  *Id.*; *see also id.* at 0021 (Hejeij "helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies").

Moreover, OFAC found that Hejeij provided support to Hizballah member Adham Tabaja, as well as to Tabaja's affiliated companies in Iraq.  *Id.* at 0021.[5]   Based on its investigation, OFAC determined that "[a]s of early[] 2014, [] Hejeij and an individual whom OFAC has reason to believe is Adham Tabaja[] were responsible for transferring funds from Hizballah companies in Iraq to Hizballah."  *Id.* at 0229.   OFAC further concluded that in mid-

---

[5] OFAC designated Tabaja pursuant to EO 13224 on the same day it designated Hejeij.  *See* A.R. at 0020-21; EO 13224, § 1(d)(i).  The agency determined that Tabaja, *inter alia*, "maintains direct ties to senior Hizballah organizational elements, including the terrorist group's operational component, the Islamic Jihad, and holds properties in Lebanon on behalf of the group."  A.R. at 0020.

2014, Hejeij was an owner of Global Cleaners, an entity that "provided millions of dollars per year to Hizballah." *Id.*; *see also id.* ("As of 2014, Hizballah had previously held investments in Global Cleaners as part of Baghdad's city government's agreement to award 80 . . . municipal contracts to Hizballah-owned companies.").[6]

### D.    Hejeij's Request For Removal From The SDN List

More than two years later, by letter dated October 2, 2017, Hejeij, through counsel, requested that OFAC reconsider its decision to designate Hejeij as a SDGT. *Id.* at 0022-26.  In his letter, Hejeij claimed that "[i]t is [his] intention to show that an insufficient basis exists for his continued designation and/or to demonstrate a fundamental change in circumstances meriting the rescission of his designation." *Id.* at 0023.  In response, OFAC provided Hejeij a March 12, 2018 request for additional information to better evaluate his petition. *Id.* at 0029-32.  OFAC specifically asked Hejeij, *inter alia*, about his relationship with Hizballah, Tabaja, and Global Cleaners. *Id.* at 0029-31.  OFAC also inquired as to Hejeij's "previous and current affiliation and involvement with . . . MEAB[.]" *Id.* at 0031.

Hejeij responded by letter dated June 8, 2018. *Id.* at 0033-55.  Hejeij flatly claimed that he "does not have and has never knowingly had a relationship with Hizballah." *Id.* at 0035.  As to Tabaja, Hejeij acknowledged that he "previously maintained an indirect business relationship with . . . Tabaja, who was formerly a customer at MEAB up until his designation by OFAC." *Id.* at 0039.  According to Hejeij, Tabaja was "an important customer at MEAB" who, along with his companies, "held a number of accounts at MEAB, and received services with respect to a number of banking products prior to being off-boarded following his designation." *Id.*  Hejeij

---

[6] On October 20, 2016, OFAC designated Global Cleaners pursuant to EO 13224 for being owned or controlled by Tabaja.  81 Fed. Reg. 73474 (Oct. 25, 2016); *see also* https://www.treasury.gov/press-center/press-releases/Pages/jl0587.aspx; EO 13224, § 1(c).

additionally admitted that he "developed a relationship with Mr. Tabaja in order to facilitate and support the customer relationship" and that "they would, on occasion, travel together to Iraq on [Hejeij's] private jet." *Id.* Hejeij added that "[d]uring that time Mr. Tabaja had several commercial projects underway in Iraq that he sought to visit; however, [Hejeij's] visits were primarily for the purpose of overseeing the opening of MEAB branches in both Baghdad and Basra." *Id.* With respect to Global Cleaners, Hejeij stated that the company "held accounts at MEAB" but that he "had no relationship" with Global Cleaners "other than indirectly via his role as MEAB's chairman." *Id.* at 0042.

Hejeij also described his roles and responsibilities at MEAB. *Id.* at 0044-45. According to Hejeij, prior to OFAC's designation decision, he was a founder of the bank, served as its chairman, and held a 33.33% ownership interest. *Id.* He further asserted he "does not maintain any current relationship with MEAB" and denied that he has any remaining ownership interest in the bank. *Id.* at 0044. Additionally, Hejeij claimed that during his tenure as chairman of MEAB, he "[was] not aware of the bank's opening an account for any person directly affiliated with Hizballah or any charitable institutions known to be otherwise connected to Hizballah." *Id.* at 0047. He similarly stated that he "has not invested in any infrastructure projects in which he knew were led by or otherwise related to Hizballah or to entities or charitable institutions known to be connected to Hizballah." *Id.* at 0047-48.

In his submission to OFAC, Hejeij also argued that the agency lacked sufficient evidence to designate him under EO 13224. *Id.* at 0052-53. He claimed that he was not involved in the provision of financial services to designated individuals such as Adham Tabaja, and that "his apparent role in any such dealings were mostly ceremonial." *Id.* at 0052. Hejeij further argued

that the cessation of his relationship with MEAB constituted a change in circumstances warranting his removal from the SDN List.  *Id.* at 0053-54.

Also in June 2018, Hejeij sent a letter to OFAC requesting that they enter into an agreement to remove him from the SDN List.  *Id.* at 0167-72.  Specifically, Hejeij sought to begin discussions regarding a potential Terms of Removal Agreement, which would "condition OFAC's rescission of [his] designation on any number of stipulations negotiated between the agency and [Hejeij]."  *Id.* at 0169.  Such terms, in Hejeij's view, might include requiring the severance of ties between Hejeij and Tabaja, as well as a prohibition against extending lines of credit for multiple years.  *Id.* at 0170-71.

Following OFAC's October 17, 2018 and November 28, 2018 disclosure of non-privileged and unclassified summaries of otherwise privileged and classified information related to Hejeij's designation, *id.* at 0226-33, Hejeij supplemented his response to OFAC's request for information by letter dated February 22, 2019, *id.* at 0256-66.[7]  Hejeij emphasized that loans to certain SDGTs were terminated by MEAB after designation of those individuals, *id.* at 0257-58, and he asserted that he has never held an ownership interest in Global Cleaners.  *Id.* at 0259-60; *see also id.* at 0263.  Hejeij also reiterated that his relationship with Tabaja was limited to "facilitating a customer relationship with Tabaja on behalf of MEAB."  *Id.* at 0262. Additionally, Hejeij denied managing commercial ventures in Iraq on behalf of Hizballah, maintaining instead that his travel was "for the purpose of overseeing and effectuating the opening of two MEAB branches in Baghdad and Basra."  *Id.* at 0263.  Hejeij further noted that audits undertaken by MEAB have not indicated that he engaged in any illicit activity identified

---

[7] OFAC provided Hejeij a redacted version of the evidentiary memorandum and supporting exhibits related to his designation on April 19, 2018.  A.R. at 0138-39.

by OFAC, *id.* at 0264, and Hejeij again argued that his "departure and divestment from MEAB constitutes a changes in circumstances negating the basis of his designation," *id.* at 0265; *see also id.* (claiming a change in circumstances based on MEAB's closing of Tabaja's accounts). According to Hejeij, he "does not recall any interactions with any person holding themselves out to be an official representative of Hizballah." *Id.* at 0264.

By letter dated March 13, 2019, Hejeij requested further information related to OFAC's unclassified summaries. *Id.* at 0293-95. OFAC responded two days later, confirming that no additional unclassified information could be released. *Id.* at 0338; *see also id.* at 0227-32.

### E.     OFAC's Denial Of Hejeij's Request

On August 29, 2019, OFAC denied Hejeij's request for reconsideration. *Id.* at 0001-15. The agency reached its decision "[a]fter carefully reviewing all available information," including classified information and material submitted by Hejeij. *Id.* at 0001; *see also id.* at 0007. OFAC found that Hejeij "has not put forth arguments or evidence establishing that an insufficient basis exists for his designation or that the circumstances resulting in the designation are no longer applicable." *Id.* at 0001. To the contrary, the agency determined that it "has reason to believe that [Hejeij] continues to maintain relationships with [Hizballah], and that [Hejeij] was not truthful with OFAC when he claimed to have distanced himself from dealings with MEAB." *Id.* at 0007. OFAC identified six specific grounds for its decision.

First, Hejeij "failed to provide sufficient evidence that he no longer provides support and services to Hizballah." *Id.* at 0001; *see also id.* at 0008-11. Referencing Hejeij's December 2018 interview with the Federal Bureau of Investigation, OFAC noted that Hejeij had demonstrated "intimate familiarity with and ongoing access to senior elements of Hizballah" based on his detailed knowledge of "Hizballah funding mechanisms and business connections,"

as well as "multiple Hizballah-affiliated bankers and money launderers." *Id.* at 0001.  In conjunction with other information available to OFAC, this familiarity and access indicated that Hejeij's "support and services [to Hizballah] have not ceased." *Id.* at 0001-02; *see also id.* at 0014.

Second, OFAC explained that it "has evidence in its possession that undermines [Hejeij's] claim that he has never knowingly had any sort of relationship with Hizballah." *Id.* at 0002.  Specifically, Hejeij "met with a Hizballah finance official in 2013 and agreed to make changes to bank accounts held by individuals, entities, and charitable institutions affiliated with Hizballah in order to hide the ties between money laundering activities and Hizballah." *Id.* OFAC acknowledged Hejeij's denial of any support to Hizballah but found that denial "disingenuous" and "undermin[ing] his overall credibility." *Id.*

Third, OFAC addressed the audits relied on by Hejeij in his request for reconsideration. *Id.* Contrary to Hejeij's argument, OFAC found "the focus of the audits was on the financial position and performance of MEAB . . . at a time when [Hejeij] allegedly had no relationship with [MEAB]." *Id.*  It therefore concluded that the audits "did not assess [Hejeij's] behavior, and thus did not indicate that [he] did not engage in the conduct outlined by OFAC." *Id.*

Fourth, OFAC determined that Hejeij "downplayed his commercial ventures in Iraq, including his involvement with Global Cleaners S.A.R.L." *Id.*  Information within OFAC's possession contradicted Hejeij's assertion that he was not an owner of that entity. *Id.*  Similarly, the agency "has reason to believe that [Hejeij] opened the Iraqi MEAB branches for reasons other than advancing innocuous commercial interests." *Id.*; *see also id.* at 0013-14.

Fifth, OFAC explained that "[i]n addition to having direct ties to Hizballah," Hejeij "also collaborated with Adham Tabaja[.]" *Id.* at 0002.  Notwithstanding Hejeij's denials, OFAC

determined that Hejeij and Tabaja "were responsible for transferring funds from Hizballah companies in Iraq to Hizballah."  *Id.*  Further, Hejeij's relationship with Tabaja through MEAB demonstrated that Hejeij "was personally involved in facilitating a customer relationship with Adham Tabaja," and that he "collaborated closely with Adham Tabaja, a Hizballah member and financier, for the benefit of Hizballah."  *Id.*; *see also id.* at 0013.

Sixth, OFAC concluded that Hejeij had provided false or misleading information regarding his involvement with MEAB.  *Id.* at 0006, 0010-11.  In particular, evidence available to OFAC belied Hejeij's assertions regarding his limited role at MEAB and his current relationship with the bank.  *Id.*  Although Hejeij insisted that he had resigned his position and that he "had no relationship with MEAB," *id.* at 0265; *see also id.* at 0044, OFAC found that he "continues to oversee the day-to-day operations" of the bank and that "the management change was merely a change on paper designed to circumvent sanctions," *id.* at 0003; *see also id.* at 0011, 0014.  As the agency had previously explained to Hejeij, the provision of such false or misleading information was itself a basis to deny his petition.  *Id.*; *see also id.* at 0032.

Additionally, OFAC considered the remaining arguments raised by Hejeij in his petition.  *Id.* at 0011-14.  Noting that Hejeij had been provided unclassified summaries related to his initial designation—constituting the full extent of releaseable information—OFAC rejected Hejeij's claim that he had not been able to respond to OFAC's findings underlying its initial designation decision.  *Id.* at 0011-12, 0014.  As to Hejeij's argument that OFAC did not fully understand MEAB's procedures for extending credit, OFAC explained that the details of such procedures were irrelevant to OFAC's denial decision, which was based on evidence that Hejeij provides support and services to Hizballah, as well as the fact that he provided false information to OFAC.  *Id.* at 0012.  Similarly, MEAB's termination of loans to certain designated individuals did not

13

weigh in favor of removing Hejeij from the SDN List, particularly "as these particular loans . . . did not factor into any part of the basis for [Hejeij's] initial designation." *Id.* at 0012.

OFAC also addressed Hejeij's argument disputing that, as of mid-2014, he was an owner of Global Cleaners. *Id.* at 0012-13. The agency considered the documentation submitted by Hejeij but nonetheless determined that it was insufficient to rebut OFAC's finding. *Id.* The agency added that "[r]egardless, [Hejeij's] association with and provision of financial benefit to [Hizballah] via [Global Cleaners] is but one of many discrete pieces of evidence utilized to support [Hejeij's] initial designation and is not determinative with respect to OFAC's conclusion whether [Hejeij] should be removed from the SDN List." *Id.* at 0013; *see also id.* at 0002.

Moreover, OFAC responded to Hejeij's claim that "his department and divestment from MEAB constitutes a change in circumstances negating the basis of his designation." *Id.* at 0014. As OFAC explained, information available to the agency contradicted Hejeij's assertion; in fact, "not only does [Hejeij] continue to be involved with MEAB, he also continued to provide support or services to [Hizballah] subsequent to his designation." *Id.*

Accordingly, OFAC denied Hejeij's request for reconsideration. *Id.* at 0015.

**F.    Procedural History**

Notwithstanding the then-ongoing administrative process concerning his request for reconsideration, on June 26, 2019, Hejeij filed this lawsuit against Defendants OFAC and Andrea M. Gacki, in her official capacity as Director of OFAC. Compl., ECF No. 1, ¶¶ 11-12. OFAC provided Hejeij its decision regarding his request for reconsideration on August 29, 2019, A.R. at 0001, and Hejeij subsequently amended his complaint on October 11, 2019, Am. Compl., ECF No. 6.

Hejeij's Amended Complaint advances three theories concerning OFAC's designation decisions. *See* Am. Compl. ¶¶ 56-79. First, according to Hejeij, OFAC's decision to deny his request for reconsideration is arbitrary and capricious on the grounds that "Hejeij does not meet the legal criteria for designation under E.O. 13224 and the information assembled and rationalized by OFAC does not provide a reason to believe that he does meet the criteria for designation." *Id.* ¶ 58. Second, Hejeij claims that "Defendants have unreasonably delayed issuance of a decision or determination on" his request to enter into a Terms of Removal Agreement. *Id.* ¶ 63. Third, Hejeij contends that OFAC has failed to provide him adequate notice of the reasons for its June 10, 2015 designation decision, as well as its August 29, 2019 denial decision, in violation of his purported rights under the Fifth Amendment and the APA. *Id.* ¶¶ 64-79. Hejeij seeks a variety of declaratory and injunctive relief, including an order "to rescind Hejeij's designation[,]" an order requiring OFAC "to disclose a fully and sufficiently detailed statement of reasons as to OFAC's decision[s]," and an order "provid[ing] Hejeij's cleared counsel access to the full unredacted administrative record created in support of OFAC's [decisions]." *Id.*, Relief Requested.

## LEGAL STANDARDS OF REVIEW

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *E.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case." *Prisology v. Fed. Bureau of Prisons*, 74 F. Supp. 3d 88, 93 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.  For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein.  *E.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) ("Matters that are not 'outside' the pleadings a court may consider on a motion to dismiss include 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' or documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." (citations omitted)).

Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion.  Fed. R. Civ. P. 12(d); *Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 106-07 (D.D.C. 2014).  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Conant*, 60 F. Supp. 3d at 107.  In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)); *see also id.*

(noting the court's "'limited role . . . in reviewing the administrative record'" and explaining that "[w]hen assessing a summary judgment motion in an APA case, 'the district judge sits as an appellate tribunal'" (citations omitted)).

## DISCUSSION

## I.    OFAC's Decision Was Not Arbitrary, Capricious, Or An Abuse Of Discretion

In his Amended Complaint, Hejeij claims that OFAC's denial of his delisting petition violates the APA, allegedly because he does not meet the criteria for designation under EO 13224. Am. Compl. ¶¶ 56-59 (citing 5 U.S.C. § 706(2)(A)). But as explained below, OFAC's decision readily withstands scrutiny under the applicable APA standards.

### A.    OFAC's Decision Is Entitled To Substantial Deference

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). As relevant here, a court should uphold an agency decision unless it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court may not "substitute its judgment for that of the agency." *Id.* Rather, the agency's decision should be affirmed as long as it is supported by a rational basis. *Id.*; *see also Zevallos*, 10 F. Supp. 3d at 118-19.

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."). The Supreme Court has emphasized the need for courts to grant this heightened deference even when considering constitutional claims. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). Cases involving blocking orders are no exception. *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").

**B.      OFAC's Well-Reasoned Decision Easily Satisfies The APA's Standard**

Applying the highly deferential standard of review required in these circumstances, the Court should uphold OFAC's decision to deny Hejeij's delisting petition. The unclassified portions of the administrative record alone provide an unambiguous, rational basis for the agency's determination that Hejeij provided—and continues to provide—support and services to

Hizballah.  A.R. at 0001-03, 0007-15; *see* EO 13224, § 1(d)(i).[8]  As OFAC explained, its

conclusion was based in part on Hejeij's admitted familiarity with and access to senior elements

of Hizballah.  A.R. at 0001-02, 0008-11, 0014.  Further, and contrary to Hejeij's self-serving

denial of any relationship with Hizballah, OFAC relied on evidence that Hejeij "met with a

Hizballah finance official in 2013 and agreed to make changes to bank accounts held by

individuals, entities, and charitable institutions affiliated with Hizballah in order to hide the ties

between money laundering activities and Hizballah."  *Id.* at 0002.  OFAC also detailed Hejeij's

extensive collaboration with Hizballah member and financier Adham Tabaja.  *Id.* at 0002, 0013-

14.  Rejecting Hejeij's claim that his relationship with Tabaja was limited and professional,[9]

OFAC determined that Hejeij and Tabaja "were responsible for transferring funds from

Hizballah companies in Iraq to Hizballah"; Hejeij "was personally involved in facilitating a

customer relationship with Adham Tabaja"; and Hejeij "collaborated closely with [] Tabaja . . .

for the benefit of Hizballah."  *Id.* at 0002.

　　As to Hejeij's commercial ventures in Iraq, OFAC determined that there is "reason to

believe that [Hejeij] opened the Iraqi MEAB branches for reasons other than advancing

innocuous commercial interests."  *Id.*; *see also id.* at 0013-14.  OFAC also considered Hejeij's

arguments regarding Global Cleaners and MEAB's audits, but reasonably concluded that neither

argument weighed in favor of granting his petition.  *Id.* at 0002, 00012-13, 0229.  Hejeij's

various allegations regarding, for example, Global Cleaners and Tabaja, Am. Compl. ¶¶ 23, 52-

---

[8] As noted above, Defendants respectfully refer the Court to the classified portions of the record, which provide additional information considered by OFAC in connection with its decision.

[9] A finding that Hejeij's relationship with Tabaja was limited and professional would not be sufficient to warrant Hejeij's removal from the SDN List, as EO 13224 does not restrict the circumstances in which the provision of support or services is sanctionable.  *See* EO 13224, § 1(d).  For the same reason, it is ultimately immaterial whether Hejeij "knowingly" provided support or services to Hizballah, *see id.*, though the evidence here establishes that he did.

53, provide no reason to doubt OFAC's fact-finding process or its credibility determinations,

which prior decisions in this Circuit have upheld against similar challenges. *E.g.*, *Holy Land*

*Found.*, 333 F.3d at 162 (rejecting challenge to OFAC's use of hearsay evidence); *Zevallos*, 10

F. Supp. 3d at 123 n.9 (finding unpersuasive plaintiff's argument that "OFAC relied on

'outdated, biased, and incredible sources'"; plaintiff "made these arguments to OFAC, . . . OFAC

concluded that the evidence before it *was* credible, . . . [and] [i]t is not the province of this Court

to reweigh the evidence and reconsider [plaintiff's] arguments on appeal" (citation omitted));

*Kadi*, 42 F. Supp. 3d at 12-23 (holding OFAC's designation was supported by substantial

evidence, notwithstanding plaintiff's argument that "the evidence underlying OFAC's decision is

unreliable").

Additionally, OFAC explained that it was appropriate to deny Hejeij's petition because

Hejeij had provided false or misleading information to OFAC, particularly about his involvement

with MEAB.  A.R. at 0003; *see also id.* at 0006, 0010-12, 0015.  OFAC had previously notified

Hejeij that "[a]ny false or misleading information provided may result in the . . . denial of the

final determination" of his petition.  *Id.* at 0032.  Notwithstanding this admonition, Hejeij

provided false or misleading information in his June 8, 2018 response to OFAC, claiming that

his role at the bank was "mostly ceremonial and that [he] did not have the authority to extend

credit unilaterally."  *Id.* at 0003; *see also id.* at 0012, 0052-53.  Similarly, he falsely or

misleadingly represented that his relationship with MEAB had ended.  *Id.* at 0003.  Contrary to

Hejeij's claim that he "does not maintain any current relationship with MEAB," *id.* at 0044; *see*

*also id.* at 0265, OFAC found that "as of 2018, [Hejeij] continued to use MEAB on behalf of

Hizballah[,]" *id.* at 0003.  Further, Hejeij "continues to oversee the day-to-day operations at

MEAB; the management change was merely a change on paper designed to circumvent

sanctions." *Id.*; *see also id.* at 0011, 0014, 0044-45, 0265.  OFAC's decision is thus fully supported by the administrative record and consistent with the evidence before the agency.  *See State Farm*, 463 U.S. at 43.

Hejeij's arguments in support of his claim under § 706(2)(A) do not compel a different conclusion.  He first asserts that OFAC has been "unwilling[] to seriously consider the facts before it and adjudicate the matter fairly."  Am. Compl. ¶ 5.  This argument, however, is wholly without support in the record.  Rather, the record makes clear that OFAC reached its decision only "[a]fter carefully reviewing all available information, including the evidence in the record regarding [Hejeij's] designation, classified information, and all of the arguments raised in [his] written submissions and the material submitted by [him]."  A.R. at 0001; *see also id.* at 0007 (explaining that "OFAC has carefully considered the arguments and information submitted by [Hejeij]").  OFAC's detailed discussion of the evidence, as well as its responses to each of Hejeij's arguments, confirms as much.  *Id.* at 0001-03, 0008-14.  Moreover, the premise of Hejeij's theory runs counter to the presumption of regularity that attaches to OFAC's decisions, according to which, "in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties."  *United States v. Chem. Found. Inc.*, 272 U.S. 1, 14-15 (1926).

Hejeij fares no better in alleging that OFAC "reflexive[ly] dismiss[ed] . . . exculpatory information provided by Hejeij as being non-germane."  Am. Compl. ¶ 5; *see also id.* ¶¶ 49-51.  As noted above, the record establishes that OFAC carefully considered the information provided by Hejeij.  A.R. at 0001-14.  Moreover, Hejeij misconstrues OFAC's reasoning.  For example, OFAC explained that the specifics of MEAB's operating procedures were not pertinent to its decision, because regardless of those procedures, the evidence before the agency supported a

conclusion that Hejeij continues to provide support and services to Hizballah, and because he

provided false or misleading information to OFAC.  *Id.* at 0012.  Similarly, the termination of

loans from MEAB to certain SDGTs, which Hejeij described in his response to OFAC's

questionnaire, *id.* at 0257-59, did not warrant Hejeij's removal from the SDN List, particularly as

these loans "did not factor into any part of the basis for [Hejeij's] initial designation and [] do not

comprise any part of the basis for this denial," *id.* at 0012.  OFAC likewise considered Hejeij's

arguments regarding Global Cleaners.  *Id.* at 0002, 0012-13.  As the agency explained, those

arguments were insufficient to overcome OFAC's prior finding that, as of mid-2014, he was an

owner of that company, and "[r]egardless, [Hejeij's] association with and provision of financial

benefit to [Hizballah] via [Global Cleaners] is but one of many discrete pieces of evidence

utilized to support [Hejeij's] initial designation and is not determinative with respect to OFAC's

conclusion whether [Hejeij] should be removed from the SDN List."  *Id.* at 0013.

     Moreover, Hejeij cannot establish that, even if OFAC erred in its analysis of some of the

evidence before it, which is not the case, such error was prejudicial.  *See* 5 U.S.C. § 706

(requiring courts reviewing agency action to take "due account . . . of the rule of prejudicial

error").  Given the totality of evidence before the agency, any such error would be harmless and

therefore insufficient to warrant the relief sought by Hejeij.

     As set forth above, the administrative record amply demonstrates that OFAC's decision

satisfies the highly deferential APA standard that the Court must apply here.  *See Zevallos*, 10 F.

Supp. 3d at 123 n.9 (explaining that a court must uphold OFAC's decision if "the evidence

OFAC relied upon as a whole 'adequately supports its ultimate decision'" (citation omitted));

*Holy Land Found.*, 219 F. Supp. 2d at 74 (decision must be affirmed if it "meets the 'minimal

standards of rationality'") (quoting *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*,

705 F.2d 506, 521 (D.C. Cir. 1983)).  Accordingly, there is no basis to conclude that OFAC's

decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).  The

Court should therefore grant Defendants summary judgment on Count I of the Amended

Complaint.[10]

## II.      OFAC Has Not Unlawfully Delayed Any Action

Invoking 5 U.S.C. § 706(1), Hejeij claims in Count II of his Amended Complaint that

"Defendants have unreasonably delayed issuance of a decision or determination on [Hejeij's]

request" to enter into a Terms of Removal Agreement.  Am. Compl. ¶ 63.  But OFAC has

responded to Hejeij's request through its denial decision, rendering this claim moot.  And in any

event, Hejeij has failed to identify an agency action subject to APA review, let alone an action

that is discrete and required as a matter of law.

Hejeij's argument falters at the outset because OFAC has not delayed any decision with

respect to Hejeij's request.  To the contrary, its denial decision reflects OFAC's position that

Hejeij should remain on the SDN List.  A.R. at 0003; *see also id.* at 0007, 0015 (noting Hejeij's

request to enter into Terms of Removal Agreement but nonetheless denying his petition).

Hejeij's claim under § 706(1) is thus at best moot.  *See Zevallos*, 10 F. Supp. 3d at 123 (holding

claim under § 706(1) was moot where OFAC had rendered a decision on a blocked individual's

administrative request; "[a]ll this Court can do is 'compel agency action . . . unreasonably

---

[10] In the event the Court were to find that OFAC's decision was inconsistent with the APA, the
proper remedy would be a remand to the agency, not an order vacating Hejeij's designation.  *See,
e.g.*, *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court
reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate
course is simply to identify a legal error and then remand to the agency, because the role of the
district court in such situations is to act as an appellate tribunal." (citation omitted)).

23

delayed,' i.e., compel OFAC to issue *a* decision—which it has already done" (alteration in original) (citing 5 U.S.C. § 706(1))).[11]

Moreover, given the specific request at issue, Hejeij has failed to state a claim under § 706(1). Judicial review under the APA is limited to final agency action. *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006); *see* 5 U.S.C. § 704. The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. §§ 551(13), 701(b)(2). Each of these categories of action is then further defined. *See id.* §§ 551(4), (6), (8), (10), (11). A "failure to act" is "properly understood as . . . a failure to take one of the agency actions . . . defined in § 551(13)." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) ("*SUWA*"). Additionally, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Id.* at 64.

Here, the response requested by Hejeij is not "agency action." *Id.* at 64. Courts "have long recognized" that the term "agency action," while "expansive," "is not so all-encompassing as to authorize . . . judicial review over everything done" by an agency. *Fund for Animals*, 460 F.3d at 19-20. "Agencies prepare proposals, conduct studies, meet with Members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs." *Id.* Such activities do not constitute agency action. *See id.* Hejeij's correspondence to OFAC makes clear that he has merely sought to begin discussions with OFAC regarding a potential settlement. A.R. at 0169 ("[Hejeij] respectfully requests to enter into discussions regarding a proposed Terms of Removal Agreement with OFAC."); *see also id.* (suggesting that OFAC and Hejeij "[n]egotiat[e] the terms of such an

---

[11] Insofar as OFAC erred in not separately responding to Hejeij's request, such error is harmless. *See* 5 U.S.C. § 706.

agreement"); *id.* at 0170 ("[Hejeij] seeks to discuss with OFAC any proposed conditions that the agency deems necessary . . . ."); *id.* at 0171 (request "to immediately be[gin] discussing the terms and scope of such agreement").[12]  Such a process of discussion and negotiation cannot reasonably be viewed as a "rule," 5 U.S.C. § 551(4), "order," *id.* § 551(6), "license," *id.* § 551(8), "sanction," *id.* § 551(10), or "relief," *id.* § 551(11).  *Cf. Chem. Mfrs. Ass'n v. EPA*, 26 F. Supp. 2d 180, 182 (D.D.C. 1998) (suggesting that process leading to settlement is not final agency action).  Likewise, the ongoing process of negotiating a settlement is not a "discrete" action subject to compulsion under the APA.  *See SUWA*, 542 U.S. at 64-65.

Nor is OFAC required to engage in settlement discussions in response to Hejeij's request. "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ." *Id.* at 65.  Nothing in IEEPA imposes any obligation on OFAC with respect to responding to such requests.  *See* 50 U.S.C. §§ 1701-1708.  The same is true of EO 13224.  *See generally* EO 13224.  Similarly, § 501.807 of OFAC's regulations, on which Hejeij relies, *see* Am. Compl. ¶ 65, establishes the procedures governing delisting petitions, but it does not provide a process or period of time within which OFAC must decide whether to enter into a settlement agreement with a SDGT.  *See* 31 C.F.R. § 501.807.  Indeed, OFAC's willingness to consider a settlement agreement turns on the specific facts before it and a wide variety of wholly discretionary factors, including policy goals, availability of specific remedial measures, OFAC's ability to exercise oversight of a settlement in a particular location (including resource constraints and jurisdictional and foreign policy considerations), and

---

[12] Hejeij's Amended Complaint similarly contemplates that Hejeij's request would not result in an agency decision, but instead may require additional discussions between the parties.  *See* Am. Compl. ¶ 63 (alleging that "OFAC has failed to issue a decision, make a determination, *or otherwise respond in any manner* to Hejeij's request" (emphasis added)).

assessment of litigation risks.  *Cf. Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C.

Cir. 2007) (agency's decision to pursue broader settlement strategy rather than pursue

enforcement actions against individual entities is a nonreviewable judgment "arising from

considerations of resource allocation, agency priorities, and costs of alternatives . . . well within

the agency's expertise and discretion").  Thus Hejeij cannot demonstrate that OFAC was

required to respond to his request, let alone within a specific period of time.  *Cf. Orlov v.

Howard*, 523 F. Supp. 2d 30, 37 (D.D.C. 2007) ("Here, there are no statutory guidelines

compelling USCIS to adjudicate adjustment of status applications within a certain period of time.

Thus, plaintiff plainly cannot assert that USCIS has failed to adjudicate his application within a

time period in which it was *required* to do so.").

The Court should therefore dismiss Count II of the Amended Complaint under Rule

12(b)(1) or 12(b)(6) or, in the alternative, grant summary judgment to Defendants pursuant to

Rule 56.[13]

### III.    OFAC's Decisions Accord With The Fifth Amendment

In Count III and Count V of his Amended Complaint, Hejeij alleges that OFAC infringed

upon his purported Fifth Amendment right to due process by failing to adequately notify him of

the basis for its decision to designate him as an SDGT and its decision to deny his delisting

petition.  Am. Compl. ¶¶ 64-67, 72-75.  Hejeij's arguments, however, are unsupported by fact or

law.  As a foreign person lacking substantial contacts with the United States, Hejeij cannot assert

---

[13] To the extent the Court construes the alleged delay as pertaining to the request for
reconsideration, such an argument would be moot for the reasons discussed above.  It would also
be without merit.  Hejeij sought reconsideration on October 2, 2017, A.R. at 0022-26, and
provided information to OFAC as recently as March 13, 2019, *id.* at 0293-95.  Under these
circumstances, OFAC's August 29, 2019 decision cannot be properly characterized as
unreasonably delayed.

any constitutional rights.  Nevertheless, the notice provided by OFAC accords with any process that Hejeij may be due.

### A.  Hejeij Cannot Assert Constitutional Rights

"[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *accord Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950).  Some constitutional protections may apply when aliens "have come within the territory of the United States and developed substantial connections with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (plurality opinion).  Although the D.C. Circuit has not directly addressed substantial connection claims within the context of an OFAC sanctions case, the Circuit's discussion of the issue in Foreign Terrorist Organization ("FTO") cases is instructive.  *Cf. Kadi*, 42 F. Supp. 3d at 25-26.  In *National Council of Resistance of Iran v. Department of State*, the D.C. Circuit concluded that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account."  251 F.3d 192, 201 (D.C. Cir. 2001).  By contrast, in *32 County Sovereignty Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country."  292 F.3d 797, 799 (D.C. Cir. 2002).

Here, the allegations in Hejeij's Amended Complaint confirm that he cannot assert any constitutional rights.  He acknowledges that he is a foreign national with no physical presence in the United States.  Am. Compl. ¶¶ 10-11.  And although he states that "all of [his] property and interests in property within U.S. jurisdiction was blocked, and U.S. persons are generally prohibited from engaging in transactions with him[,]" *id.* ¶ 15, this allegation does not indicate

that Hejeij in fact has property within the United States; rather, it is merely a description of the legal consequence of his designation, 50 U.S.C. § 1702(a)(1)(B); EO 13224, § 1(d), and as such is insufficient to demonstrate a substantial connection between him and this country.  *See Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (explaining that "conclusory statements and legal conclusions are insufficient to state a plausible basis for standing" (citing *Iqbal*, 556 U.S. at 663)).  In any event, mere property ownership—in the absence of both presence and a substantial connection to this country—would be insufficient under *Verdugo-Urquidez* and *Jifry* to support Hejeij's claim to the protections of the Constitution.  Similarly, Hejeij's allegation that he "is now subject to an effective international boycott[,]" Am. Compl. ¶ 1, is not supported by details in the Amended Complaint or the record, nor is it relevant to the issue of whether Hejeij has had sufficient contacts with the United States.  Thus the allegations Hejeij has set forth are inadequate to demonstrate that he is entitled to Fifth Amendment protections, *see Verdugo-Urquidez*, 494 U.S. at 270-71, particularly in the context of a summary judgment motion, *see Conant*, 60 F. Supp. 3d at 107 ("Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.") (citing *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009))).

Because Hejeij has not demonstrated that he can assert any rights under the Constitution, the Court should dismiss his Fifth Amendment claims for lack of subject-matter jurisdiction under Rule 12(b)(1).[14]

---

[14] Another court in this district recently concluded, in dicta, that "the question of whether a foreign plaintiff may bring a Fifth Amendment due process claim is not a jurisdictional question; if it were, the Circuit's approach in *Jifry* would be inconsistent with the Supreme Court's admonition that a court may not assume jurisdiction for purposes of resolving the merits of a claim." *Joumaa v. Mnuchin*, No. 17-cv-2780, 2019 WL 1559453, at *10 n.13 (D.D.C. Apr. 10, 2019), *appeal filed*, No. 19-5166 (D.C. Cir. June 6, 2019).  Defendants respectfully disagree, as

**B.      Hejeij's Fifth Amendment Due Process Arguments Fail On The Merits**

Even if Hejeij could assert a Fifth Amendment claim—and he cannot—the Court should

nonetheless hold that OFAC's well-established administrative procedures satisfy due process.

"Due process is flexible and calls for such procedural protections as the particular situation

demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citations omitted).  "The essence of due

process is the requirement that a person in jeopardy of serious loss (be given) notice of the case

against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976)

(internal quotation marks and citation omitted).  In the context of OFAC's designation of a

SDGT—where pre-deprivation notice is not required, *Zevallos*, 793 F.3d at 116; *Holy Land*

*Found.*, 333 F.3d at 163-64—due process mandates only that OFAC (1) provide Hejeij "with the

unclassified evidence on which it relied to designate him[,]" (2) allow Hejeij the opportunity "to

contest the propriety and adequacy of that evidence[,]" and (3) permit him "to continue

contesting his designation by filing new delisting requests, meaning that he can make any new

arguments that occur to him and reiterate and expand any arguments he felt received short shrift

on Treasury's last review." *Zevallos*, 793 F.3d at 116-17.  Here, OFAC has satisfied each of

these criteria.

**1.      OFAC Has Provided Hejeij With Unclassified Evidence, Which**
**Adequately Notifies Him Of The Bases Of OFAC's Decisions**

OFAC gave Hejeij access to the unclassified evidence underlying both his 2015

designation and the 2019 decision to deny reconsideration, and he had ample opportunity to

challenge the agency's reliance on that information.  With respect to its June 10, 2015 decision to

---

the D.C. Circuit in *Jifry* did not address the Supreme Court's admonition against assuming
jurisdiction.  *Jifry*, 370 F.3d at 1183.  As Article III standing is a threshold jurisdictional issue,
the Court here should resolve Hejeij's constitutional claim on that basis, without assumptively
reaching the merits.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 101 (1998).

designate Hejeij as a SDGT, OFAC has described to the extent possible, consistent with the

national security interests of the United States, the specific evidence it relied on in determining

that Hejeij meets the criteria for designation under § 1(d) of EO 13224.  The press release and

administrative record made available to Hejeij, including unclassified summaries of classified

information, explains OFAC's determination that Hejeij provides support and services to

Hizballah.  A.R. at 0020-21, 0142-45.  OFAC detailed the various schemes utilized by Hejeij for

the benefit of Hizballah, particularly through MEAB.  *Id.* at 0021, 0229, 0232.  For instance,

OFAC apprised Hejeij of its finding that "[i]n mid-2013, a Hizballah finance official met with []

Hejeij, and Hejeij agreed to make changes to bank accounts held by individuals, entities, or

charitable institutions affiliated with Hizballah so as to hide ties between money laundering and

Hizballah." *Id.* at 0229.  Further, "Hejeij agreed to begin transferring accounts at MEAB that

were registered to Hizballah-affiliated individuals or entities to new accounts under different

names." *Id.*  Similarly, OFAC notified Hejeij of its determination that in 2013, Hejeij "was

working to open [MEAB] branches in Iraq for Hizballah." *Id.*; *see also id.* at 0021 (Hejeij

"helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah

procurement companies").

Additionally, OFAC explained that Hejeij provided support for and services to Hizballah

through a variety of commercial ventures.  *Id.* at 0021, 0229, 0232.  As of 2013, Hejeij managed

commercial ventures in Iraq on behalf of Hizballah, "includ[ing] various energy-related ventures

in Iraq as well as certain business activities in Africa and South America used to finance

Hizballah." *Id.* at 0229.  Revenues from these ventures "were then remitted to Hizballah." *Id.*

Moreover, as of mid-2014, Hejeij was an owner of Global Cleaners, which "provided millions of

dollars per year to Hizballah." *Id.*; *see also id.* ("As of 2014, Hizballah had previously held

investments in Global Cleaners as part of Baghdad's city government's agreement to award 80 . .
. municipal contracts to Hizballah-owned companies."). Similarly, OFAC explained that Hejeij
"has provided support to [Hizballah] for a number of years through [MEAB], including by
investing in civilian infrastructure that [Hizballah] uses in Lebanon and Iraq." *Id.* at 0232; *see
also id.* at 0021 ("Hejeij has . . . invested in infrastructure that Hizballah uses in both Lebanon
and Iraq."). OFAC also described Hejeij's relationship with Hizballah members. *Id.* at 0021,
0229. Most notably, in 2014, Hejeij, along with Hizballah member and financier Adham Tabaja,
"were responsible for transferring funds from Hizballah companies in Iraq to Hizballah." *Id.* at
0229.

OFAC has likewise sufficiently described and provided adequate notice of the basis for
its denial of Hejeij's petition. In its August 29, 2019 letter, OFAC set forth six bases for its
decision. *Id.* at 0001-0003.

- First, OFAC determined that Hejeij has continued to provide support and services to
  Hizballah, based in part on statements made by Hejeij during his December 2018
  interview with the Federal Bureau of Investigation. *Id.* at 0001-02 (noting that Hejeij had
  demonstrated "intimate familiarity with and ongoing access to senior elements of
  Hizballah" based on his detailed knowledge of "Hizballah funding mechanisms and
  business connections," as well as "multiple Hizballah-affiliated bankers and money
  launderers"); *see also id.* at 0008-11.

- Second, in light of evidence before the agency, OFAC did not credit Hejeij's claim "that
  he has never knowingly had any sort of relationship with Hizballah." *Id.* at 0002 (noting
  finding that Hejeij met with Hizballah finance official and helped Hizballah obscure its
  money laundering activities); *see also id.* at 0010.

31

- Third, OFAC explained that the audits of MEAB relied on by Hejeij were not exculpatory, as they "did not assess [Hejeij's] behavior, and thus did not indicate that [he] did not engage in the conduct outlined by OFAC." *Id.* at 0002.

- Fourth, the agency rejected Hejeij's characterization of his commercial ventures in Iraq, including Global Cleaners. *Id.*; *see also id.* at 0013-14.

- Fifth, OFAC stated that its denial decision was based on its finding that Hejeij facilitated a relationship and collaborated with Tabaja for the benefit of Hizballah. *Id.* at 0002; *see also id.* at 0013.

- And sixth, OFAC apprised Hejeij that it denied his petition because he had provided false or misleading information to the agency. *Id.* at 0003, 0006, 0010-11; *see also id.* at 0032 (notifying Hejeij that providing such information would constitute a basis to deny the petition). Specifically, the information in OFAC's possession indicated that Hejeij had not been candid in describing his role at MEAB and his current relationship with the bank. *Id.* at 0003, 0006, 0010-11.

The unclassified portions of the record thus plainly provide Hejeij "a basis from which to understand his designation." *Zevallos*, 10 F. Supp. 3d at 131. Adequate notice under the Fifth Amendment requires nothing more.[15]

Hejeij's arguments to the contrary are unpersuasive. According to Hejeij, due process can only be satisfied if OFAC "grant[s] [him] sufficient access to the administrative record underlying his designation, provid[es] sufficiently detailed unclassified summaries in lieu of the redacted portions of the administrative record, and grant[s] [his] cleared counsel access to the

---

[15] In any event, any error associated with the notice provided by OFAC would be harmless, given that the administrative record amply supports OFAC's decisions. *See Zevallos*, 793 F.3d at 117.

full unredacted administrative record." Am. Compl. ¶ 70.  He makes a similar claim with respect

to the record underlying OFAC's denial decision.  *Id.* ¶ 78; *see also id.* ¶¶ 2, 4, 54 (suggesting

that Hejeij should be permitted access to the classified information in the record).  He is

mistaken.  IEEPA expressly authorizes OFAC to rely upon classified information in an

administrative record to support a designation, *see* 50 U.S.C. § 1702(c), and courts regularly

receive such information on an *ex parte* and *in camera* basis when evaluating challenges to

sanctions programs, *e.g.*, *Fares v. Smith*, 901 F.3d 315, 324-25 (D.C. Cir. 2018) (rejecting

argument that OFAC cannot rely on undisclosed classified and law enforcement privileged

information to support a designation); *Kadi*, 42 F. Supp. 3d at 24 (finding that "it was wholly

proper for OFAC to rely on classified material in making its determination").  In addition, the

D.C. Circuit has repeatedly held that "due process require[s] the disclosure of only the

unclassified portions of the administrative record."  *Holy Land Found.*, 333 F.3d at 164 (internal

quotation marks and citation omitted); *see also Nat'l Council of Resistance of Iran*, 251 F.3d at

208-09 (holding that under due process clause, agency "need not disclose the classified

information to be presented *in camera* and *ex parte* to the court[,]" and that "[t]his is within the

privilege and prerogative of the executive, and we do not intend to compel a breach in the

security which that branch is charged to protect"); *Jifry*, 370 F.3d at 1183-84 (holding that

government satisfied notice requirements of due process by informing pilots, all foreign

nationals, that their airmen certificates had been revoked based on TSA's determination that they

were a "security threat" without requiring agency to disclose the reasons for the determination,

which were classified).

Moreover, "[w]hile courts have recognized that unclassified summaries of classified

information on which an agency relied may be helpful to litigants, they are not required and

'disclosure may not always be possible.'" *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 119 n.2

(D.D.C. 2015) (quoting *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d

965, 983 (9th Cir. 2012)).   There is likewise no basis to permit Hejeij's counsel access to the

unredacted record.   *Cf. Ellsberg v. Mitchell*, 709 F.2d 51, 61 (D.C. Cir. 1983) (rejecting

argument that plaintiff or his counsel should have access to classified materials; "our nation's

security is too important to be entrusted to the good faith and circumspection of a litigant's

lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of

secrecy) or to the coercive power of a protective order").   *Accord Salisbury v. United States*, 690

F.2d 966, 973 n.3 (D.C. Cir. 1982); *Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978).   *See also*

*Dep't of Navy v. Egan*, 484 U.S. 518, 528 (1988) ("It should be obvious that no one has a 'right'

to a security clearance.   The grant of a clearance requires an affirmative act of discretion on the

part of the granting official.").   Hejeij's request is therefore directly contrary to the text of

IEEPA, as well as to binding and persuasive precedent.

**2.      Hejeij Has Had A Meaningful Opportunity To Contest The Propriety
And Adequacy Of The Evidence Relied On By OFAC**

Contrary to Hejeij's assertions, Am. Compl. ¶¶ 1, 3, OFAC has also provided him a

meaningful opportunity to challenge OFAC's June 2015 designation decision.   Indeed, the record

is replete with information submitted by Hejeij.   Early in the reconsideration process, Hejeij

provided approximately 55 pages of arguments and documents to OFAC on a variety of topics,

including his relationship with Hizballah, Tabaja, and MEAB.   A.R. at 0033-88.   Further, after

OFAC released additional unclassified information to Hejeij, *id.* at 00227-32, Hejeij

supplemented his response with 35 more pages of arguments and evidence.   *Id.* at 00256-91.

These submissions, coupled with Hejeij's ability "to continue contesting his designation by filing

new delisting requests," *Zevallos*, 793 F.3d at 116-17; *see* 31 C.F.R. § 501.807, confirms that

Hejeij has been able to meaningfully respond to OFAC's designation decision.  *See Zevallos*, 10

F. Supp. 3d at 131 (explaining that designated individual's "meaningful opportunity to be heard

is further evidenced by the . . . questionnaire OFAC sent to him in response to his renewal of his

reconsideration request, and his opportunity to respond to that."); *Kadi*, 42 F. Supp. 3d at 29

(noting that SDGT was able to rebut evidence "through his own submissions to OFAC,"

including in response to requests for information).[16]

     Thus, even if the Court were to reach the merits of Count III and Count V, it should grant

summary judgment in favor of Defendants pursuant to Rule 56.

## IV.    Hejeij Was Provided With Sufficient Notice Under the APA

     In Count IV and Count VI of his Amended Complaint, Hejeij recasts his notice-based

arguments as APA claims.  Am. Compl. ¶¶ 64-67, 76-79.  While the APA requires OFAC to

provide Hejeij with the administrative record related to its decision once a lawsuit is initiated, *cf.*

*Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("the focal point for judicial review should

be the administrative record"), it does not entitle him to the classified or otherwise protected

portions of that record.  *See, e.g.*, *Sulemane v. Mnuchin*, No. 16-cv-1822, 2019 WL 77428, at *7

(D.D.C. Jan. 2, 2019).  OFAC already provided Hejeij the "true, correct, and complete copy of

the non-privileged documents that were directly or indirectly considered in connection with

OFAC's decision" to deny his delisting petition.  ECF No. 7 ¶ 4.  And the unclassified

summaries of classified information that OFAC provided him—though it was not required to do

so, *FBME Bank Ltd.*, 125 F. Supp. 3d at 119 n.2—represent the extent of additional releasable

---

[16] Accordingly, and in light of the presumption of regularity that attaches to OFAC's decisions,
*see Chem. Found.*, 272 U.S. at 14-15, there is likewise no basis for Hejeij's allegation that
"OFAC has long hid the ball from Hejeij as to the reasons for his designation and moved the
goalposts at its convenience so as to ensure that Hejeij cannot meaningfully contest that
designation."  Am. Compl. ¶ 3.

information at this time.  *See id.*; *see also* A.R. at 0227-32, 0338.  Hejeij fails to identify an entitlement to anything further under the APA.  *See* Am. Compl. ¶¶ 64-67, 76-79.  In any event, as explained above in response to Hejeij's due process claims, whatever level of notice might be required by the APA was satisfied here in light of the administrative record related to OFAC's initial designation decision and its denial decision, including the unclassified summaries of classified information.  *See supra* Part III.  Accordingly, Hejeij's APA claims likewise fail.

The Court should therefore dismiss Count IV and Count VI of the Amended Complaint pursuant to Rule 12(b)(6) or, in the alternative, grant summary judgment to Defendants under Rule 56.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the alternative, for summary judgment, and enter judgment in favor of Defendants on all claims.

Dated November 8, 2019                    Respectfully submitted,

                                          JOSEPH H. HUNT
                                          Assistant Attorney General

                                          DIANE KELLEHER
                                          Assistant Branch Director

                                          */s/Stuart J. Robinson*
                                          STUART J. ROBINSON
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          450 Golden Gate Ave.
                                          San Francisco, CA 94102
                                          Tel: (415) 436-6635
                                          Fax: (415) 436-6632
                                          Email: stuart.j.robinson@usdoj.gov
                                          Cal. Bar No. 267183

                                          Counsel for Defendants