

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID: SDGT-12284

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Dear Mr. Ferrari,

As you are aware, on June 10, 2015, the U.S. Department of the Treasury's Office of Foreign
Assets Control (OFAC) designated your client, Kassem Hejeij, a Specially Designated Global
Terrorist pursuant to Executive Order (E.O.) 13224 and placed him on the list of Specially
Designated Nationals and Blocked Persons (SDN list). Your client's designation was based
upon evidence that he provided support and services to Hizballah, an entity that is also
designated pursuant to E.O. 13224 and on the SDN list. Specifically, your client maintained
direct ties with senior elements in Hizballah and provided support to the group for a number of
years through Middle East and Africa Bank (MEAB), including by working on behalf of
Hizballah to manage commercial ventures in Iraq.

The Reporting, Procedures and Penalties Regulations, 31 C.F.R. Part 501 (collectively, the
Regulations), provide that designated persons may seek administrative reconsideration of their
designation by submitting arguments or evidence that circumstances resulting in their
designation no longer apply, or arguments or evidence that they believe establishes that an
insufficient basis exists for the designation. Designated persons may also propose remedial
steps, such as corporate reorganization, resignation from positions in a blocked entity, or similar
steps that the person believes would negate the basis for designation.

In a letter dated October 2, 2017, your client requested that OFAC reconsider his designation as a
Specially Designated Global Terrorist. After carefully reviewing all available information,
including the evidence in the record regarding your client's designation, classified information,
and all of the arguments raised in your written submissions and the material submitted by your
client, OFAC has determined that your client has not put forth arguments or evidence
establishing that an insufficient basis exists for his designation or that the circumstances resulting
in the designation are no longer applicable.

Specifically, your client failed to provide sufficient evidence that he no longer provides support
and services to Hizballah. 

Accordingly, •

1

and in light of other information available to OFAC regarding your client's prior support for and services to Hizballah, OFAC has reason to believe that your client's support and services have not ceased.

Further, OFAC has evidence in its possession that undermines your client's claim that he has never knowingly had any sort of relationship with Hizballah. Indeed, your client met with a Hizballah finance official in 2013 and agreed to make changes to bank accounts held by individuals, entities, and charitable institutions affiliated with Hizballah in order to hide the ties between money laundering activities and Hizballah. Your client's disingenuous denial of any support or affiliation with Hizballah undermines his overall credibility.

Moreover, OFAC finds unpersuasive your client's assertions regarding the audits conducted of MEAB. Your client claimed that financial audits of MEAB did not indicate that he engaged in the conduct identified by OFAC. Given that the focus of the audits was on the financial position and performance of MEAB as of December 31, 2015, at a time when your client allegedly had no relationship with MEAB, it is OFAC's position that the audit report did not assess your client's behavior, and thus did not indicate that your client did not engage in the conduct outlined by OFAC.

In your February 22, 2019 supplemental response to OFAC's March 12, 2018 questionnaire, your client downplayed his commercial ventures in Iraq, including his involvement with Global Cleaners S.A.R.L. To begin, your client noted that while MEAB provided banking services to Global Cleaners S.A.R.L. during his tenure as Chairman, he otherwise had no relationship with the company. While OFAC acknowledges that your client's name does not appear on the corporate record documents your client provided, information available to OFAC indicates that your client was an owner of Global Cleaners S.A.R.L., which provided millions of dollars per year to Hizballah. Further, your client asserts that his assistance in opening two MEAB branches in Basra and Baghdad, Iraq, constituted nothing more than his exploitation of a business opportunity in a "burgeoning market." OFAC, however, has reason to believe that your client opened the Iraqi MEAB branches for reasons other than advancing innocuous commercial interests.

In addition to having direct ties to Hizballah, your client also collaborated with Adham Tabaja, whom OFAC designated in June 2015 for providing support and services to Hizballah. As of early 2014, your client and an individual whom OFAC has reason to believe is Adham Tabaja, were responsible for transferring funds from Hizballah companies in Iraq to Hizballah. Separately, in your supplemental response, your client stated that his relationship with Adham Tabaja was solely through his role as MEAB chairman and that MEAB only provided Adham Tabaja and his companies banking facilities consistent with MEAB's internal procedures. However, your client's description of his relationship with Adham Tabaja as professional in nature does not diminish the fact that he was personally involved in facilitating a customer relationship with Adham Tabaja. These actions demonstrate that your client collaborated closely with Adham Tabaja, a Hizballah member and financier, for the benefit of Hizballah, notwithstanding your client's allegation that the relationship was strictly professional and prior to Tabaja's designation as a Specially Designated Global Terrorist.

2

In OFAC's March 12, 2018 questionnaire, OFAC noted that providing false or misleading information could result in the denial of the final determination of your client's request for reconsideration. In your June 8, 2018 response to OFAC's questionnaire, you asserted that your client's past role with MEAB was mostly ceremonial and that your client did not have the authority to extend credit unilaterally at the institution. OFAC has reliable evidence in its possession contradicting these assertions. Similarly, you noted that your client "does not maintain any current relationship with MEAB"; "has ceased any and all relationships with MEAB since the time of his designation"; and "upon his resignation and the transfer of his ownership interest in MEAB, [he] ceased his relationship with the bank. Currently [his] sole dealings with MEAB takes place through the bank's lawyers." However, according to information available to OFAC, as of 2018, your client continued to use MEAB on behalf of Hizballah. Moreover, your client continues to oversee the day-to-day operations at MEAB; the management change was merely a change on paper designed to circumvent sanctions.

Consequently, and for the aforementioned reasons, your client's request is denied and your client's name will remain on OFAC's SDN list pursuant to E.O. 13224.

If, in the future, your client decides to pursue the reconsideration process again, he will need to submit a new request, and provide OFAC new evidence as well as any other information that OFAC may request in order to process his request. For expediency purposes, please direct all questions and correspondence to OFAC via the following email: OFAC.Reconsideration@treasury.gov. Your client may also write OFAC at the following:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
Washington, DC 20220

Thank you for your cooperation.

Sincerely,

Andrea Gacki
Director
Office of Foreign Assets Control

3

### Evidentiary Memorandum Review Sheet

Name:     Kassem Hejeij Petition Denial – SDGT 12284

Drafted:     ███████████████

Sanctions Investigator
Counterterrorism Section

Approved:    ███████████████   8/7/19

Supervisory Sanctions Investigator
Counterterrorism Section

Nikole Albowicz  ██████  8/7/19
Assistant Director
CT, HR, and Corruption

Gregory Gatjanis  ████████  8/27/19
Associate Director
Office of Global Targeting

Office of the Chief Counsel
(Foreign Assets Control)

Brad Smith
Deputy Director
Office of Foreign Assets Control  BTS 08/28/2019
    w/ edits to memo
Andrea Gacki    and letter
Director
Office of Foreign Assets Control

TOP SECRET ████████████



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

(U) Case ID SDGT-12284

## EVIDENTIARY MEMORANDUM

(U) MEMORANDUM FOR      Andrea Gacki
Director
Office of Foreign Assets Control

(U) THROUGH:      Gregory T. Gatjanis
Associate Director
Office of Global Targeting

████████████

Section Chief
Counterterrorism
Office of Global Targeting

(U) FROM:      ████████████

Sanctions Investigator
Counterterrorism
Office of Global Targeting

(U) SUBJECT:      Recommendation to deny **Kassem HEJEIJ**'s request for removal from the Specially Designated Nationals and Blocked Persons (SDN) List

### (U) I. Summary

(U) This memorandum recommends the denial of **Kassem HEJEIJ**'s (**HEJEIJ**) request for removal from the SDN List.[1]  On June 10, 2015, the Office of Foreign Assets Control (OFAC) designated **HEJEIJ** as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order (E.O.) 13224.  [Exhibit 1, p. 1]  The information presented below establishes a reason to believe that the basis for **HEJEIJ**'s designation continues to exist and, therefore, the circumstances continue to warrant the blocking of **HEJEIJ**'s property and/or interests in property.

---

[1] (U) The name of the petitioner will appear in **BOLD CAPITAL LETTERS**.  Throughout this memorandum, an asterisk (*) following a name in ALL CAPS denotes an individual or entity whose property and interests in property have been blocked

████████████
TOP SECRET ████████████

TOP SECRET ███████████████████

## (U) II. Procedural Background

(U) On June 10, 2015, OFAC designated **HEJEIJ** as a SDGT pursuant to E.O. 13224 for providing financial, material, or technological support for, or financial or other services to or in support of, HIZBALLAH*.[2] Specifically, **HEJEIJ** maintained direct ties to HIZBALLAH* organizational elements, helped open bank accounts for HIZBALLAH* in Lebanon, and invested in infrastructure that HIZBALLAH* used in both Lebanon and Iraq. [Exhibit 1, p. 2] In addition, **HEJEIJ** collaborated extensively with ADHAM TABAJA*, ultimately in support of HIZBALLAH*. OFAC designated ADAHAM TABAJA* on June 10, 2015, pursuant to E.O. 13224 for providing support and services to HIZBALLAH*. [Exhibit 1, p. 1-2]

(TS ██████████ **HEJEIJ** was designated for his provision of support and services to HIZBALLAH*, both in his capacity as Middle East Africa Bank ("MEAB") chairman and outside of that capacity. [Exhibit 32] To the extent that MEAB is referenced below, it is generally done so to demonstrate that **HEJEIJ** made untrue statements in his petition and response to OFAC's questionnaire about his purported disassociation from MEAB and purported lack of association with HIZBALLAH*.

(U) On October 2, 2017, **HEJEIJ** filed a request for OFAC to reconsider his designation as an SDGT and requested that OFAC send a questionnaire containing "any and all requests for information necessary to consider the rescission of his designation." [Exhibit 2]

(U) Also on October 2, 2017, **HEJEIJ** requested a copy of the administrative record underlying his designation. [Exhibit 10]

(U) On October 11, 2017, OFAC responded to **HEJEIJ**'s counsel acknowledging his request for reconsideration and for a copy of his administrative record. [Exhibit 3]

(U) On December 22, 2017, **HEJEIJ** requested OFAC provide him notice of any electronic surveillance gathered or obtained pursuant to the Foreign Intelligence Surveillance Act used in support of **HEJEIJ**'s designation. [Exhibit 11]

(U) On March 7, 2018, **HEJEIJ** requested immediate disclosure of the administrative record underlying his designation and threatened to pursue litigation to seek its disclosure. [Exhibit 12]

(U) Also on March 7, 2018, **HEJEIJ** requested OFAC provide him with copies of all correspondence or other communications between OFAC and individuals and/or law firms claiming to have represented **HEJEIJ**. [Exhibit 13]

(U) On March 12, 2018, OFAC sent **HEJEIJ** a questionnaire which included questions regarding his relationships with HIZBALLAH* and HIZBALLAH*-affiliated SDGTs. OFAC

---

[2] The Department of State designated HIZBALLAH* pursuant to E.O. 13224 on October 31, 2001, [Exhibit 40, p. 2], and section 219 of the Immigration and Nationality Act, as amended, 8 U.S.C. § 1189 on October 8, 1997. [Exhibit 41, p. 1] HIZBALLAH* is also listed in the Annex to Executive Order 12947 of January 23, 1995. [Exhibit 40, p. 3] OFAC designated HIZBALLAH* pursuant to Executive Order 13582 on August 10, 2012. [Exhibit 42, p. 2]

TOP SECRET ███████████████████

TOP SECRET

noted in the questionnaire that providing false or misleading information in response may result in the denial of **HEJEIJ**'s request for reconsideration. [Exhibit 4]

(U) On April 19, 2018, OFAC sent **HEJEIJ** a redacted copy of the administrative record on which his designation was based. [Exhibit 14]

(U) On June 8, 2018, **HEJEIJ** responded to OFAC's questionnaire. [Exhibit 5] On March 12, 2019, OFAC received a letter dated February 22, 2019 in which **HEJEIJ** provided a supplemental response to OFAC's questionnaire. [Exhibit 27]

(U) On June 11, 2018, **HEJEIJ** requested a non-privileged and unclassified summary of the classified and/or privileged information contained in his administrative record. [Exhibit 15] On October 17, 2018, OFAC provided **HEJEIJ** with a non-privileged, unclassified summary of the information contained in his administrative record. [Exhibit 20] On November 28, 2018, OFAC provided **HEJEIJ** with another unclassified, non-privileged summary of information contained in his administrative record. [Exhibit 21]

(U) Also on June 11, 2018, **HEJEIJ** requested entering into a Terms of Removal agreement with OFAC to effect his removal from the SDN list conditional on refraining from conduct "anathema to U.S. interests." [Exhibit 16, pp. 2-3]

(U) Also on March 13, 2019, **HEJEIJ** requested clarification of the non-privileged, unclassified summary of the information OFAC provided **HEJEIJ** on November 28, 2018. [Exhibit 28] On March 18, 2019, OFAC responded to **HEJEIJ** and stated OFAC had already provided all of the non-privileged, unclassified information contained in **HEJEIJ**'s administrative record. [Exhibit 37]

## (U) III. Basis for Denial of Request

(U) OFAC has carefully considered the arguments and information submitted by **HEJEIJ**. **HEJEIJ** argues that 1) he "does not have and has never knowingly had a relationship with HIZBALLAH\*" [Exhibit 5, p. 3] and that 2) he "does not maintain any current relationship with Middle East Africa Bank (MEAB)" and "upon his resignation and the transfer of his ownership interest in MEAB, he ceased his relationship with the bank. Currently, his sole dealings with MEAB takes place through the bank's lawyers." [Exhibit 5, pp. 12-13]

(S       However, as demonstrated below, OFAC has reason to believe that **HEJEIJ** continues to maintain relationships with HIZBALLAH\*, and that **HEJEIJ** was not truthful with OFAC when he claimed to have distanced himself from dealings with MEAB.

(U//LES) Accordingly, OFAC has reason to believe that the circumstances which led to **HEJEIJ**'s designation continue to exist.

3

TOP SECRET 

[Exhibit 17, p. 1]

[Exhibit 17, p. 1];

[Exhibit 17, p. 2];

[Exhibit 17, p. 2]; and

[Exhibit 17, pp. 2-4],

[Exhibit 17, p. 2]

[Exhibit 17, p. 1]

[Exhibit 17, p. 4; Exhibit 25, p. 2]

[Exhibit 24, p. 1]

4

TOP SECRET

TOP SECRET



[Exhibit 26]

[Exhibit 17, p. 2]

7

[Exhibit 17, p. 3]

[Exhibit 17, p. 3]

Exhibit 17, pp. 2-3]

[Exhibit 17, p. 4]

[Exhibit 17, p. 4]

[Exhibit 18, p. 2]

[Exhibit 22]

'(U)

[Exhibit 39]

5

TOP SECRET

TOP SECRET ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ In totality, these points demonstrate that **HEJEIJ** was untruthful with OFAC in his questionnaire response, in which he stated that he "does not have and has never knowingly had a relationship with HIZBALLAH*." [Exhibit 5, p. 3]  OFAC previously stated to **HEJEIJ** that providing OFAC false or misleading information regarding the basis for **HEJEIJ**'s designation could result in the denial of his request for reconsideration.  [Exhibit 4]

**(U//LES) Additional Information on HEJEIJ's Continued Relationship with MEAB and Provision of Financial, Material, or Technological Support for, or Financial or Other Services to or in Support of, HIZBALLAH***

(U//LES) ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ [Exhibit 19, pp. 1, 5]

(S ████████████████████████████████████████ 9

██████████████████████████████████████ [Exhibit 6]

(TS ████████████████████████████████████

████████████████████████████████████ [Exhibit 8, p. 1]

(U//LES) ████████████████████████████████

██████████████████████████████████████████████

_____

8 (U) ██████████████████████████████████

████████████████████████████████ [Exhibit 23, p. 1]

9 (S ██████████████████████████████████

██████████████████████████████████████████████

6

TOP SECRET ████████████████████████████

TOP SECRET



[Exhibit 7, pp. 1-2]

shows that **HEJEIJ** was not truthful with OFAC when **HEJEIJ** stated that he "does not maintain any current relationship with [MEAB]" and that "upon his resignation and the transfer of his ownership interest in MEAB, he ceased his relationship with the bank." [Exhibit 5, p. 12] Moreover, it demonstrates that **HEJEIJ** continued to provide financial, material, or technological support for, or financial or other services to or in support of, HIZBALLAH* subsequent to his designation on June 10, 2015.



(U//FOUO)

[Exhibit 33, p. 7]

[Exhibit 33, p. 7]

**(U) Other Arguments Raised by HEJEIJ**

(U) **HEJEIJ** argues in Exhibit 5 that OFAC has not provided **HEJEIJ** a meaningful opportunity to respond to the allegations forming the basis for his designation due to significant redactions in the administrative record provided to **HEJEIJ**. [Exhibit 5, p. 20] However, OFAC provided **HEJEIJ** with a non-privileged, unclassified summary of the classified and/or privileged information contained in his administrative record over the course of two letters in October and November 2018. [Exhibit 20; Exhibit 21] These submissions included information from every exhibit which formed the basis of **HEJEIJ**'s designation, which provided **HEJEIJ** sufficient notice for the basis of his designation. On March 13, 2019, **HEJEIJ** asked for clarification of the aforementioned summary [Exhibit 28]; OFAC replied on March 18, 2019, that OFAC's

---

10 (S

11 (U//FOUO)

[Exhibit 38, p. 3]

TOP SECRET

TOP SECRET ███████████████

October and November 2018 letters constituted the extent of the releasable information contained in the administrative record. [Exhibit 37]

(S███████████) Additionally, **HEJEIJ** argues in Exhibit 5 that OFAC lacks a proper understanding of MEAB's operating procedure, which **HEJEIJ** alleges would make it appear that **HEJEIJ** was directly involved in extending financial services and credit to HIZBALLAH* members. [Exhibit 5, p. 20] In particular, **HEJEIJ** argues that MEAB's credit committee and compliance department would vet and provide preliminary approval of loan applications prior to their final approval by **HEJEIJ**, meaning that **HEJEIJ** could not have unilaterally extended credit to HIZBALLAH* members. However, knowledge of such details of MEAB's operating procedures are not germane to the basis for this denial, which is predicated on 1) **HEJEIJ**'s ongoing provision of financial, material, or technological support for, or financial or other services to or in support of, HIZBALLAH*, contrary to representations **HEJEIJ** made to OFAC in response to OFAC's questionnaire, and 2) **HEJEIJ**'s provision of false information regarding his relationship with MEAB. Information ███████████████ demonstrate that **HEJEIJ** ███████ continues to ███████████████ for the benefit of HIZBALLAH* through MEAB [Exhibit 6; Exhibit 19, p. 5; Exhibit 7, pp. 1-2], which wholly contradicts statements by **HEJEIJ** in Exhibit 5 that: 1) **HEJEIJ** did not unilaterally act to support HIZBALLAH* through MEAB, and 2) **HEJEIJ**'s resignation as chairman of MEAB represented a cessation of his MEAB-linked activities. [Exhibit 5, pp. 20-21]

(U) Further, **HEJEIJ** provides information in Exhibit 27 regarding loans which MEAB extended to, and which **HEJEIJ** alleges were terminated subsequent to the designation of, NABIL MAHMOUD ASSAF*, MUHAMMAD BADR-AL-DIN*, ALI MUHAMMAD QANSU*, JIHAD MUHAMMAD QANSU*, ABDUL LATIF SAAD*, and ISSAM AHMAD SAAD*.[12] [Exhibit 27, pp. 2-4] Though OFAC is not disputing **HEJEIJ**'s claim that MEAB terminated such loans following OFAC's February 2018 designation of the aforementioned individuals, the information **HEJEIJ** provided, as well as **HEJEIJ**'s claim that the loans were not sanctionable activity at the time they were extended to these individuals, are not germane to the basis for this denial, as these particular loans 1) did not factor into any part of the basis for **HEJEIJ**'s initial designation and 2) do not comprise any part of the basis for this denial.

(S███████████) Additionally in Exhibit 27, **HEJEIJ** provides information that he claims rebuts statements in OFAC's unclassified summary of classified and/or privileged information contained in **HEJEIJ**'s administrative record that **HEJEIJ**, as of mid-2014, was an owner of GLOBAL CLEANERS SARL*.[13] [Exhibit 27, p. 4-5] Specifically, **HEJEIJ** provides a Lebanese commercial register entry current as of 2018 for GLOBAL CLEANERS*, which **HEJEIJ** purports to identify all persons that have maintained an ownership share in, or a formal position with, GLOBAL CLEANERS*. [Exhibit 27, pp. 13-19] Additionally, **HEJEIJ** provides "Minutes of an Extraordinary General Meeting of Global Cleaners" dated August 20, 2013,

---

[12] (U) On February 2, 2018, OFAC designated ALI MUHAMMAD QANSU* for acting for or on behalf of ADHAM TABAJA* and NABIL MAHMOUD ASSAF*, MUHAMMAD BADR-AL-DIN*, JIHAD MUHAMMAD QANSU*, ABDUL LATIF SAAD*, and ISSAM AHMAD SAAD* for acting for or on behalf of TABAJA's* company, AL-INMAA*. [Exhibit 29]
[13] (U) On October 20, 2016, OFAC designated GLOBAL CLEANERS SARL* for being owned or controlled by ADHAM TABAJA*. [Exhibit 30]

8

TOP SECRET ███████████████

which **HEJEIJ** claims identifies GLOBAL CLEANERS*'s shareholders as of August 2013. [Exhibit 27, pp. 5, 25-26]  **HEJEIJ** further claims that none of the individuals identified in either document acted as an agent or nominee for **HEJEIJ**.  [Exhibit 27, p. 5]

(S ████████████ While OFAC acknowledges that **HEJEIJ** is not identified in either document, the August 2013 minutes **HEJEIJ** provides are not germane to the use of information regarding **HEJEIJ**'s affiliation with GLOBAL CLEANERS* in the basis for **HEJEIJ**'s initial designation.

███████████████████████████████████████████████

[Exhibit 31, pp. 1-2]  Additionally, the 2018 corporate registry for GLOBAL CLEANERS* provided by **HEJEIJ** does not correctly reflect "all persons that have maintained an ownership share in, or a formal position with" the company, as **HEJEIJ** argues. ADHAM TABAJA*, whom GLOBAL CLEANERS* was designated for being owned or controlled by, is not listed as a person associated with GLOBAL CLEANERS*.  Instead, an individual identified as "Mohamad Adham Tabaja," whom based on OFAC's understanding of Arabic naming conventions, OFAC assesses to be a relative of TABAJA*, is named on the commercial registry. [Exhibit 27, p. 17]  Based on TABAJA's* known stake in GLOBAL CLEANERS*, yet his likely relative appearing in his place on the GLOBAL CLEANERS* commercial registry entry, OFAC assesses that this individual is either an agent or nominee of TABAJA*.  Such use of a proxy on the corporate documents by TABAJA* casts doubt on **HEJEIJ**'s claim that no individual on the document acted as an agent or nominee for **HEJEIJ**.  Regardless, **HEJEIJ**'s association with and provision of financial benefit to HIZBALLAH* via GLOBAL CLEANERS* is but one of many discrete pieces of evidence utilized to support **HEJEIJ**'s initial designation and is not determinative with respect to OFAC's conclusion whether **HEJEIJ**'s should be removed from the SDN List. [Exhibit 32]

(S ████████████  Further, in Exhibit 27, **HEJEIJ** contends that his relationship with ADHAM TABAJA* was solely through **HEJEIJ**'s role as MEAB chairman and that MEAB only provided TABAJA* and TABAJA's* companies banking facilities consistent with MEAB's internal procedures. [Exhibit 27, pp. 7-8] ██████████████████[14]██████████████

███████████████████████████████████████████████

[Exhibit 34, p. 2; Exhibit 35, p. 2]  Furthermore, the precise nature of **HEJEIJ**'s relationship with TABAJA* is irrelevant, as **HEJEIJ**'s statements that he was involved in "facilitating a customer relationship with TABAJA*," "providing TABAJA* banking facilities," and "opening and maintenance of accounts" held by TABAJA's* companies [Exhibit 27, p. 7] demonstrate that **HEJEIJ** collaborated closely with TABAJA*, a significant HIZBALLAH* financier.██████████████████████████

(S ████████████ Additionally in Exhibit 27, **HEJEIJ** argues that he traveled to Iraq in late 2013 only to oversee the opening of MEAB branches in Baghdad and Basra, as MEAB sought to open branches in Iraq to serve an expanding customer base as Iraq emerged from a decade of war. [Exhibit 27, p. 8] ████████████████████████████████

[14] (S ████████████████████████████████████████
███████████████████████████████████████████████

9



[Exhibit 34, p. 2; Exhibit 36, p. 2]

(U//LES) Further, in Exhibit 27, **HEJEIJ** argues that due to a lack of specificity in OFAC's disclosure and the significant passage of time since an alleged mid-2013 meeting with a HIZBALLAH* finance official regarding hiding HIZBALLAH* activity at MEAB, **HEJEIJ** is unaware of the meeting OFAC is referring to and cannot recall any interactions with official representatives of HIZBALLAH*. [Exhibit 27, p. 9]  However, **HEJEIJ**'s* lack of recollection of a meeting with a HIZBALLAH* official does not mean that such a meeting did not occur, and OFAC views **HEJEIJ**'s* denials as being self-serving and unpersuasive given **HEJEIJ**'s stated ability to recall the details of his travel to Iraq in 2013 [Exhibit 27, p. 8] coupled with **HEJEIJ**'s additional untruthful statements documented herein.

(S     ) Moreover, in Exhibit 27, **HEJEIJ** stated in response to OFAC's disclosure that "**HEJEIJ** has maintained direct ties with senior elements of HIZBALLAH*," that, if these senior elements included ADHAM TABAJA* and his companies, **HEJEIJ**'s ties to TABAJA* and his companies arose solely in **HEJEIJ**'s role of chairman at MEAB and when MEAB provided those parties services when they were considered legitimate business people and companies prior to their designation. [Exhibit 27, pp. 9-10]

[Exhibit 34, p. 2; Exhibit 35, p. 2]

(S   ) Finally in Exhibit 27, **HEJEIJ** asserts that his departure and divestment from MEAB constitutes a change in circumstances negating the basis of his designation. [Exhibit 27, p. 10]  However, the information contained above in this memo contradicts both **HEJEIJ**'s assertion that he has distanced himself from MEAB and that circumstances have changed such that the basis for **HEJEIJ**'s designation has been negated. As demonstrated above, not only does **HEJEIJ** continue to be involved with MEAB, he also continued to provide support or services to HIZBALLAH* subsequent to his designation.

(U) **HEJEIJ** argues in Exhibit 28 that OFAC's November 28, 2018 disclosure[16] fails to provide sufficient detail as to the allegations underlying the basis for **HEJEIJ**'s designation. [Exhibit 28, p. 3]  However, the information OFAC has provided to **HEJEIJ** represents the extent of the information releasable to **HEJEIJ**, and as noted above, OFAC's Exhibit 20 and Exhibit 21 disclosures to **HEJEIJ** included information from every exhibit that formed the basis of **HEJEIJ**'s designation, providing **HEJEIJ** sufficient information regarding the basis of his designation.

---

[15] (S

[16] (U) This disclosure is contained in Exhibit 21.

Hejeij 0014

TOP SECRET ████████████

## (U) V. Conclusion

(U//LES) The basis for **HEJEIJ**'s designation continues to exist subsequent to his June 2015 designation by OFAC, and **HEJEIJ** was not truthful with OFAC when he stated that he ceased his relationship with MEAB.  Therefore, the circumstances continue to warrant the blocking of his property and/or interests in property.

## (U) VI. Recommendation

(U) That you deny the request for removal of **HEJEIJ** from the SDN List.

✓ _BTS for AML_
✓ _08/28/20__  Agree      _____ Disagree   _____Let's discuss

11

TOP SECRET ████████████

T̶O̶P̶ ̶S̶E̶C̶R̶E̶T̶ ██████████████████████████████

## (U) EXHIBITS

Exhibit 1:    (U) U.S. Department of the Treasury website, Press Release, "Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq," June 10, 2015, available at https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx, accessed August 10, 2018 (U)

Exhibit 2:    (U) Letter from Erich Ferrari to OFAC, Re: Kassem Hejeij – Request for Administrative Reconsideration, October 2, 2017 (U)

Exhibit 3:    (U) Email from OFAC to Erich Ferrari, OFAC Case ID: SDGT-12284, October 11, 2017 (U)

Exhibit 4:    (U) Letter from OFAC to Erich Ferrari, Re: Kassem Hejeij, March 12, 2018 (U)

Exhibit 5:    (U) Letter from Erich Ferrari to OFAC, Re: Response to OFAC's March 12, 2018 Questionnaire, June 8, 2018 (U)

Exhibit 6:    (U//F̶O̶U̶O̶) ████████████████████ (S███████████████

Exhibit 7:    (U) ████████████████ (U//L̶E̶S̶)

Exhibit 8:    (U//F̶O̶U̶O̶) ████████████████████ (TS████████████

Exhibit 9:    (U) U.S. Department of the Treasury website, Press Release, "Treasury Sanctions Hizballah Financier and His Company," January 7, 2016, available at https://www.treasury.gov/press-center/press-releases/Pages/jL0317.aspx, accessed August 10, 2018 (U)

Exhibit 10:    (U) Letter from Erich Ferrari to OFAC, Re: Kassem Hejeij – Request for Administrative Record, October 2, 2017 (U)

Exhibit 11:    (U) Letter from Erich Ferrari to OFAC, Re: SDN Reconsideration Petition Supplement – Global Terrorism Sanctions Regulations 31 CFR Part 594, December 22, 2017 (U)

Exhibit 12:    (U) Letter from Erich Ferrari to OFAC, Re: Request for Immediate Disclosure of Administrative Record, March 7, 2018 (U)

Exhibit 13:    (U) Letter from Erich Ferrari to OFAC, Re: Request for Release of Filings and Records on Behalf of Kassem Hejeij, March 7, 2018 (U)

Exhibit 14:    (U) Letter from OFAC to Erich Ferrari, Re: Kassem Hejeij, April 19, 2018 (U)

T̶O̶P̶ ̶S̶E̶C̶R̶E̶T̶ ████████████████████████



~~TOP SECRET~~ ██████████████

Exhibit 15:  (U) Letter from Erich Ferrari to OFAC, Re: Request for Non-Privileged and Unclassified Summary of Otherwise Privileged Information Contained in the Administrative Record, June 11, 2018 (U)

Exhibit 16:  (U) Letter from Erich Ferrari to OFAC, Re: Request to Enter into Agreement for Removal from OFAC's SDN List, June 11, 2018 (U)

Exhibit 17:  (U//~~FOUO~~) ███████████████████████████████
~~(S~~ ██████████████████████████████████

Exhibit 18:  (U//~~FOUO~~) ██████████████████████ ~~(S~~ ████████

Exhibit 19:  (U) █████████████████████████ (U//~~LES~~)

Exhibit 20:  (U) Letter from OFAC to Erich Ferrari, Re: Kassem Hejeij, October 17, 2018 (U)

Exhibit 21:  (U) Letter from OFAC to Erich Ferrari, Re: Kassem Hejeij, November 28, 2018 (U)

Exhibit 22:  (U) ████████████████████████████████
(U) ████████████████████████

Exhibit 23:  (U) ████████████████████████████████
(U) ████████████████████████

Exhibit 24:  (U) ████████████████████████████████
(U) ████████████████████████

Exhibit 25:  (U) ████████████████████████████████
(U) ████████████

Exhibit 26:  (U) ████████████████████████████

13

~~TOP SECRET~~ ████████████████████████

TOP SECRET 

(U)

Exhibit 27:    (U) Letter from Erich Ferrari to OFAC, Re: Supplemental Response to OFAC's March 12, 2018 Questionnaire, February 22, 2019 (U)

Exhibit 28:    (U) Letter from Erich Ferrari to OFAC, Re: Supplemental Letter Regarding OFAC's November 28, 2018 Disclosure of Additional Information Regarding the Basis of Designation, March 13, 2019 (U)

Exhibit 29:    (U) U.S. Department of the Treasury Website, Press Release, "Treasury Targets Hizballah Financial Network in Africa and the Middle East," February 2, 2018, https://home.treasury.gov/news/press-releases/sm0278, accessed March 15, 2019 (U)

Exhibit 30:    (U) U.S. Department of the Treasury Website, Press Release, "Treasury Sanctions Hizballah Financiers and Operatives," October 20, 2016, https://www.treasury.gov/press-center/press-releases/Pages/jl0587.aspx, accessed March 15, 2019 (U)

Exhibit 31:    (U//FOUO) ███████████████ (S ███████████

Exhibit 32:    (U//FOUO) Designation Pursuant to E.O. 13224: KASSEM HEJEIJ (TS ███████████████

Exhibit 33:    (U//FOUO) ███████████████ (U//FOUO)

Exhibit 34:    (U//FOUO) ███████████ (S ████████

Exhibit 35:    (U//FOUO) ███████████ (S ████████

Exhibit 36:    (U//FOUO) ███████████ (S ████████

Exhibit 37:    (U) Letter from OFAC to Erich Ferrari, Re: Supplemental Letter Regarding OFAC's November 28, 2018 Disclosure of Additional Information Regarding the Basis of Designation of Kassem Hejeij, March 18, 2019 (U)

Exhibit 38:    (U) ███████████████████████

(U)

14

TOP SECRET ███████████████

TOP SECRET ███████████████████████

Exhibit 39: (U) ███████████████████████████████

 (U)

Exhibit 40: (U) Department of State, Office of the Coordinator for Counterterrorism, "Designation of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001," 67 Fed. Reg. 12633 (Mar. 19, 2002) (U)

Exhibit 41: (U) Department of State website, Bureau of Counterterrorism, Foreign Terrorist Organizations, accessed Mar. 8, 2018, https://www.state.gov/j/ct/rls/other/des/123085.htm (U)

Exhibit 42: (U) Executive Order 12947 of January 23, 1995, "Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process," 60 Fed. Reg. 5079 (Jan. 25, 1995) (U)

Hejeij 0019 TOP SECRET ███████████████████████

**Exhibit 1**

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

# Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon And Iraq

6/10/2015

*Action Targets Lebanese Businessmen and their Companies for Supporting Hizballah's Financial Operations and Terrorist Activities*

**WASHINGTON –** The U.S. Department of the Treasury targeted a key Hizballah support network today by designating Hizballah member Adham Tabaja, his company Al-Inmaa Group for Tourism Works, and its subsidiaries, as well as Lebanese businessman Kassem Hejeij and Hizballah Islamic Jihad member Husayn Ali Faour, who provide support and services to Hizballah. Also designated today is Car Care Center, a front company based in Lebanon that supports Hizballah's transportation needs. Treasury's actions against these three individuals and four companies were taken pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism.

Today's actions underscore the direct ties between Hizballah's commercial and terrorist activities, as well as the group's continued exploitation of the legitimate commercial sector for financial, organizational, and material support – from vehicles to investment and construction services – which enable the group to carry out acts of terrorism. Today's actions continue Treasury's ongoing efforts to target Hizballah and its supporters under E.O. 13224, which have recently included actions against a key Hizballah support network based in Africa and a global Hizballah-linked procurement network, among numerous other designations.

"Hizballah is responsible for perpetrating terrorism and fomenting instability worldwide. Hizballah is using so-called legitimate businesses to fund, equip, and organize these subversive activities," said Adam J. Szubin, Acting Under Secretary for Terrorism and Financial Intelligence. "The United States will pursue any individual or company that supports Hizballah's activities."

As a result of this action, all assets of those designated today that are based in the United States or in the control of U.S. persons are frozen, and U.S. persons are generally prohibited from engaging in transactions with them.

**Adham Tabaja, his company Al-Inmaa Group for Tourism Works, and its subsidiaries**

Tabaja is a Hizballah member and majority owner of the Lebanon-based real estate development and construction firm Al-Inmaa Group for Tourism Works. The company's subsidiaries include Al-Inmaa Engineering and Contracting, which operates in Lebanon and Iraq, as well as Lebanon-based Al-Inmaa for Entertainment and Leisure Projects.

Tabaja maintains direct ties to senior Hizballah organizational elements, including the terrorist group's operational component, the Islamic Jihad, and holds properties in Lebanon on behalf of the group. Tabaja's company Al-Inmaa Engineering and Contracting has been one of the largest and most successful real estate businesses in Lebanon since the late 1990s and has been used by Hizballah as an investment mechanism. In 2006, Tabaja used his ties to Hizballah leadership to create a construction monopoly for Al-Inmaa Engineering and Contracting in the Hizballah-controlled Dahieh section of Beirut and Southern Lebanon.

More recently, Tabaja has used the Iraqi branches of Al-Inmaa Engineering and Contracting to obtain oil and construction development projects in Iraq that provide both financial support and organizational infrastructure to Hizballah. Tabaja and his companies have also sought to secure lucrative business contracts in the Green

Hejeij 0020

https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx

Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon And Iraq

# Exhibit 1

Zone areas of Baghdad, Iraq. Tabaja has worked with Hizballah officials, including E.O. 13224-designated Hizballah political official Shaykh Muhammad Kawtharani, for these projects.

**Kassem Hejeij**

Hejeij is a Lebanese businessman that maintains direct ties to Hizballah organizational elements. In addition to his support to Adham Tabaja and his affiliated companies in Iraq, Hejeij has helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies. Hejeij has also invested in infrastructure that Hizballah uses in both Lebanon and Iraq.

**Husayn Ali Faour and Car Care Center**

Faour is a member of Hizballah's Islamic Jihad, the unit responsible for carrying out the group's overseas terrorist activities. Faour has also managed the Lebanon-based Car Care Center, a front company used to supply Hizballah's vehicle needs. More recently, Faour has worked with Tabaja to secure and manage construction, oil, and other projects in Iraq for Al-Inmaa Engineering and Contracting.

For identifying information on the individuals and entities designated today, click *here.*

###



Ferrari & Associates, P.C.

Exhibit 2
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

October 02, 2017

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8106 5197 5540**

Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Treasury Annex
Washington, D.C. 20220

Re:  **Kassem Hejeij—Request for Administrative Reconsideration, 31 C.F.R. § 501.807**
*Executive Order 13224*

Dear Sir or Madam:

On June 10, 2015, the United States Department of the Treasury designated Kassem Hejeij ("Petitioner") as a Specially Designated Global Terrorist[1] ("SDGT") pursuant to Executive Order 13224 ("E.O. 13224"), "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism," for his alleged ties to Hizballah organizational elements and his provision of support and services to Hizballah.[2] E.O. 13224 and its implementing regulations, the Global Terrorism Sanctions Regulations ("GTSR"), 31 C.F.R. Part 594, were promulgated "to disrupt the financial support network for terrorist and terrorist organizations by authorizing the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism."[3]

By means of this submission, and pursuant to 31 C.F.R. § 501.807, Petitioner formally requests the administrative reconsideration of his SDGT designation. Petitioner files this request

---

[1] A "Specially Designated Global Terrorist" is defined as "any person whose property and interests in property are blocked pursuant to [31 C.F.R. § 594.201(a)]"—the regulatory authority codifying the designation criteria of E.O. 13224.

[2] PRESS RELEASE, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq, U.S. Dep't of Treasury*, June 10, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.

[3] PRESS RELEASE, Executive Order 13224, U.S. Dep't of State Office of the Coordinator for Counterterrorism, Sept. 23, 2001, *available at* https://www.state.gov/j/ct/rls/other/des/122570.htm. The Office of the Coordinator for Counterterrorism also noted that E.O. 13224 "authorize[d] the U.S. government to block the assets of individuals and entities that provide support services or assistance to, or otherwise associate with, terrorists and terrorist organizations designated under the Order, as well as their subsidiaries, front organizations, agents, and associates."

Exhibit 2

for reconsideration with the objective of cooperating with OFAC in its review process and remediating any conduct that may have served as the basis for the designation. It is Petitioner's intention to show that an insufficient basis exists for his continued designation and/or to demonstrate a fundamental change in circumstances meriting the rescission of his designation.

## I.  Legal Background

Pursuant to 31 C.F.R. § 501.807, designated individuals and entities may seek the administrative reconsideration of their designation and request to be removed (or "delisted") from the U.S. Department of the Treasury's Office of Foreign Assets Control's ("OFAC") Specially Designated Nationals and Blocked Persons List ("SDN List"). The procedures outlined at § 501.807 are incorporated into the GTSR pursuant to § 594.101, which states – in relevant part – that "the recordkeeping and reporting requirements and license application and other procedures [of Part 501] apply to this part."

In seeking the reconsideration of their designation, a person may assert that the circumstances resulting in the designation are no longer applicable or that the designation was made in error. In doing so, the designated person may also submit arguments and evidence that establishes an insufficient basis exists for the designation or can assert that the circumstances resulting in the designation are no longer applicable.[4] In short, the designated person must argue that the factual basis upon which OFAC made its designation was either in error or is no longer factual.[5] Moreover, the designated person may propose and undertake remedial measures that would effectively negate the basis for the person's designation.[6] OFAC has provided "examples of situations that may result in delisting," such as "a positive change in behavior, the death of an SDN [Specially Designated National], the basis for the designation no longer exists, or the designated was based on mistaken identity."[7]

In considering a request for reconsideration, OFAC will review information provided to it by the designee and may request clarifying, corroborating, or other additional information during the reconsideration process.[8] OFAC "endeavors to send the first questionnaire within 90 days from the date the petition is received by OFAC."[9] OFAC will issue a written decision to the

---

[4] 31 C.F.R. § 501.807(a).

[5] *Zevallos v. Obama*, 793 F. 3d 106, 110 (D.C. Cir. 2015).

[6] 31 C.F.R. § 501.807.

[7] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.

[8] 31 C.F.R. § 501.807.

[9] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx. OFAC may send follow-up questionnaires to a given petitioner, particularly if OFAC "learns new information in response to a questionnaire…"

Exhibit 2

designated person upon concluding its review of the request for reconsideration.[10]   The time in which OFAC renders a decision on a reconsideration petition is dependent on "a range of factors, including: whether OFAC needs additional information, how timely and forthcoming the petitioner is in responding to OFAC's requests, and the specific facts of the case."[11]   There are no limits imposed on the number of times a designated person can request reconsideration of their designation if OFAC has denied earlier requests, although OFAC has stated that if a given petitioner "fail[s] to present new arguments or evidence [following a denial and subsequent petition for reconsideration], and there has been no change in circumstances, OFAC will [presumptively] deny [the] application [for reconsideration]."[12]

## II.   Request for Questionnaire

Pursuant to 31 C.F.R. §§ 501.807 and 594.101, Petitioner respectfully requests the administrative reconsideration of his designation.   In order to aid OFAC in its reconsideration efforts, Petitioner invites OFAC to request any "clarifying, corroborating, or other additional information" deemed necessary to its consideration of this request for reconsideration.[13]   While Petitioner intends to supplement this filing with additional submissions containing information and documents relevant to this request for reconsideration, Petitioner respectfully requests that OFAC also issue a questionnaire containing any and all inquiries or requests for information necessary to consider the rescission of his designation.   The timely disclosure of such requests will enable Petitioner to directly address the issues regarded as most important to OFAC and will allow for the effective disposition of this matter.

## III.   Policy Considerations

OFAC has noted that "[t]he power and integrity of the Office of Foreign Assets Control (OFAC) sanctions derive not only from its ability to designate and add persons to the [SDN List], but also from its willingness to remove persons from the SDN List consistent with the law."[14]   OFAC implements and administers U.S. economic sanctions programs "not to punish [a given target], but to bring about a positive change in behavior."[15]   OFAC has noted that it "seeks to reward those who change behavior and motivate others to do so," including by rescinding the

---

[10] 31 C.F.R. § 501.807.

[11] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.

[12] 31 C.F.R. § 501.807. *See also* Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.

[13] 31 C.F.R. § 501.807.

[14] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.

[15] *Id.*

3

Exhibit 2

designation of those who have undertaken a change in conduct.[16]  As evidence of this underlying policy objective, OFAC has noted that it "removes hundreds of individuals and entities from the SDN List [each year]..."[17]

Petitioner's reconsideration request is intended to aid OFAC in its review of the factual basis for the designation and to allow OFAC to meet the GTSR's policy objectives by gaining confidence that Petitioner has remediated any conduct that may have given rise to his designation.  The GTSR and its underlying Order were promulgated, in part, to targets persons who provide support services or assistance to, or otherwise associate with, designated terrorists and terrorist organizations.  By requesting the reconsideration of his designation and providing OFAC with evidence underscoring that Petitioner has remediated his conduct and is not engaged in the activities giving rise to OFAC's designation, Petitioner seeks to permit OFAC to better realize the objectives of E.O. 13224 and the GTSR and reward designees who change their behavior, thus persuading other designees to do the same and erode the basis for terrorism finance.  For this reason, it is Petitioner's view that his reconsideration request serves the purposes underlying the E.O. 13224 and the GTSR.

## IV.   Conclusion

Undersigned counsel respectfully requests that OFAC respond to this letter with a questionnaire seeking any information or documents necessary to fairly reconsider and rescind Petitioner's designation.  Petitioner is eager to respond to any requests from OFAC and is prepared to engage in good faith to ensure that the reconsideration process moves forward in an expeditious manner.

Please forward all correspondence regarding this request for reconsideration to undersigned counsel's Washington D.C. office:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Petitioner thanks OFAC for its consideration and looks forward to the agency's response.

---

[16] PRESS RELEASE, *Treasury Department Explains Value, Effect of Sanctions*, U.S. Dep't of State, June 12, 2014, *available at* https://geneva.usmission.gov/2014/06/13/treasury-department-explains-value-effect-of-sanctions/.
[17] *Id.*

4

Exhibit 2

Sincerely,

Erich C. Ferrari

Hejeij 0026

Exhibit 3

From:       OFAC.Reconsideration
To:         Erich Ferrari (ferrari@falawpc.com)
Cc:         Tyler Cullis (cullis@falawpc.com)
Subject:    OFAC Case ID: SDGT-12284
Date:       Wednesday, October 11, 2017 11:39:00 AM

October 11, 2017

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004

Re: Kassem Hejeij

Case ID: SDGT-12284

Dear Mr. Ferrari:
This letter acknowledges receipt of your correspondence dated October 2, 2017 to the Office
of Foreign Assets Control (OFAC), requesting a copy of the administrative record and
reconsideration of your client's designation as a Specially Designated National and Blocked
Person (SDN) pursuant to Executive Order 13224.

Your requests are under review. However, the review process can be lengthy, and it is likely
that OFAC will seek additional information from your client before a final determination may
be made concerning your client's designation as an SDN.

For information concerning procedures for removal from the SDN List, please refer to 31
C.F.R. § 501.807. For additional information regarding general licenses pertaining to legal
services and legal fees, please see 31 C.F.R. §§ 594.506 and 594.517, respectively.

For the most expedient communications, please direct all questions and correspondence
regarding your requests to **OFAC.Reconsideration@treasury.gov**. You may also
communicate via telephone at (202) 622-2420, fax at (202) 622-5390, or mailing OFAC at the
following address:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, DC 20220

Please refer to SDGT-12284 cited above in all future correspondence. Also, please provide an
English translation of any documents or correspondence that are prepared in a language other
than English.

Thank you for your cooperation.

Sincerely,

Exhibit 3

Todd Conklin
Assistant Director
Africa/Transnational Threats/Accountability Division
Office of Foreign Assets Control

Exhibit 4



Case ID SDGT-12284

Erich C. Ferrari
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004

MAR 1 2 2018

Re:   KASSEM HEJEIJ

Dear Mr. Ferrari:

This letter responds to your request, dated October 2, 2017, submitted to the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), for reconsideration of your client KASSEM HEJEIJ's designation as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order 13224 (E.O. 13224), Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism."

In order to assist OFAC in evaluating your client's request for reconsideration, please provide detailed narrative responses to the following requests for information in a signed original statement along with, where specified, supporting documentation. For original statements and documents prepared in a language other than English, please include English translations.

1.   Personal Identification.

   a.   Please provide or confirm the following for your client, if applicable:

   - Alternate name(s) or alias(es)
   - Date and place of birth
   - Mailing address(es)
   - Phone number(s)
   - Email address
   - All passport number(s), country(ies)/date(s) of issue, and expiration
   - All personal identification number(s), country(ies)/date of issue, and expiration
   - U.S. visa number(s), type, place/date of issue, and expiration
   - U.S. resident alien number(s) or asylum document number(s)
   - Occupation

2.   Relationship with HIZBALLAH.  Please describe the type of relationship(s) your client currently has, or previously had, with HIZBALLAH, an organizational entity designated pursuant to E.O 13224.  Please be specific to the nature of the relationship, including, but not limited to, details of any official or unofficial roles or titles held within the organization, the names and locations of any organizational elements which your client dealt with in either a limited capacity or on a reoccurring basis, and specific examples of services provided to the organization.

1

Exhibit 4

3.  Relationship with other Specially Designated Nationals and Blocked Persons: Please
    describe the type of relationship(s), including, but not limited to, financial or business
    relationship(s), your client currently has, or previously had, with the following
    individuals and entities. With respect to entities, please describe the nature or title of
    each position, financial interest, or any other relationship(s) your client currently holds or
    previously held with any of the entities listed below, or any other entity owned or
    controlled by, or affiliated with the aforementioned individuals, HIZBALLAH, or any
    other entity or individual on the list of Specially Designated Nationals and Blocked
    Persons (SDN List). A copy of the current SDN List can be found on OFAC's website at
    http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx. If your
    client has ended his relationship(s) with any of the individuals or entities, please explain.

    a.  HUSAYN ALI FA'UR (A.K.A. HOUSEIN ALI FAOUR)
    b.  NABIL MAHMOUD ASSAF (A.K.A. NABIL ASSAF; A.K.A. NABIL
        MUHAMMAD ASSAF)
    c.  MUHAMMAD BADR-AL-DIN, (A.K.A. MOHAMED BADREDDINE; A.K.A.
        MOHAMMED BADREDDINE)
    d.  ALI YOUSSEF CHARARA (A.K.A. ALI YOUSSEF SHARARA; A.K.A. 'ALI
        YUSUF SHARARA)
    e.  HASAN JAMAL-AL-DIN (A.K.A. HASSAN JAMALEDDINE)
    f.  MUHAMMAD AL-MUKHTAR KALLAS (A.K.A. MOHAMAD EL
        MOKHTAR KALLAS; A.K.A. MOHAMED KALLAS)
    g.  ALI MUHAMMAD QANSU (A.K.A. ALI MOHAMED KANSO; A.K.A. ALI
        MOHAMED KANSOU; A.K.A. ALI QANSU)
    h.  JIHAD MUHAMMAD QANSU (A.K.A. JEHAD KANSO; A.K.A. MOHAMED
        KANSO; A.K.A. JIHAD KANSO; A.K.A. JIHAD MOHAMAD KANSO;
        A.K.A. JIHAD KANSOU; A.K.A. JIHAD MOHAMAD KANSOU; A.K.A.
        JEHAD KANSU; A.K.A. JEHAD QANSAWII; A.K.A. JEHAD QANSO;
        A.K.A. JIHAD QANSU)
    i.  ADHAM HUSAYN TABAJA (A.K.A. ADHAM HUSSEIN TABAJA; A.K.A.
        ADHAM TABAJAH)
    j.  ABDUL LATIF SAAD (A.K.A. ABD-AL-LATIF SAD)
    k.  ISSAM AHMAD SAAD (A.K.A. ISAM AHMAD SAAD; A.K.A. ISAM
        AHMAD SAD)
    l.  AL-INMAA ENGINEERING AND CONTRACTING (a.k.a. AL-INMAA
        GROUP FOR ENGINEERING AND CONTRACTING; a.k.a. INMAA 'AL' FOR
        ENGINEERING AND CONTRACTING SARL)
    m.  AL-INMAA FOR ENTERTAINMENT AND LEISURE PROJECTS (a.k.a. AL-
        INMAA FOR ENTERTAINMENTS AND LEISURE PROJECTS; a.k.a. AL-
        INMAA GROUP FOR ENTERTAINMENT AND LEISURE PROJECTS
    n.  AL-INMAA GROUP FOR TOURISM WORKS, LLC (a.k.a. AL-INMAA
        GROUP; a.k.a. AL-INMAA GROUP FOR TOURISM WORK, LLC; a.k.a. AL-
        INMAA GROUP, LLC)
    o.  BLUE LAGOON GROUP LTD. (f.k.a. BLUE LAGOON ALI KANSO GROUP
        (S.L.) LIMITED; a.k.a. BLUE LAGOON ALI KANSO GROUP LTD.; a.k.a.
        BLUE LAGOON GROUP)

2

Exhibit 4

p.   CAR CARE CENTER (a.k.a. CAR CARE CENTER CCC; a.k.a. CAR CARE CENTER COMPANY; a.k.a. "CCC COMPANY")
q.   DOLPHIN TRADING COMPANY LIMITED
r.   GLOBAL CLEANERS S.A.R.L. (a.k.a. GLOBAL CLEANERS, INC.)
s.   GOLDEN FISH LIBERIA LTD
t.   GOLDEN FISH S.A.L. (OFFSHORE)
u.   KANSO FISHING AGENCY LIMITED
v.   SKY TRADE COMPANY
w.   SPECTRUM INVESTMENT GROUP HOLDING SAL (a.k.a. SPECTRUM INTERNATIONAL INVESTMENT HOLDING SAL; a.k.a. SPECTRUM INVESTMENT GROUP HOLDING; a.k.a. SPECTRUM INVESTMENT GROUP SAL HOLDING; a.k.a. SPECTRUM INVESTMENT HOLDING; a.k.a. "SPECTRUM HOLDING")
x.   STAR TRADE GHANA LIMITED

Please provide the length of time and specific dates of employment and describe each position, the duties in each position, the salaries and other benefits (such as stock shares) received in each position, and the date and conditions of separation or retirement from each entity. If your client held a written employment contract, please provide a copy. If your client had some other type of relationship with the aforementioned SDGT entities or individuals, please provide an explanation of such relationship. If your clients ceased employment and/or renounced financial interest(s), please provide official supporting documentation.

4.   <u>Relationship with Financial Institutions</u>. Please describe your client's previous and current affiliation and involvement with Middle East Africa Bank (MEAB) or any other financial institution in Lebanon or abroad.

5.   <u>Relationship with other Entities and Investments</u>. Please provide details of any other entity you own or control in Lebanon, Iraq, or elsewhere. Please also provide any similar details for any entities you may invest in, directly or indirectly, in Lebanon, Iraq, or elsewhere. Please provide the name, address, and type of activity(ies) for each entity, as well as details concerning your position/role in each entity.

6.   <u>U.S. Accounts and Assets</u>. Please detail any interest you currently hold in any financial accounts or real property in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

7.   <u>Legal Proceedings</u>. Have you ever been, or are you currently the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide, including the United States? If so, please describe these legal proceedings and/or provide any supporting official documentation.

You may provide any additional information you deem appropriate that could assist OFAC in the review of your request for reconsideration.

Hejeij 0031

Exhibit 4

If OFAC does not receive a response within 90 days from the date of this letter, OFAC will assume that you do not wish to proceed with your requests for reconsideration and the cases will be administratively closed. If you need an extension of time to respond to this letter, please notify OFAC, in writing, requesting how much additional time you will need.

Any false or misleading information provided may result in the delay and/or denial of the final determination of your requests for reconsideration. Further, knowingly and willfully making materially false, fictitious, or fraudulent statements or concealing a material fact in response to this letter may result in criminal penalties. *See* 18 U.S.C. § 1001.

Please note that OFAC may pose additional questions and documentary requests. For expediency purposes, please direct all questions and correspondence to OFAC via the following email: OFAC.Reconsideration@treasury.gov. You may also call (202) 622-2420, fax (202) 622-5390 or write OFAC at the following:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
Washington, DC 20220

Sincerely,

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
Office of Foreign Assets Control

4



Exhibit 5
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

Ferrari & Associates, P.C.

June 8, 2018

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8126 0280 7799**

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
Office of Global Targeting
United States Department of the Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue, N.W.
Freedman's Bank Building
Washington, D.C. 20220

Re:    **Response to OFAC's March 12, 2018 Questionnaire**[1]
       *SDGT-12284—Kassem Hejeij*

Dear Ms. Thomas:

On June 10, 2015, the United States Department of the Treasury designated Kassem Hejeij ("Respondent") as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 ("E.O. 13224").[2] Respondent was designated for allegedly having ties to Hizballah organizational elements and providing support and services to Hizballah.[3] On October 2, 2017, Respondent filed a formal request for reconsideration of his designation.[4]

On March 12, 2018, OFAC sent undersigned counsel a questionnaire seeking information and/or documents responsive to a series of questions relevant to OFAC's review of Respondent's reconsideration request. Below are responses to those inquiries, as well as a factual and legal analysis underlining why Respondent's designation should be rescinded. Respondent

---

[1] Because this response contains business information and/or other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence confidentially. If OFAC believes that it is required to release this document or any of the information contained herein to the public pursuant to the Freedom of Information Act ("FOIA") or any other federal law, please notify undersigned counsel as soon as possible. Undersigned counsel intends to provide additional information in support of this request for confidentiality.

[2] PRESS RELEASE, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. Dep't of Treasury, June 10, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.

[3] *Id.*

[4] Respondent's reconsideration case has been assigned Case ID SDGT-12284.

Exhibit 5

respectfully reserves the right to supplement this initial response to OFAC's questionnaire with additional information and documents responsive to OFAC's queries become available.

**I.    Response to Questionnaire**

1.  Personal Identification.

    a.  Please provide or confirm the following for your client, if applicable:

        (i)  Alternate name(s) or alias(es)

        **RESPONSE:** There are two alternate spellings to Respondent's name: (1) Hojeij, Kassem; and (2) Hajaig, Kassim.  Respondent does not have any alternate names or aliases.

        (ii) Date and place of birth

        **RESPONSE:** ▉▉▉▉ 1953, Lagos Island, Nigeria.

        (iii) Mailing address(es)

        **RESPONSE:** Roche Street, Bahari Building, Block 1, 16th Floor, Beirut, Lebanon.

        (iv) Phone number(s)

        **RESPONSE:** Respondent's phone number is +9613064064.  Please note that there are other phone numbers that may be associated with his name, and for which he pays the bills.  Those phone numbers are those of his family members whom he supports.

        (v) Email address

        **RESPONSE:** kassemhejeij@gmail.com.

        (vi) All passport number(s), country(ies)/date(s) of issue, and expiration

        **RESPONSE:** (1) LR0038000, Republic of Lebanon, Issuance: Sept. 22, 2017, Expiration: Sept. 22, 2022;

        (2) GA194955, Canada, Issuance Date: Jan. 28, 2014, Expiration Date: Jan. 28, 2024;

Hejeij 0034

Exhibit 5

(3) 513183279, United Kingdom of Great Britain and Northern Ireland, Issuance Date: April 17, 2015, Expiration Date: May 17, 2025; and

(4) 15GA73696, Republic of Gabon, Issuance Date: July 13, 2016, Expiration Date: July 13, 2021.

(vii) All personal identification number(s), country(ies)/date of issue, and expiration

**RESPONSE:**  0000 11818742, Republic of Lebanon, Issuance Date: July 5, 1998, Expiration Date: N/A.

(viii) U.S. visa number(s), type, place/date of issue, and expiration

**RESPONSE:** There is no information responsive to this request.

(ix) U.S. resident alien number(s) or asylum document number(s)

**RESPONSE:** There is no information responsive to this request.

(x) Occupation

**RESPONSE:** Until recently, Respondent was the Mayor of Deir Antar, Lebanon.  He does not currently have any other occupation.

2. Relationship with HIZBALLAH.  Please describe the type of relationship(s) your client currently has, or previously had, with HIZBALLAH, an organizational entity designated pursuant to E.O. 13224.  Please be specific to the nature of the relationship, including, but not limited to, details of any official or unofficial roles or titles held within the organization, the names and locations of any organizational elements which your client dealt with in either a limited capacity or on a reoccurring basis, and specific examples of services provided to the organization.

**RESPONSE:** Respondent does not have and has never knowingly had a relationship with Hizballah.  In fact, Respondent believes that Hizballah has been behind efforts to attack him and his family in southern Lebanon, including by alleging that Respondent is working in some manner with Israel.  Further, Respondent believes that real estate which he owns has been occupied by entities affiliated with Hizballah and that such occupation has occurred in order to intimidate Respondent and his family.

Hejeij 0035

Exhibit 5

3. <u>Relationship with other Specially Designated Nationals and Blocked Persons:</u> Please describe the type of relationship(s), including, but not limited to, financial or business relationship(s), your client currently has, or previously had, with the following individuals and entities. With respect to entities, please describe the nature or title of each position, financial interest, or any other relationship(s) your client currently holds or previously held with any of the entities listed below, or any other entity owned or controlled by, or affiliated with the aforementioned individuals, HIZBALLAH, or any other entity or individual on the list of Specially Designated Nationals and Blocked Persons (SDN List). A copy of the current SDN List can be found on OFAC's website at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx. If your client has ended his relationship(s) with any of the individuals or entities, please explain.

a. HUSAYN ALI FA'UR (A.K.A. HOUSEIN AL FAOUR)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Husayn Ali Fa'ur. If OFAC has information indicating that Respondent has or has had a relationship with such person, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

b. NABIL MAHMOUD ASSAF (A.K.A. NABIL ASSAF; A.K.A. NABIL MUHAMMAD ASSAF)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Nabil Mahmoud Assaf. If OFAC has information indicating that Respondent has or has had a relationship with such person, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

c. MUHAMMAD BADR-AL-DIN, (A.K.A. MOHAMED BADREDDINE; A.K.A. MOHAMMED BADREDDINE)

**RESPONSE:** Respondent recalls meeting Muhammad Badr-al-Din on two (2) prior occasions. First, Respondent met Muhammad Badr-al-Din while visiting his cousin, Faraj Yasin, in Dubai over fifteen (15) years ago. Mr. Yasin introduced Mr. Badr-al-Din as a person working in the automotive oils trade in Dubai. This meeting lasted no more than a few minutes.

4

Exhibit 5

Respondent met Mr. Badr-al-Din for a second time over ten (10) years ago in Beirut during a funeral. Mr. Badr-al-Din introduced himself to Respondent and reminded him of their previous meeting in Dubai five (5) years earlier. This conversation was limited to the exchange of pleasantries. Since this time, Respondent does not recall any other interactions with Mr. Badr-al-Din.

d. ALI YOUSSEF CHARARA (A.K.A. ALI YOUSSEF SHARARA; A.K.A. 'ALI YUSUF SHARARA)

**RESPONSE:** Respondent previously maintained an indirect business relationship with Ali Youssef Charara, as he was formerly a customer at the Middle East Africa Bank ("MEAB") up until his designation by OFAC.[5] Currently, however, Respondent has no relationship with Mr. Charara and has not knowingly had any such relationship since Respondent resigned from his position as MEAB's Chairman in June 2015.

Mr. Charara was an important customer of MEAB, as well as other Lebanese banks, due to his extensive business holdings in Lebanon's telecommunications sector. As a result, Respondent is aware that MEAB opened and maintained accounts on behalf of Mr. Charara during Respondent's time as MEAB's Chairman. Respondent was involved in the initial communications with Mr. Charara regarding the opening of these accounts. Mr. Charara, however, was ultimately referred to MEAB's Compliance Division in order to open the accounts through the bank's standard procedure.

As part of the bank's account opening Know-Your-Customer ("KYC") process, Mr. Charara provided the required information and financial documents required to open accounts at MEAB. Upon successfully satisfying the bank's KYC and due diligence processes, MEAB opened accounts on behalf of Mr. Charara, offered him bills of collection, and provided him a line of credit. While Respondent was not involved in any of the routine decisions to provide banking products to Mr. Charara, Respondent may have signed documents related to the extension of such products to Mr. Charara. That said, any authorizations provided by Respondent were carried out in the ordinary course of business in his role of Chairman, and through MEAB's normal internal procedures. These signatures would have only been provided following review and approval from the relevant bank committees.

---

[5] On January 7, 2016, Ali Youssef Charara was designated by OFAC pursuant to E.O. 13224. *See* RESOURCE CENTER, *Counter Terrorism Designations; Counter Narcotics Removals*, U.S. Dep't of Treasury, January 7, 2016, *available at* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160107.aspx.

Exhibit 5

e.   HASAN JAMAL-AL-DIN (A.K.A. HASSAN JAMALEDDINE)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Hasan Jamal-al-Din.  If OFAC has information indicating that Respondent has or has had a relationship with such person, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

f.   MUHAMMAD AL-MUKHTAR KALLAS (A.K.A. MOHAMED EL MOKHTAR KALLAS; A.K.A. MOHAMED KALLAS)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had a relationship, business or otherwise, with Muhammad al-Mukhtar Kallas.  If OFAC has information indicating that Respondent has or has had a relationship with such person, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

g.   ALI MUHAMMAD QANSU (A.K.A. ALI MOHAMED KANSO; A.K.A. ALI MOHAMED KANSOU; A.K.A. ALI QANSU)

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had a relationship, business or otherwise, with Ali Muhammad Qansu.  If OFAC has information indicating that Respondent has or has had a relationship with such person, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any relationship that may have been entered into unknowingly.

h.   JIHAD MUHAMMAD QANSU (A.K.A. JEHAD KANSO; A.K.A. MOHAMED KANSO; A.K.A. JIHAD KANSO; A.K.A. JIHAD KANSOU; A.K.A. JIHAD MOHAMAD KANSOU; A.K.A. JEHAD KANSU; A.K.A. JEHAD QANSAWH; A.K.A. JEHAD QANSO; A.K.A. JIHAD QANSU)

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had a relationship, business or otherwise, with Jihad Muhammad Qansu.  If OFAC has information indicating that Respondent has or has had a relationship with such person, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

Hejeij 0038

Exhibit 5

i.   ADHAM  HUSAYN  TABAJA  (A.K.A.  ADHAM  HUSSEIN  TABAJA;  A.K.A.
ADHAM TABAJAH)

**RESPONSE:** Respondent previously maintained an indirect business relationship
with Adham Tabaja, who was formerly a customer at MEAB up until his designation
by OFAC.[6]  Currently, Respondent has no relationship with Mr. Tabaja and has not
knowingly had any such relationship since he resigned from his position as MEAB's
Chairman in June 2015.

Mr. Tabaja was an important customer at MEAB, even before Respondent's tenure as
MEAB's Chairman.[7]  Mr. Tabaja and his companies were widely viewed as the most
important contractors in southern Lebanon.  They were also widely known to be
engaged in infrastructure projects in Iraq, including, for instance, the construction of a
residential project in Nasiriya and waste collection in Baghdad, Najaf, and Karbala.
These activities made Mr. Tabaja a significant customer both for MEAB, as well as a
number of other Lebanese banks. As a result, Mr. Tabaja and his companies held a
number of accounts at MEAB, and received services with respect to a number of
banking products prior to being off-boarded following his designation.

As noted above, Mr. Tabaja was a customer of MEAB prior to Respondent assuming
his former role as Chairman of MEAB.  Nonetheless, Respondent developed a
relationship with Mr. Tabaja in order to facilitate and support the customer
relationship.  While Respondent and Mr. Tabaja did not maintain a close personal
relationship, they would, on occasion, travel together to Iraq on Respondent's private
jet.[8]  During that time Mr. Tabaja had several commercial projects underway in Iraq
that he sought to visit; however, Respondent's visits were primarily for the purpose of
overseeing the opening of MEAB branches in both Baghdad and Basra.[9]  During their
travels to Iraq, Respondent did not visit any of the project sites of Mr. Tabaja's
business ventures.[10]

---

[6] On June 10, 2015, Adham Tabaja was designated by OFAC pursuant to E.O. 13224 for maintaining direct ties to
senior Hizballah organizational elements, including Hizballah's operational component-Islamic Jihad—and for
holding properties in Lebanon on behalf of the group, amongst other reasons. *See* PRESS RELEASE, *Treasury
Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. Dep't of Treasury, June 10, 2015,
*available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.
[7] Mr. Tabaja was a customer at MEAB for more than a decade prior to Respondent becoming the bank's Chairman.
As such, Respondent did not have a role in the bank's onboarding of Mr. Tabaja.
[8] Respondent does not recall the dates on which Mr. Tabaja flew on his private jet.  Respondent sold the private
aircraft in July 2015 following his OFAC designation.
[9] Exhibit A—MEAB Baghdad and Basra Branch Opening Documents.
[10] Project site visits of Mr. Tabaja's properties in Iraq and Lebanon were conducted by the bank's credit department
in order to confirm that the properties were being used for the purposes outlined in the credit applications.

7

Exhibit 5

Respondent no longer holds a position or financial interest in MEAB, and thus lacks access to documents regarding what banking products Mr. Tabaja and his related companies received from MEAB. This includes a lack of access to any accounts that may have been provided to Mr. Tabaja during Respondent's tenure as MEAB's Chairman.

Further, Respondent is aware that MEAB is pursuing legal claims against Mr. Tabaja and his companies for debts owed to the bank. These claims arise from debts owed by Mr. Tabaja related to the closing of his and his companies' accounts following his designation by OFAC. Despite the fact that Respondent no longer holds a position nor any ownership interest in MEAB, Mr. Tabaja has threatened Respondent through a mutual acquaintance, and engaged in the physical intimidation of Respondent's family at their home in southern Lebanon. Mr. Tabaja's threats against Respondent occurred as a result of MEAB's legal actions against Mr. Tabaja, as described above. Specifically, Mr. Tabaja's lawyer told Respondent that there will be "consequences" for Respondent if MEAB continues to pursue litigation against Mr. Tabaja.

j.   ABDUL LATIF SAAD (A.K.A. ABD-AL-LATIF SAD)

**RESPONSE:** Abdul Latif Saad was the mayor of a village in southern Lebanon called Aita Al-Jabal. Respondent—formerly the mayor of Deir Intar—met Abdul Latif Saad in late 2010 during a meeting for the Union of Municipalities in the Al Kala-Bent Jbeil District. Due to their positions as municipal leaders of districts in southern Lebanon, Respondent and Mr. Saad engaged in several telephone conversations to discuss municipal matters.

k.   ISSAM AHMAD SAAD (A.K.A. ISAM AHMAD SAAD; A.K.A. ISAM AHMAD SAD)

**RESPONSE:** Respondent believes that Issam Ahmad Saad is the brother of Abdul Latif Saad. Respondent encountered Issam Ahmad Saad on two (2) occasions when members of the Saad family had passed away and Mr. Saad was accepting condolences.

l.   AL-INMAA ENGINEERING AND CONTRACTING (a.k.a. AL-INMAA GROUP FOR ENGINEERING AND CONTRACTING; a.k.a. INMAA 'AL' FOR ENGINEERING AND CONTRACTING SARL)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had a direct relationship with Al Inmaa Engineering and Contracting. Rather, during

Exhibit 5

Respondent's tenure as the Chairman of MEAB, he was aware that the bank maintained accounts on behalf of Al Inmaa Engineering and Contracting, and provided banking products to the company.

Following Al Inmaa Engineering and Contracting's designation by OFAC, MEAB closed all accounts maintained on its behalf and referred the matter to Lebanon's Banking Control Commission for settlement of outstanding debts owed to the bank.[11]

m. AL-INMAA FOR ENTERTAINMENT AND LEISURE PROJECTS (a.k.a. AL-INMAA FOR ENTERTAINMENTS AND LEISURE PROJECTS; a.k.a. AL-INMAA GROUP FOR ENTERTAINMENT AND LEISURE PROJECTS)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had a direct relationship with such entity. If OFAC has information indicating that Respondent has or has had a relationship with such, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

n. AL-INMAA GROUP FOR TOURISM WORKS, LLC (a.k.a. AL-INMAA GROUP; a.k.a. AL-INMAA GROUP FOR TOURISM WORK, LLC; a.k.a. AL-INMAA GROUP, LLC)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had a direct relationship with Al Inmaa Group for Tourism Works, LLC. If OFAC has information indicating that Respondent has or has had a relationship with such an entity, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

o. BLUE LAGOON GROUP LTD. (a.k.a. BLUE LAGOON ALI KANSO GROUP (S.L.) LIMITED; a.k.a. BLUE LAGOON ALI KANSO GROUP LTD.; a.k.a. BLUE LAGOON GROUP)

**RESPONSE:** Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Blue Lagoon Group Ltd. If OFAC has information indicating that Respondent has or has had a relationship with such entity, Respondent respectfully requests that OFAC reveal this information so that he can

---

[11] Exhibit B—MEAB July 9, 2017 Letter to the Secretariat of the Special Investigation Committee, Banque du Liban.

Exhibit 5

either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

p.  CAR CARE CENTER (a.k.a. CAR CARE CENTER CCC; a.k.a. CAR CARE CENTER COMPANY; a.k.a. "CCC COMPANY")

**RESPONSE:** Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Car Care Center.  If OFAC has information indicating that Respondent has or has had a relationship with such entity, Respondent respectfully requests that OFAC reveal this information so that Respondent can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

q.  DOLPHIN TRADING COMPANY LIMITED

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Dolphin Trading Company Limited.  If OFAC has information indicating that Respondent has or has had a relationship with such entity, Respondent respectfully requests that OFAC reveal this information so that Respondent can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

r.  GLOBAL CLEANERS S.A.R.L. (a.k.a. GLOBAL CLEANERS, INC.)

**RESPONSE:**  Respondent is aware that Global Cleaners S.A.R.L. held accounts at MEAB, which were closed following the identification and inclusion of Global Cleaners S.A.R.L. on OFAC's SDN List.  Respondent is not aware as to the nature of said accounts, and Respondent had no relationship with Global Cleaners S.A.R.L. other than indirectly via his role as MEAB's Chairman.

s.  GOLDEN FISH LIBERIA LTD

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Golden Fish Liberia Ltd.  If OFAC has information indicating that Respondent has or has had a relationship with such entity, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

Exhibit 5

t.  GOLDEN FISH S.A.L. (OFFSHORE)

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Golden Fish S.A.L.  If OFAC has information indicating that Respondent has or has had a relationship with Golden Fish S.A.L., Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

u.  KANSO FISHING AGENCY LIMITED

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Kanso Fishing Agency Limited. If OFAC has information indicating that Respondent has or has had a relationship with Kanso Fishing Agency Limited, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

v.  SKY TRADE COMPANY

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Sky Trade Company.  If OFAC has information indicating that Respondent has or has had a relationship with Sky Trade Company, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

w.  SPECTRUM INVESTMENT GROUP HOLDING SAL (a.k.a. SPECTRUM INTERNATIONAL INVESTMENT HOLDING SAL; a.k.a. SPECTRUM INVESTMENT GROUP HOLDING; a.k.a. SPECTRUM INVESTMENT GROUP SAL HOLDING; a.k.a. SPECTRUM INVESTMENT HOLDING; a.k.a. "SPECTRUM HOLDING")

**RESPONSE:**  Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Spectrum Investment Group Holding SAL.  If OFAC has information indicating that Respondent has or has had a relationship with Spectrum Investment Group Holding SAL, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

Hejeij 0043

Exhibit 5

x.  STAR TRADE GHANA LIMITED

**RESPONSE:** Respondent does not knowingly have and has never knowingly had any relationship, business or otherwise, with Star Trade Ghana Limited. If OFAC has information indicating that Respondent has or has had a relationship with Star Trade Ghana Limited, Respondent respectfully requests that OFAC reveal this information so that he can either rebut it or take steps to cease any such relationship that may have been entered into unknowingly.

Please provide the length of time and specific dates of employment and describe each position, the duties of each position, the salaries and other benefits (such as stock shares) received in each position, and the date and conditions of separation or retirement from each entity. If your client held a written employment contract, please provide a copy. If your client had some other type of relationship with the aforementioned SDGT entities or individuals, please provide an explanation of such relationship. If your clients ceased employment and/or renounced financial interest(s), please provide official supporting documentation.

4.  Relationship with Financial Institutions. Please describe your client's previous and current affiliation and involvement with Middle East Africa Bank (MEAB) or any other financial institution in Lebanon or abroad.

**RESPONSE:** Respondent does not maintain any current relationship with MEAB. Following his designation, Respondent tendered his resignation as Chairman and transferred all of his shares in the bank to Ali Hejeij. On June 15, 2015, MEAB's Board of Directors accepted Respondent's resignation and the transfer of his shares.[12] On June 18, 2015, Banque du Liban also accepted Respondent's transfer of his ownership interest in MEAB.[13]

Prior to his OFAC designation, Respondent served as MEAB's Chairman and held an ownership interest in the bank. Specifically, Respondent was elected as MEAB's Chairman on December 28, 2007.[14] In this capacity, he served as the primary representative of the bank and acted on its behalf.[15] Respondent was also one of the founders of MEAB alongside his brother, Hassan Hejeij.[16] As such, Respondent

---

[12] Exhibit C – Minutes of June 15, 2015 Meeting of MEAB's Board of Directors.
[13] Exhibit D – Banque du Liban June 19, 2015 Letter Accepting Respondent's Resignation.
[14] Exhibit E – Minutes of December 28, 2007 Meeting of MEAB's Board of Directors.
[15] Exhibit F – MEAB's Articles of Association. The specific authorities of the Chairman are enumerated in Article 34 of the MEAB's Articles of Association.
[16] Exhibit G – MEAB's Articles of Incorporation.

Exhibit 5

maintained an 33.33% ownership interest in MEAB at the time of its formation and up until his brother's resignation. Respondent did not hold a managerial or operation role at MEAB until he was elected as the bank's Chairman.

Upon his resignation and the transfer of his ownership interest in MEAB, Respondent ceased his relationship with the bank. Currently, Respondent's sole dealings with MEAB takes place through the bank's lawyers. These communications relate to Respondent's provision of information he acquired while MEAB Chairman which are relevant to legal claims the bank has brought against certain customers or former customer.

5. <u>Relationship with other Entities and Investments</u>. Please provide details of any other entity you own or control in Lebanon, Iraq, or elsewhere. Please also provide any similar details for any entities you may invest in, directly or indirectly, in Lebanon, Iraq, or elsewhere. Please provide the name, address, and type of activity(ies) for each entity, as well as details concerning your position/role in each entity.

**RESPONSE:** Respondent does not maintain an interest in any entities in Lebanon, Iraq, or elsewhere. Following his designation, Respondent transferred his financial interest in all entities in which he held an ownership share. Moreover, Respondent abandoned any position(s) held in these same entities after his OFAC designation.

Respondent formerly held an ownership interest in the following companies at the time of his designation:

- Excillis Trading Co. S.A.L.
  - 40% ownership interest
  - Board Member

- Cote d'Azur Hotel S.A.L.
  - 2% ownership interest
  - Vice Chairman

- Groupe Immobilier Pour Le Financement et L'Investissement S.A.L. (GRIMFI)
  - 50% ownership interest
  - Managing Director

- W.A.F. Commercial & Investment Co. S.A.R.L.
  - 38% ownership interest
  - Manager

13

Hejeij 0045

Exhibit 5

- W.A.F. Commercial & Investment Co. S.A.L.
  - 36% ownership interest
  - Vice Chairman

- Brokerage Insurance Services S.A.R.L.
  - 33% ownership interest
  - Partner

- Coco Beach Co. S.A.L.
  - 50% ownership interest
  - CEO/Director

- Coral Beach Co. S.A.L.
  - 50% ownership interest
  - CEO/Director

- Blue Tell Holdings S.A.L.
  - 2% ownership interest
  - CEO/Director

- New Family Beach Co. S.A.L.
  - 50% ownership interest
  - Vice Chairman – General Manager

- Hejeij Group Holding S.A.L.
  - 49.3% ownership interest
  - Vice Chairman – General Manager

- Tyros-Lebanese Company for Development & Tourism S.A.L.
  - 43.9% ownership interest
  - Board Member – General Manager

- BMEKEEN 244 S.A.L.
  - 50% ownership interest
  - Board Member – General Manager

- K-R Investment Co. S.A.L.
  - 70% ownership interest
  - CEO/Director

14

Exhibit 5

- Emirate Lebanese Co. S.A.L.
  - ○ 46.7% ownership interest
  - ○ Vice Chairman – General Manager

As noted above, Respondent no longer maintains an ownership interest in any of these companies and has resigned from all positions held therein.

6. <u>U.S. Accounts and Assets</u>.  Please detail any interest you currently hold in any financial accounts or real property in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

**RESPONSE:**  Respondent does not maintain an interest in any financial accounts or real property in the United States.  However, Respondent had provided a legal fees to his prior legal counsel—Squire Patton Boggs.  Respondent believes that those funds remain on retainer for the provision of legal services authorized pursuant to general license.

On September 29, 2017, undersigned counsel requested specific license authorization from OFAC to receive funds originating from within the United States to its U.S. bank account for payment of legal fees and for reimbursement of incurred expenses related to legal representation of Respondent.  Under the proposed transaction, Squire Patton Boggs, which holds legal fees for certain other authorized legal services provided to Respondent, would transfer said funds to Ferrari Legal P.C.  OFAC has not yet substantively responded to this license request.

7. <u>Legal Proceedings</u>.  Have you ever been, or are you currently the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide, including the United States?  If so, please describe these legal proceedings and/or provide any supporting official documentation.

**RESPONSE:**  Respondent has not been and is not currently the subject of any legal proceedings in any jurisdiction worldwide, including in the United States.

8. <u>Additional Information:</u>  You may provide any additional information you deem appropriate that could assist OFAC in the review of your request for reconsideration.

**RESPONSE:**  During Respondent's time as the Middle East Africa Bank's Chairman, Respondent is not aware of the bank opening an account for any person directly affiliated with Hizballah or any charitable institutions known to be otherwise connected to Hizballah.  Moreover, Respondent has not invested in any infrastructure projects in which

15

Exhibit 5

he knew were led by or otherwise related to Hizballah or to entities or charitable institutions known to be connected to Hizballah.

## II.    Legal Background

### A.    Statutory and Regulatory Framework

#### i.    International Emergency Economic Powers Act

On October 28, 1977, the President signed into law the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, which serves as the statutory basis under which most, but not all, U.S. economic sanctions programs implemented and administered by OFAC are promulgated.[17]   IEEPA was enacted to provide authority for the President to impose economic sanctions "to deal with any unusual or extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."[18]   Such authorities include, but are not limited to, the power to "regulate,…prevent or prohibit,…any importation or exportation of, or dealing in,…transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."[19] The President is authorized to issue Executive orders to impose such sanctions and to promulgate regulations to exercise the authorities contained in IEEPA.[20]

#### ii.    United Nations Participation Act

On December 20, 1945, the President signed into law the United Nations Participation Act ("UNPA"), 22 U.S.C.S. § 287c.  The UNPA authorized the President to impose certain economic sanctions on foreign countries or foreign nationals "whenever the United States is called upon by the Security Council to apply measures which said Council has decided."[21] Further, the UNPA authorized the President to impose such measures "through any agency which he may designate, and under such orders, rules, regulations as may be prescribed by him…"[22]

---

[17] IEEPA serves as the statutory basis, in part, of the Global Terrorism Sanctions Regulations ("GTSR"), 31 C.F.R. Part 594, as well as Executive Order 13224 underlying those regulations.

[18] 50 U.S.C. § 1701(a).

[19] 50 U.S.C. § 1701(a)(1)(B).

[20] 50 U.S.C. § 1704.

[21] 22 U.S.C.S. § 287c(a).

[22] *Id.*

16

iii. Executive Order 13224 and the Global Terrorism Sanctions Regulations, 31
     C.F.R. Part 594

On September 23, 2001, acting pursuant to IEEPA and the UNPA, the President issued
E.O. 13224, "Blocking Property and Prohibiting Transactions With Persons Who Commit,
Threaten to Commit, or Support Terrorism," in order "to disrupt the financial support network
for terrorist and terrorist organizations by authorizing the U.S. government to designate and
block the assets of foreign individuals and entities that commit, or pose a significant risk of
committing, acts of terrorism."[23]

E.O. 13224 blocks all property and interests in property that are in, or that otherwise
come within, the United States or the possession or control of a U.S. person,[24] wherever located,
of the following persons:

1)  foreign persons listed in the Annex to E.O. 13224;

2)  foreign persons determined by the Secretary of State "to have committed, or to pose a
    significant risk of committing, acts of terrorism[25] that threaten the security of U.S.
    nationals or the national security, foreign policy, or economy of the United States";

3)  Persons determined by the Secretary of the Treasury "to be owned or controlled by,
    or to act for or on behalf of [the foregoing]"; and

4)  Persons determined by the Secretary of the Treasury "to assist in, sponsor, or provide
    financial, material, or technological support for, or financial or other services to or in
    support of, such acts of terrorism of" those persons subject to the Order.[26]

---

[23] PRESS RELEASE, Executive Order 13224, U.S. Dep't of State, Sept. 23, 2001, *available at*
https://www.state.gov/j/ct/rls/other/des/122570.htm. The Office of Coordinator for Counterterrorism also noted that
E.O. 13224 "authorize[d] the U.S. government to block the assets of individuals and entities that provide support
services or assistance to, or otherwise associate with, terrorist and terrorist organizations designated under the Order,
as well as their subsidiaries, front organizations, agents, and associates."

[24] For purposes of E.O. 13224, U.S. persons are defined as any U.S. citizen, permanent resident alien, entity
organized under the laws of the United States (including foreign branches), or any person located in the United
States. *See* § 3(c) of E.O. 13224 (Sept. 23, 2001).

[25] For purposes of E.O. 13224, "terrorism" is defined as "an activity that (i) involves a violent act or an act
dangerous to human life, property, or infrastructure; and (ii) appears to be intended – (A) to intimidate or coerce a
civilian population; (B) to influence the policy of a government by intimidation or coercion; or (C) to affect the
conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking." *See* § 3(d) of E.O.
13224.

[26] § 1 of E.O. 13224 (Sept. 23, 2001).

Hejeij 0049

Exhibit 5

E.O. 13224 prohibits U.S. persons from engaging in any transaction or dealing in property or interests in property blocked pursuant to the Order. This includes the making or receiving of any contribution of funds, goods, or services to or for the benefit of persons subject to the Order.

Section 7 of E.O. 13224 authorizes the Secretary of the Treasury "to take such action, including the promulgation of rules and regulations, and to employ all powers granted by the President by IEEPA and UNPA as may be necessary to carry out the purposes of th[e] order."[27] On June 6, 2003, OFAC, acting under a delegation of authority from the Secretary of the Treasury, promulgated the Global Terrorism Sanctions Regulations ("GTSR"), 31 C.F.R. Part 594, to implement and codify the provisions of E.O. 13224.[28]

Consistent with Executive Order 13224, the GTSR blocks the property and interests in property of the following persons that are in or come within the United States or the possession or control of a U.S. person, wherever located, of persons designated under the Order.[29] The names of persons whose property and interests in property are blocked pursuant to § 594.201 are incorporated into OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List") with the identifier "[SDGT]."[30]

In addition, 31 C.F.R. § 594.204 prohibits U.S. persons from engaging in any transaction or dealing in property or interests in property of persons whose property and interests in property are blocked by 31 C.F.R. § 594.201(a). This includes the receipt, or contribution funds, goods, or services from, or by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to § 594.201(a). This prohibition applies to services performed in the U.S. or by U.S. persons: (1) on behalf of or for the benefit of a person blocked by § 594.201(a), or (2) with respect to property interests subject to § 594.201.[31]

iv.    Delisting Procedures

Designated persons "may seek administrative reconsideration of his, her, or its designation…or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded…"[32] Specifically, blocked parties "may submit

---

[27] In addition, § 7 of E.O. 13224 permits the Secretary of the Treasury "to redelegate any of these functions to other officers and agencies of the [U.S.] Government."

[28] See Global Terrorism Sanctions Regulations, U.S. Dep't of Treasury, 68 FED. REG. 34196 (June 6, 2003), available at https://www.gpo.gov/fdsys/pkg/FR-2003-06-06/pdf/03-14251.pdf.

[29] 31 C.F.R. § 594.201(a).

[30] See NOTE 2 to 31 C.F.R. § 594.201(a).

[31] 31 C.F.R. § 594.406.

[32] 31 C.F.R. § 501.807.

18

arguments or evidence that the person believes establishes that insufficient basis exists for the designation."[33]   Blocked persons "may [also] propose remedial steps on the person's part...which the person believes would negate the basis for designation."[34]

OFAC has published Frequently Asked Questions ("FAQs") regarding petitions for removal from its SDN List, which provide additional guidance relating to arguments that can be made by designated parties seeking rescission of their OFAC designation.[35]   OFAC identifies "examples of situations that may result in delisting" to include: "a positive change in behavior, the death of an SDN, the basis for the designation no longer exists, or the designation was based on mistaken identity."[36]

### B. Legal Analysis

#### i. Basis and Criteria for Designation

Nearly three years ago, OFAC designated Respondent for his alleged provision of support and services to Hizballah.[37]   OFAC's press release announcing Respondent's designation alleged that Respondent:

1) Maintains direct ties to Hizballah organizational elements, including by his provision of support to Adham Tabaja and affiliated companies in Iraq;[38]

2) Has helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies; and

3) Has invested in infrastructure that Hizballah uses in both Lebanon and Iraq."[39]

Presumably, these specific allegations serve as the factual basis underlying OFAC's determination that Respondent meets the criteria for designation under E.O. 13224.

---

[33] 31 C.F.R. § 501.807(a).

[34] *Id.*

[35] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.

[36] *Id.*

[37] PRESS RELEASE, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. Dep't of Treasury, June 10, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.

[38] *Id.*

[39] *Id.*

Hejeij 0051

Exhibit 5

On April 19, 2018, OFAC provided Respondent with a copy of the unclassified version of the administrative record underlying his designation pursuant to E.O. 13224. All substantive portions of this administrative record are redacted in the version provided to Respondent and thus remain inaccessible to him. This includes, for instance, the section of the record identifying the factual and legal basis for Respondent's designation (titled "Basis for Designation of Kassem Hejeij"). Nevertheless, the unclassified version of the administrative record provides clarity as to the legal provision under which OFAC designated Respondent. According to the evidentiary memorandum contained within OFAC's administrative record, Respondent was designated for "provid[ing] financial, material, or technological support for, or other services to or in support of, Hizballah, a person designated pursuant to E.O. 13224."

   ii.   Sufficiency of the Evidence

Due to the significant redactions contained within OFAC's unclassified version of the administrative record disclosed to Respondent, Respondent is unable to provide any assessment as to the sufficiency of the evidence before the agency. He is thus effectively foreclosed from having a meaningful opportunity to respond to the evidence in the agency's possession. For example, OFAC has not identified those Hizballah organizational elements with which Respondent is alleged to maintain ties nor the nature of any such ties. Further, outside of Mr. Tabaja and Mr. Charara, OFAC has failed to provide the names of the persons or entities tied to Hizballah for which Respondent allegedly opened bank accounts and provided credit. OFAC has also failed to disclose the infrastructure projects in Lebanon and Iraq tied to Hizballah in which Respondent is alleged to have invested. The absence of this information undermines Respondent's ability to meaningfully respond to OFAC's allegations, instead leaving Respondent speculating as to OFAC's evidentiary basis for making these allegations.

Insofar as Respondent is forced to speculate as to the basis for OFAC's designation action, Respondent believes his designation may be based on MEAB's prior relationship with Mr. Tabaja and Mr. Charara. Due to his status as MEAB's Chairman, Respondent's signature would be located on documents extending banking facilities and other bank products to customers, including those extended to Mr. Tabaja and Mr. Charara. As such, and without a proper understanding of MEAB's operating procedures, it may appear that Respondent was involved in the extension of financial services and credit to Mr. Tabaja and Mr. Charara, and their companies.

However, Respondent did not have any direct involvement in extending financial services to either of these individuals or their companies, and his apparent role in any such dealings were mostly ceremonial. For instance, in order to extend banking facilities or credit to bank customers, MEAB would send the proposed customer's files to the bank's credit committee to determine the feasibility of the endeavor. If approved by MEAB's credit committee, the matter

Exhibit 5

would then be submitted to the compliance department to determine compliance with local or foreign laws prior to extending services to any particular customer. These compliance processes included checking the name of the proposed client against a number of foreign sanctions lists. If approved by the compliance department, the matter would then be referred to the Risk Management Department to identify any risks arising from the extension of banking facilities or credit to the customer. The matter would then be re-examined by the credit committee for final approval regarding the proposed product extension. If the proposed extension of credit exceeded the bank's internal limits, it would be forwarded to the Chairman for final approval.

Given these procedures, it is entirely possible that Respondent's signature was attached to MEAB's extension of banking facilities or credit to Mr. Tabaja and Mr. Sharara and related companies. Respondent, however, would only sign in reliance upon the representations made by other departments which had reviewed the proposed dealings. Thus, as Chairman, Respondent would not, and could not, unilaterally provide for any such extensions of credit to any specific customers, including Mr. Tabaja or Mr. Charara.

Further, Respondent tendered his resignation as Chairman of MEAB following his OFAC designation. At that time he also relinquished his ownership interests in the bank. As such, Respondent has ceased any and all relationships with MEAB since the time of his designation. To the extent that Respondent's designation is based on his prior role as Chairman and MEAB's prior servicing of accounts and extension of credit to Mr. Tabaja and Mr. Sharara, Respondent respectfully contends that there has been a fundamental change in circumstances warranting the rescission of his designation.

## C. Change in Circumstances

"The power and integrity of OFAC's sanctions derive not only from its ability to designate and add persons to the [SDN List], but also from its willingness to remove persons from the SDN List consistent with the law."[40] As a result, OFAC has stated that "[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior."[41] Evidencing this commitment to use sanctions to provoke a behavioral change in the targeted person, OFAC noted that it has "remove[d] hundreds of individuals and entities from the SDN List."[42] OFAC's removal of parties from its SDN List typically follows a petition for reconsideration, wherein evidence is provided to show that the factual basis for the designation was erroneous or that a fundamental change in circumstances has occurred .

---

[40] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.
[41] *Id.*
[42] *Id.*

Exhibit 5

Respondent respectfully contends that there is no lawful basis under which to maintain Respondent's designation under E.O. 13224. He is not engaged in the provision of financial, material, or technological support for, or financial or other services to or in support of, Hizballah. As evident from Respondent's actions subsequent to his designation, he is deeply motivated to remediate any conduct that may have served as the basis for his designation by OFAC. Respondent hopes that OFAC pursues this reconsideration matter in recognition of the fact that its policy objectives are achieved when designated parties either correct the factual record or remediate their conduct so as to nullify the alleged harm to U.S. national security and foreign policy and are thus removed from OFAC's sanctions lists. Respondent has already shown a clear change in circumstances—relinquishing his financial interests and positions—that would negate his ability to participate in the type of conduct alleged in OFAC's designation action targeting Respondent.

## IV.    Conclusion

For the foregoing reasons, Respondent respectfully requests that OFAC review the factual basis underlying Respondent's designation, carefully consider the evidence presented herein, and find that Respondent no longer meets the criteria for designation under E.O. 13224. Accordingly, Respondent respectfully requests that OFAC rescind Respondent's designation and remove him from the SDN List.

If OFAC has any additional questions necessary to its review of this reconsideration request, or relating to the evidence and arguments detailed herein, Respondent urges OFAC to present such questions at the earliest possible time to resolve this matter expeditiously.

Please forward all correspondence relating to this matter to undersigned counsel's Washington, D.C. office:

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and Respondent looks forward to reaching a mutually satisfactory conclusion to this reconsideration matter.

Hejeij 0054

Exhibit 5

Sincerely,

Erich C. Ferrari

Exhibit 5

# EXHIBIT

# A

Exhibit 5

In the name of God, Most gracious, Most Merciful 

## LEASING CONTRACT

**Serial Nb.: 24**
**Chapter Nb.: 71**

This contract is signed by and between: **Hachem Mohamad Jawad El Hayali**, hereinafter referred to as "The Lessor" and **Middle East and Africa Bank S.A.L. (MEAB)**, hereinafter referred to as "The Lessee". The parties agree as follows:

**First** – The Lessor leases to the Lessee, who verified the hall of 310 m2 surface located in Karameh Charkiah, in 907 A 20 region, Building Nb. 71, for the duration of one year from 01/02/2013 until 30/01/2014, against rental fees amounting to sixty five thousand US Dollars only.

**Second** – The Lessor leased the hall to the Lessor against rental fees amounting to sixty five thousand US Dollars only to be paid in advance, taking into consideration that the surface of the leased hall is of 310 m2.

**Third** – The Lessor is entitled to work at the premises throughout the duration of the contract, which is one year, and at the expiry of the lease term, he shall be bound to evacuate the premises and deliver it to the Lessor free of any occupancy. In case of any delay, he shall be bound to pay the amount of ................ Dinar for each delay day without the need to any official warning.

**Fourth** – The property taxes shall be borne by the Lessor or the landlord and the water, electricity, guarding and cleaning services fees shall be borne by the Lessee who shall pay the same regularly at his own expenses in addition to the rental fees described above. He shall also deliver the receipts thereof to the Lessor at the request of the latter and maintain the same condition of electric spotlights, glass and other institutions provided for in this document as received.

**This contract is made in two copies, one for each party, on 01/02/2013.**

| Lessor | Lessee | Witness |
|--------|--------|---------|
| (Signature) | (Signature) | (Signature) |

Sworn translation delivered on 17/01/2018

Exhibit 5

# MEAB

A bank of your own
Capital: 122.000.000.000 L.P Fully Paid – C.R.B. No.: 58153 Baabda – List of Banks No.: 110

## Minutes to appoint Branch Manager in Basra

We, Middle East and Africa Bank S.A.L., of Lebanese nationality, hereby appoint Mr. Moussa Abdul Majid Madi, as the Branch Manager in Basra, to manage the Basra Branch of MEAB and we entrusted him with the necessary powers to manage the said branch, including the right to negotiate, give opinion, open current accounts and credits at Iraqi banks, the Central Bank of Iraq and the Directorate General of accounts, sign all correspondences pertaining to the bank, represent MEAB before the Iraqi courts, with the right to mandate others to perform the same task and appoint lawyers, employees and workers, jointly with Mr. Jihad Ezzeddine Ezzeddine / Operations Manager at Basra Branch.

**MEAB S.A.L.**
**Chairman / Director-general**
**Kassem Hjeij**
(Signature and seal)

Nb. 3370/2014 – 12/03/2014
Verified by me to ratify the validity of signature of **Mr. Kassem Mohamad Hjeij**, mother's name Fatima, Lebanese, born in Lagos in 1953, Register Nb. 88/Deir Antar, according to identity card holding his photo, **enjoying legal and civil capacities**, in his quality as the Chairman/Director-general of MEAB by virtue of a commercial circular, a copy of which is verified and kept at this office, signing before me and at my office, I, **Manal Mohamad Yahfoufi, the Notary Public of Ghobeiry**, after public reading is made and approval is voluntarily granted on **Wednesday, 12/03/2014.**

**The Notary Public of Ghobeiry**
**Manal Mohamad Yahfoufi**
(Signature and seal)

Sworn translation delivered on 17/01/2018

Exhibit 5

Beirut, 28/02/2014

**Bank of Lebanon**
**Central Council**
**146/CB/17**

To the Chairman of
**Middle East and Africa Bank S.A.L.**

<u>Subject</u>:      Opening of two branches
<u>Reference</u>:   Your letter Nb. !.م.ر/32/2013 of 13/11/2013

With reference to the subject and reference above, we hereby declare that the Central Council convened on 22/02/2014, made the following decision Nb. 7/6/14:

"To grant "Middle east and Africa Bank S.A.L." the approval to open two new branches for the bank: the first in Ghazieh region and the second in Hamra region, and to inform the Directorate of Legal Affairs at the Bank of Lebanon of the starting date of operation of the branches intended to be opened".

**Please accept our deepest respect and consideration**

**Governor of Bank of Lebanon**
**Riad Toufic Salameh**
(Signature)

<u>Copy to:</u>
Banking Control Commission
Directorate of Legal Affairs
Directorate of Banks
Directorate of Payment Systems

Sworn translation delivered on 17/01/2018

Exhibit 5

In the name of God, Most gracious, Most Merciful

**Republic of Iraq**
**Central Bank of Iraq - Directorate General of Banking and Credit Control**
No.: 9/3/11704
Date: 07/08/2014

**Together to support our armed forces to eradicate terrorism**

<u>**To**</u>:        Middle East and Africa Bank S.A.L.
<u>**Subject**</u>:   Establishing two branches for a foreign bank in Iraq

With reference to your multiple letters, the last of which is your letter Nb. !.م.ر/14/2014 of 26/06/2014,
Based on the decision of the Board of this bank in its session Nb. 1513 held on 13/07/2014,
It is hereby decided to:

1- Grant the final approval to open two branches for your bank in Baghdad and Basra provided that you deliver us a letter of appointment of an Accredited External Auditor.

2- Appoint each of:
   - Mr. Kamal Fadel Saad as the Regional Manager of Branches in Iraq.
   - Mr. Said Ahmad Hjeij as Baghdad Branch Manager.
   - Mr. Moussa Abdul Majid Madi as Basra Branch Manager.

3- Release the operational capital of the two branches amounting to (14) million US Dollars provided that the amount is registered in its equivalent in Iraqi Dinar according to applicable instructions.

4- Inform us of the starting operation date of the branches to provide you with the code number.

5- Settle the amount of (15) million dinar against authorizations and branches opening fees in Iraq.

**With all our consideration and respect,**
**Abed El Abbass Khalaf Sultan**
**Director-General by delegation – Date: 07/08/2014**
(Signature)

Copy to:
   - Ministry of Commerce – Company Registration Department – Foreign Section – Please be informed. With all consideration and respect.

Sworn translation delivered on 17/01/2018

# EXHIBIT

# B

Hejeij 0061

Exhibit 5



Hejeij 0062

# EXHIBIT

# C

Hejeij 0063

Exhibit 5

**Minutes of Meeting of the Board of Directors**
**Of Middle East and Africa Bank S.A.L**
**Held on 15/06/2015**

At exactly 5:00 p.m. on Monday, 15/06/2015, the Board of Directors of Middle East and Africa Bank S.A.L held a meeting at the Bank's head office located in Jnah, Adnan Al Hakim Street, in its building.

The meeting was attended by:

Kassem Hjeij.
Ali Hjeij.
Chabib Moukalled.
Chafic Kobeissy.
Michel Kordahi.
Nasri Malhami represented by Mr. Chafic Kobaissy.

Mrs. Itaf Mohti was appointed as Secretary.

Whereas all board members were present or represented, the quorum was established and the meeting was considered to be duly held.

The meeting was chaired by Mr. Kassem Hjeij, and the following items of agenda were studied:

1. To accept the resignation of the acting Chairman;
2. To elect a Chairman/Director General, and define his powers;
3. Other urgent matters.

<u>First Decision</u>

The Chairman stated that he is in the process of transferring all the shares he holds at the Bank to the shareholder Ali Hjeij, according to which he shall submit his resignation from his position of acting Chairman.
The Chairman then called upon the Board members to elect a replacing Chairman/Director General.

**- This decision was unanimously approved –**

No - 8

Exhibit 5

**Second Decision**

The Board members thanked the Chairman for his efforts during his mandate as Chairman of the Bank. The Board of Directors of Middle East and Africa Bank S.A.L decided to elect Mr. Ali Hjeij as Chairman/Director General for the company for the remainder of the acting Board's mandate that would end at the Annual General Meeting that would consider the 2014 financial year's accounts.

The Chairman/Director General shall have all the powers conferred upon him by virtue of law, as well as the powers provided for in Article 34 of the Statutes. He shall individually sign on behalf of the company within the scope of his powers, and represents the company towards third parties. The Chairman/Director General shall execute the decisions of the Board and shall be entitled to give the right of signature to the employees of the company in order to conduct its regular daily business.

Mr. Ali Hjeij approved his election as Chairman of the Board and thanked the Board members for their trust.

**- This decision was unanimously approved -**

**Third Decision**

At the proposal of its elected Chairman Mr. Ali Hjeij, the Board of Directors decides to renew the appointment, duration of mandate, and the powers granted at the Minutes of the Board of Directors of the Bank held on 19/05/2014 of the Director General, Mr. Adnan Youssef, Deputy General Directors, Mr. Abbas Hjeij and Ayman Hodroj, and Deputy General Director, Mr. Ahmad Noun, appointed by virtue of the Minutes of the Board Meeting of the Bank held on 16/02/2015, provided that each of them fulfill their duties on the personal account and responsibility of the Chairman Mr. Ali Hjeij, according to the provisions of Article 153 of the Code of Commerce.

**- This decision was unanimously approved -**

**Fourth Decision**

The Board of Directors of Middle East and Africa Bank S.A.L delegates its lawyer and legal advisor to register the present Minutes where needed, notify competent departments thereof, draft a new Commercial Circular holding the signature of the new Chairman, deposit it at the Secretariat of the Commercial Register in Baabda, and obtain certified true copies thereof.

**- This decision was unanimously approved -**

Exhibit 5

There being no further items to discuss, the meeting was closed, and the present minutes was prepared and signed by all present members after public reading is made:

<u>Members</u>:
Chabib Moukalled (Signature)
Chafic Kobaissy (Signature)
Nasri Malhami represented by Mr. Chafic Kobeissy (Signature)
Michel Kordahi (Signature)
Kassem Hjeij (Signature)

<u>Chairman</u>:
Ali Hjeij (Signature)

<u>Secretary</u>:
Itaf Mohti (Signature)

**Task accepted by:**
Director General: Adnan Youssef (Signature)
Deputy General Director: Abbas Hjeij (Signature)
Deputy General Director: Ayman Hodroj (Signature)
Deputy General Director: Ahmad Noun (Signature)

**Certified True copy delivered on 17/06/2015**
**Head Clerk: Liliane Matta**
(Signature and seal)

Exhibit 5

محضر اجتماع

مجلس ادارة بنك الشرق الاوسط وافريقيا ش.م.ل.

المنعقد بتاريخ ٢٠١٥/٦/١٥



في تمام الساعة  الخامسة من بعد ظهر يوم الإثنين الواقع فيه الخامس عشر من شهر حزيران

سنة ٢٠١٥ ، عقد اعضاء مجلس ادارة بنك الشرق الاوسط وافريقيا ش.م.ل. اجتماعا" في مركز

البنك الرئيسي الكائن في الجناح شارع عدنان الحكيم بملكه .

حضر الاجتماع كل من السادة :

قاسم حجيج.

علي حجيج .

شبيب مقلد .

شفيق قبيسي.

ميشال قرداحي .

نصري ملحمه  ممثلا بالسيد شفيق قبيسي .

تولت السيدة عطاف معطي مهام امانة السر.

ولما كان جميع الاعضاء حاضرين أو ممثلين، اعتبر الاجتماع منعقدا" بصورة قانونية.

رأس الجَلْسة السيد قاسم حجيج وبوشر بدرس جدول الاعمال التالي :

١- قبول استقالة رئيس مجلس الادارة الحالي .

٢- انتخاب رئيس مجلس ادارة – مديرعام ، وتحديد صلاحياته.

Exhibit 5

محضر مجلس ادارة تاريخ ٢٠١٥/٢/١٥

٣- امور طارئة اخرى .

<u>القرار الأول</u> :

عرض الرئيس على مجلس الادارة انه بصدد التفرغ عن كامل اسهمه في المصرف لمصلحة المساهم علي حجيج ، وتبعاً لذلك يقدم استقالته من رئاسة المجلس الحالي .

ثم دعا الرئيس اعضاء مجلس الادارة الى انتخاب رئيس مجلس ادارة – مدير عام بديل .

–اتخذ هذا القرار بالاجماع–

<u>القرار الثاني</u> :

شكر الأعضاء الرئيس على جهوده التي بذلها خلال توليه رئاسة مجلس ادارة المصرف ، وقرر مجلس ادارة بنك الشرق الاوسط وافريقيا ش.م.ل انتخاب السيد علي حجيج رئيسا لمجلس الادارة مديراً عاماً للشركة لما تبقى من مدة ولاية المجلس الحالي الذي تنتهي ولايته بانعقاد الجمعية العمومية العادية السنوية التي ستنظر في حسابات السنة المالية ٢٠١٤ .

يتمتع رئيس مجلس الادارة – المدير العام بجميع الصلاحيات الممنوحة له قانونياً ، وتلك الملحوظة في المادة ٣٤ من النظام الاساسي ، وهو يلزم الشركة بتوقيعه المنفرد ضمن نطاق صلاحياته ويتولى تمثيل الشركة تجاه الغير ويقوم بتنفيذ قرارات مجلس الادارة ويحق له اعطاء حق التوقيع الى موظفي الشركة لتسيير اعمالها العادية اليومية .

وافق السيد علي حجيج على انتخابه رئيساً للمجلس وشكر الاعضاء على ثقتهم .

Hejeij 0068

Exhibit 5

محضر مجلس ادارة تاريخ ٢٠١٥/١/١٥

– اتخذ هذا القرار بالاجماع –

**القرار الثالث:**

ان مجلس الإدارة الحالي يقرر بناء على اقتراح رئيسه المنتخب السيد علي حجيج ، تجديد تعيين ومدة ولاية والصلاحيات الممنوحة في محضر مجلس ادارة المصرف المنعقد بتاريخ ٢٠١٤/٥/١٩ لكل من المدير العام السيد عدنان يوسف ونائبي المدير العام السيدين عباس حجيج وأيمن حدرج ، والسيد أحمد نون نائب المدير العام ،المعين بموجب محضر اجتماع ادارة المصرف المنعقد بتاريخ ٢٠١٥/٢/١٦ ، على أن يعمل كل منهم بمهامه لحساب وعلى مسؤولية رئيس مجلس الإدارة السيد علي حجيج الشخصية وذلك استنادا لأحكام المادة ١٥٣ من قانون التجارة .

– اتخذ هذا القرار بالإجماع –

**القرار الرابع:**

ان مجلس ادارة بنك الشرق الاوسط وافريقيا ش.م.ل.يفوض محامي الشركة ومستشارها القانوني تسجيل هذا المحضر حيث يجب وابلاغه ممن يلزم ، وتنظيم اذاعة تجارية جديدة تحمل توقيع الرئيس الجديد وايداعها امانة السجل التجاري في بعبدا والاستحصال على صور مصدقة عنها .

– اتخذ هذا القرار بالاجماع –

وّلما لم يعد من موضوع اخر رفعت الجلسة ونظم هذا المحضر ووقع من جميع الحاضرين بعد تلاوته علنا.

Hejeij 0069

Exhibit 5

محضر مجلس ادارة تاريخ ٢٠١٥/٦/١٥

الرئيس

علي حجيج

امين السر

عطاف معطي

الاعضاء

شبيب مقلد

شفيق قبيسي

يصري ملحمي
بالاسم شفيق قبيسي

ميشال قرداحي

قاسم حجيج

للقبول بالمهمة :

المدير العام : عدنان يوسف

نائب المدير العام : عباس حجيج

نائب المدير العام : أيمن حدرج

نائب المدير العام : أحمد نون

صورة طبق الأصل

رئيس القلم

Exhibit 5

# EXHIBIT

# D

Hejeij 0071



Exhibit 5



# *MOUSSALLEM*

Translation & Printing
kFurn Chebbak – main str. Near police record
Beirut-LEBANON- Telefax: 01 / 611470-9
Moussallem_translation@hotmail.com
•••••

Translation from Arabic into English language

Bank of Lebanon
Central council
492/m.m./17

Beirut on 19 June 2015

To the Chairman of the Board of Directors of
Bank of Middle East and Africa s.a.l. "MEAB" Esq.

Object    : Discharge of shares
Reference: your letter : R.M. 23/2015 date : 17 June 2015

In reference to the object and reference mentioned above, we inform you that the central council held on 17 June 2015 has taken the decision no.: 24/15/15 as follows:

"To approve to Bank "MEAB s.al." the discharge of Mr. kassem Mohamad HOJEIJ to the interest of Mr. Ali kassem HOJEIJ of /10.642.776/ shares of its capital, including the guarantees shares discharged previously to his interest from Messrs. Wissam and Hassan HOJEIJ, subject to the decision of the central council no.: 18/13/15 dated 28 May 2015.
To suspend the execution of the discharge of his guarantees shares and the guarantees shares discharged for his interest from Mr. Wissan and Hassan HOJEIJ which equal to /90/ shares till the issuance of a clearance to the interest of the chairman and the members of the board of directors for the financial two years 2014-2015

Sincerely yours truly
The Governor of Bank of Lebanon
Riad Toufic Salameh
(Signature)

Cc
Committee of control of banks
Directorate of legal affairs
Reserve and clearance financial tools company in Lebanon and Middle East ( Midclear) s.a.l.
Directorate of payment systems.



Exhibit 5

# EXHIBIT

# E

Hejeij 0073

Exhibit 5

**Minutes of Meeting of the Board of Directors**
**Of Middle East and Africa Bank S.A.L**
**Held on 28/12/2007**

At exactly 2:00 p.m. on Friday, 28/12/2007, the Board of Directors of Middle East and Africa Bank S.A.L held a meeting at the Bank's head office located in Jnah, Adnan Al Hakim Street, in its building, at the personal invitation addressed by the Chairman to the members.

The meeting was attended by:
- Mr. Hassan Hjeij
- Mr. Kassem Hjeij
- Mr. Wissam Hjeij

Whereas all board members were present, the meeting was considered to be duly held.

The meeting was chaired by Mr. Hassan Hjeij, and the following items of agenda were studied:
1. To accept the resignation of the acting Chairman;
2. To elect a Chairman/Director General, and define his powers;
3. Other urgent matters.

Upon deliberation and discussion, the Board made the following decisions:

<u>First Decision</u>

The Chairman stated that he had to stay outside Lebanon from time to time, and would therefore be unable to perform his tasks as Chairman of the Bank, thus he submits his resignation from the Chairmanship while maintaining his membership at the Board.
The Chairman then called upon the Board members to elect a replacing Chairman/Director General.

**- This decision was unanimously approved –**

<u>Second Decision</u>

Upon deliberation, the Board members thanked the Chairman for his efforts made for the development and progress of the bank. The Board of Directors of Middle East and Africa Bank S.A.L decided to elect Mr. Kassem Hjeij as Chairman/Director General for

Exhibit 5

the company for the remainder of the acting Board's mandate that would end at the Annual General Meeting that would consider the 2008 financial year's accounts.

The Chairman/Director General shall have all the powers conferred upon him by virtue of law, as well as the powers provided for in Article 35 of the Statutes. He shall individually sign on behalf of the company within the scope of his powers, and represents the company towards third parties. The Chairman/Director General shall execute the decisions of the Board and shall be entitled to give the right of signature to the employees of the company in order to conduct its regular daily business.

Mr. Kassem Hjeij approved his election as Chairman of the Board and thanked the Board members for their trust.

**- This decision was unanimously approved -**

**Third Decision**

The Board of Directors of Middle East and Africa Bank S.A.L delegates its lawyer and legal advisor, Mr. Fouad Nohra, to register the present Minutes where needed, notify competent departments thereof, draft a new Commercial Circular holding the signature of the new Chairman, deposit it at the Secretariat of the Commercial Register in Baabda, and obtain certified true copies thereof.

**- This decision was unanimously approved –**

There being no further items to discuss, the meeting was closed, and the present minutes was prepared and signed by all present members after public reading is made:

**Members:**
Kassem Hjeij (Signature)
Wissam Hjeij (Signature)

**Chairman:**
Hassan Hjeij (Signature)

**Certified True copy delivered on 14/01/2008**
**Head Clerk: Liliane Matta**
(Signature and seal)

Exhibit 

محضــر اجتمـاع

مجلس إدارة بنك الشرق الأوسط وافريقيا ش.م.ل.

المنعقد بتاريخ ٢٠٠٧/١٢/٢٨

في تمام الساعة الثانية من بعد ظهر يوم الجمعة الواقع فيه الثامن والعشرون مـن شـهر كانون الأول ٢٠٠٧، عقد أعضاء مجلس إدارة بنـك الشرق الأوسط وأفريقيـا ش.م.ل. اجتماعا في مركز البنك الرئيسي الكائن في الجناح ، شارع غندور الحكيم بملكه، بناءً علـى الدعوة الشخصية الموجهة من قبل رئيس مجلس الإدارة والمبلغة من الأعضاء.

حضر الاجتماع كل من:

–   السيد حسن حجيج

–   السيد قاسم حجيج

–   السيد وسام حجيج

ولما كان جميع الأعضاء حاضرين، اعتبرت الجلسة منعقدة بصورة قانونيــة.

رأس الجلسة السيد حسن حجيج وبوشر بدرس جدول الأعمال التالــي:

١. قبول استقالة رئيس مجلس الإدارة الحالي.

٢. انتخاب رئيس مجلس إدارة جديد – مدير عام وتحديد صلاحياته.

٣. أمور طارئة أخرى.

وبعد التداول والمناقشة، اتخذ المجلس القرارات التاليــة:

<u>القرار الأول:</u>

طرح الرئيس على مجلس الإدارة اضطراره للبقاء من حين الـى آخر خـارج الأراضـي اللبنانية، وبالتالي يتعذر عليه ممارسة مهامه كرئيس مجلس إدارة المصرف، ولـذلك يقـدم استقالته من رئاسة المجلس المذكور مع احتفاظه بعضوية مجلس الإدارة.

ثم دعا الرئيس أعضاء مجلس الإدارة الى انتخاب رئيس مجلس إدارة – مدير عام بديـل.

– صدق هذا القرار بالإجماع –



Exhibit 5

**القرار الثاني:**

وبعد التداول شكر الاعضاء الرئيس على جهودة التي بذلها للنهوض بالمصرف ونموه. قرر مجلس ادارة بنك الشرق الاوسط وافريقيا ش.م.ل انتخاب السيد قاسم حجيج رئيسا لمجلس الادارة مديراً عاماً للشركة لما تبقى من مدة ولاية المجلس الحالي الذي تنتهي ولايته بانعقاد الجمعية العمومية العادية السنوية التي ستنظر في حسابات السنة المالية ٢٠٠٨.

يتمتع رئيس مجلس الادارة – المدير العام بجميع الصلاحيات الممنوحة له قانونيا، وتلك الملحوظة في المادة ٣٥ من النظام الاساسي، وهو يلزم الشركة بتوقيعه المنفرد ضمن نطـاق صـلاحياته ويتولى تمثيل الشركة تجاه الغير ويقوم بتنفيذ قرارات مجلس الادارة ويحق له اعطاء حق التوقيع الى موظفي الشركة لتسيير اعمالها العادية واليومية.

– اتخذ القرار بالاجماع –

وافق السيد قاسم حجيج على انتخابه رئيسا للمجلس وشكر الاعضاء على ثقتهم به.

**القرار الثالث:**

ان مجلس ادارة بنك الشرق الاوسط وافريقيا ش.م.ل يفوض محامي الشركة ومستشارها القانوني الاستاذ فؤاد نهرا تسجيل هذا المحضر حيث يجب وابلاغه ممن يلزم، وتنظيم اذاعه تجاريه جديدة تحمل توقيع الرئيس الجديد وايداعها امانة السجل التجاري في بعبدا والاستحصال علـى صـور مصدقة عنها.

– اتخذ القرار بالاجماع –



Exhibit 5

وبانتهاء جدول الاعمال، رفعت الجلسة ونظم هذا المحضر ووقع من جميع الحاضرين بعد تلاوته علنا.

رئيس الجلسة
حسن حجيج

**الاعضاء**

قـــاسم حجيج

وسام حجيـج

صورة طبق الأصل

رئيس القلم
ليليان متّى

٣

Exhibit 5

# EXHIBIT

# F

Hejeij 0079

Exhibit 5

## Middle East and Africa Bank S.A.L
### Articles of Association

## Chapter I
### Incorporation and Object of the Company

### Article 1 - Incorporation of the Company

A Lebanese joint-stock Company is constituted among the holders of the issued shares and of the shares to be issued later, in accordance with the applicable laws in Lebanon, particularly the code of Commerce, the Code of Money and Credit and their amendments and subsequent laws along with the present Articles of Association.

### Article 2 - Object of the Company

The Object of the Company is to perform – for its own account or for the account of third parties in Lebanon and abroad – all kinds of banking operations, financing, loaning, financial intermediation, and credit operations. And in general, with due regard to the laws in force, notably the Code of Money and Credit, all kinds of operations directly or indirectly associated to its banking and financial activity, in particular, operations including but not limited to the following:

- To accept cash deposits of any type from the public.
- To deduct any commercial bond, withdrawal bond, promissory note, deposit bills, or values and bonds issued by the public treasury or by public or mixed authorities.
- To grant any type of credit, with or without guarantee.
- To receive any type of shares, values, or funds, and to undertake the role of mediator for the buying or selling of any type of shares or bonds.
- To accept and grant any type of insurance or other guarantees upon granting advances or loan, sign all warranties or collaterals, and duly buy and sell any type of movable and immovable property.
- To issue or contribute to the issuing of all private or public shares for companies or other financial institutions in Lebanon or abroad, as well as to sell the said shares, introduce them in the financial market, or contribute or trade with them. And to insure the establishment of companies, and when necessary, shares in the capital of the said company, within the limits specified by the Code of Money and Credit.

### Article 31 – Obligations of the Board Members

As long as the Board members perform their job without fraud or violation to any of the regulations, they shall not be bound by any personal obligation in anything pertaining to the bank's undertakings.

9

Exhibit 5

They shall be individually and jointly liable of the managerial errors, as well as the performance of the tasks entrusted to them according to the terms provided for in Article 166 and the subsequent articles of the Code of Commerce.

### Article 32 – Allocations of the Board Members

The Board members shall receive either attendance allowances or a percentage of the net profit, which type and value shall be determined by the General Meeting, provided that allocations are introduced in the general expenses account.
As for the Board members who perform managerial tasks, the Board of Directors shall determine their wage.

### Article 33 – Minutes of the Meetings

1) The deliberations of the Board are kept in the form of minutes recorded in a private register signed at least by the Chairman, two present members, and the Secretary. The records can be handwritten, or typed. The Minutes are compiled in a folder of a file.
2) The Minutes shall have an evidential value against any person.
3) The Chairman – and in his absence the Deputy Chairman or two Board members – shall approve and sign copies extracted from the Minutes when required to be submitted to Judicial authorities, general directorates, banks, or any other person.

### Article 34 – Chairman

1) The Board of Directors elects from among its members its Chairman as well as one Deputy Chairman or more if need be, for no later than three years. Their election can be renewed consecutively. The Chairman has to be a Board member in his personal capacity, and not as a representative of a moral person.

2) The Chairman serves as the Director General of the Company and he shall have the right to propose to the Board of Directors the election of another Director General, however, the latter performs his task for the account of the Chairman and at his own responsibility.

3) In case the Chairman is temporarily unable to perform his tasks, he can mandate one of the Board members for the entire or part of the duration of the mandate, provided that the mandate lasts for a limited duration, yet is renewable and subject to publishing at the Commercial Register.

4) Pursuant to the provisions of Article 153 of the Code of Commerce, the Chairman or the delegated Board member or the Director General if need be, according to the

Exhibit 5

delegation and authorities accorded to him, shall represent the bank towards tiers, enforce the decisions of the Board of Directors and conduct the daily activities of the Company, under the control and surveillance of the Board of Directors. The Company shall be bound by the acts of its above-mentioned representatives within the scope of authorities entrusted to them.

5) The Chairman, or the delegated Board member or the Director General if need be, according to the delegation and authorities accorded to him, shall have the following authorities, including without limitation, unless the Board of Directors decides otherwise according to the applicable laws:

- To establish the rules of conduct of the Company business.
- To set the personnel regulations.
- To perform all necessary transactions in order to have the Company be bound by the Laws of the Country where it can operate.
- To collect all amounts due to the Company and settle its debts.
- To grant all loans with or without in-kind or personal guarantees in the form of current accounts, deductions, or warranties, pursuant to the Employment Policy approved by the Board, and set their maturity dates, interest rates and charges.
- All decisions related to the loans and investments of the company's ready monetary funds and real estate investments, contributions and participations, in addition to operation s conducted for its account on composed or complex financial tools shall be subject to the previous consent of the Specialized Committee established by the Board as provided for in the present Articles of Association.
- To sign all loan agreements by opening credits or otherwise, except for those signed in the form of issuing debt bonds.
- To withdraw, endorse and collect all commercial bonds.
- To give all dependant and interdependent guarantees and pledges.
- To withdraw, endorse and collect all checks, travel checks and credit books.
- To accept all term and on demand deposits in current accounts and saving accounts, etc… to determine the interest rates and charges due upon and to the bank.
- To accept all reference deposits, values and precious metals.
- To lease safe boxes.
- To open all proved and unproved documentary credits within the limits set by the Board according to the bank's internal policy.
- To perform all transfers in Lebanon and abroad.
- To accept checks for collection and circulation.
- To accept, sign and terminate all leasing contracts.
- To accept all in kind and personal guarantees, mortgages and movable and immovable insurances and to accept their liberation and cancellation before or after settlement.

Exhibit 5

- To file any claim and judicial reference as plaintiff or defendant and for this purpose to appoint all agents and lawyers.
- To conduct all agreements, reconciliation, arbitration with the right of submission, waiver, discharge, dismissal and approval to strike off the signals, seizures, challenges and other rights before or after settlement.
- To acquire all rights and immovable funds as to collect consolidated or bad debts and then to sell the same at the conditions deemed fit.
- To appoint, transfer and dismiss the company's agents and employees, determine their tasks, authorities and salaries and terminate their service contract.
- To delegate some of his authorities in the form and conditions prescribed by the law or the profession customs.
- And in general to perform all activities related to the company object not provided for by the law or these Articles for the General Meeting or the Board.

## Article 35 – Signing on Behalf of the Company

The company shall be bound by the signature of the Chairman or the delegated member individually, and bound by the signature of the Director General within the delegation and authorities conferred upon him.

The Chairman or the delegated member, within their scope of authorities, shall be entitled to give the right of signature to the company employees in general or particular way, in order to conduct the ordinary or some renewed activities.

The company shall be bound by the acts performed by its representatives each within the scope of his authorities.

Outside this scope, the company shall be bound only by the activities authorized or approved by the Shareholders General Meeting or the Board of Directors each within the scope of his authorities.

Exhibit 5



بنك لبناني للتوسط و.... .... ....
النظام الأساسي

الباب الأول
انشاء الشركة - موضوعها

المادة ١ - انشاء الشركة

تأسست بين اصحاب الأسهم المنشأة في ما يلي والتي قد تنشأ في ما بعد وفقاً لهذا النظام، شركة مغفلة لبنانية تخضع للقوانين النافذة في لبنان لا سيما قانون التجارة، وقانون النقد والتسليف وتعديلاتهما والقوانين الملحقة بهما، ولأحكام هذا النظام الأساسي.

المادة ٢ - موضوع الشركة

ان موضوع الشركة هو القيام لحسابها او لحساب الغير في لبنان والخارج بجميع العمليات المصرفية، والتمويل والتسليف والوساطة المالية والعمليات الائتمانية، وبشكل عام، ومع مراعاة القوانين النافذة ولا سيما قانون النقد والتسليف، جميع العمليات المتصلة مباشرة أو غير مباشرة بنشاطها المصرفي والمالي ولا سيما العمليات التالية المذكورة على سبيل البيان لا الحصر:

- قبول الودائع، ايا كانت، من الجمهور.
- حسم كل سند تجاري او سند سحب او لأمر او اذونات ايداع او قيم وسندات مصدرة عن الخزينة العامة او من قبل الهيئات العامة او المختلطة.
- منح أي اعتماد مع او بدون ضمانة.
- استلام كل سهم او قيمة او مال والقيام بدور الوسيط لشراء او بيع جميع انواع الأسهم او السندات.
- قبول او اعطاء كل تأمين او ضمانة اخرى عند منح سلفات او استقراض، وتوقيع كل كفالة او كفل، شراء وبيع جميع الأموال المنقولة وغير المنقولة وفقاً للقانون.
- اصدار أي مساهمة في اصدار او بيع او ادخال في السوق المالية او المساهمة او المتاجرة بكل سهم خاص او عام لشركات او مؤسسات مصرفية اخرى في لبنان او الخارج، وتأسيس او تأسيس الشركات وعند الاقتضاء، اخذ حصة في رأسمال هذه الشركات ضمن الحدود المنصوص عنها في قانون النقد والتسليف.

Exhibit 5

المادة ٣١ - مسؤولية اعضاء مجلس الادارة

... اعضاء مجلس الادارة ... بموجب القانون ... بموجب ما قد يحدث من بعض التصرفات ... وهم مسؤولون بصفة شخصية ومشتركة عن الاضرار الناجمة وكذلك عن اداء المهام الموكولة اليهم وذلك ضمن الشروط المنصوص عليها في المواد ١٦٦ وما يليها من قانون التجارة.

المادة ٣٢ - مخصصات اعضاء مجلس الادارة

يتقاضى اعضاء مجلس الادارة، اما بدلات حضور وإما نسبة مئوية من الارباح الصافية تحدد نوعها وقيمتها الجمعية العمومية على ان تدخل المخصصات في حساب المصاريف العامة.
اما اعضاء مجلس الادارة الذين يقومون باعمال ادارية فيحدد اجرهم مجلس الادارة.

المادة ٣٣ - محاضر الجلسات

١) تدون مداولات مجلس الادارة في محاضر دورية في سجل خاص يوقعه على الاقل الرئيس وعضوان حاضران وامين السر، ويمكن ان تكون الوقائع باليد او بالآلة الكاتبة وتجمع المحاضر في سجل ...

٢) يكون لهذه المحاضر قوة الاثبات تجاه اي كان.

٣) يصدق رئيس المجلس، وفي حال غيابه نائب الرئيس او يضوان من مجلس الادارة على النسخ المستخرجة من المحاضر لازم اقتضى ابرازها للقضاء او للادارات العامة والمصارف او لاي شخص آخر.

المادة ٣٤ - رئيس مجلس الادارة

١) ينتخب مجلس الادارة من بين اعضائه رئيسا له ونائبا للرئيس او اكثر عند الاقتضاء، لمدة ثلاث سنوات على الاكثر ويمكن تجديد انتخابهما على التوالي.
يجب ان يكون الرئيس عضوا في المجلس بصفته الشخصية وليس كممثل لشخص معنوي.

٢) يقوم الرئيس بوظيفة مدير عام للشركة، يعود للرئيس ان يقترح على المجلس تعيين مدير عام سواء، الا ان هذا الاخير يقوم بوظيفته لحساب الرئيس وعلى مسؤوليته الشخصية.

٢٠٠٩

Exhibit 5

Hejeij 0086

Exhibit 5



Exhibit 5

# EXHIBIT

# G

Hejeij 0088

Exhibit 14

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

APR 19 2018

Case ID SDGT-12284

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004

Re: Kassem Hejeij

Dear Mr. Ferrari:

This is in response to your letter dated October 2, 2017, to the Office of Foreign Assets Control (OFAC) requesting disclosure of, and access to, your client's administrative record associated with his designation as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order 13224 of September 23, 2011 ("Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism").

Processing such a request requires extensive and multiple levels of internal review by OFAC to comply with U.S. government regulations regarding the protection of classified, privileged, and otherwise non-releasable information. Enclosed, please find bates stamped pages SDGT 12284 000001 – 000021, which includes the redacted administrative record upon which the designation was based, as well as the U.S. Department of the Treasury press release issued on the day of designation. The redacted portions of the administrative record contain classified, privileged, or otherwise non-releasable information. Should additional unclassified, non-privileged, or otherwise releasable information become available, it will be provided under separate cover.

Please refer to case ID SDGT-12284 in all correspondence. For the most expedient response, please direct all questions and correspondence to OFAC via the following email: OFAC.Reconsideration@treasury.gov. You may also write, call, or fax OFAC at the following:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Annex)
Washington, DC 20220

Telephone: 202-622-2420
Fax: 202-622-5390

1

Exhibit 14

Thank you for your cooperation.

Sincerely,

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption
Office of Foreign Assets Control

Enc.

2

Hejeij 0139

Exhibit 14



~~TOP SECRET~~ ▮▮▮▮▮▮

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220.

(U) **Case ID:** SDGT-4039

(U) **MEMORANDUM FOR  JOHN E. SMITH**  *Signature* 6/5/15
**ACTING DIRECTOR**
**OFFICE OF FOREIGN ASSETS CONTROL**

(U) **FROM:**           Arthur D. McGlynn  ▮▮▮  5/12/15
Deputy Assistant Secretary
Office of Intelligence and Analysis

(U//~~FOUO~~) **SUBJECT:**      Designation Pursuant to E.O. 13224: **KASSEM HEJEIJ**[a]

(U) **INTRODUCTION**

(U) On September 23, 2001, President Bush declared a national emergency pursuant to the International Emergency Economic Powers Act ("IEEPA"), and issued Executive Order 13224 ("E.O. 13224" or "the E.O.") to address grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the September 11, 2001, terrorist attacks in New York, Pennsylvania, and at the Pentagon.  The E.O. imposes economic sanctions on persons who have committed, pose a significant threat of committing, or support terrorism.[b]

(U) President Bush identified, in the Annex to E.O. 13224, 13 individuals and 16 entities as subject to the economic sanctions.[c] As amended, the E.O. authorizes the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General, to designate persons determined:

1) to be owned or controlled by, or to act for or on behalf of, those persons listed in the Annex to the E.O., or those persons determined to be subject to subsections 1(b), 1(c), or 1(d)(i) of the E.O.;

---

[a] (U) The name of the person proposed for designation in this evidentiary will appear in **BOLD CAPITAL** font. Additionally, the names of persons previously designated as Specially Designated Global Terrorists (SDGTs) pursuant to E.O. 13224 and Specially Designated Terrorists (SDTs) pursuant to E.O. 12947 will appear in **Bold Title lower case font.**
[b] (U) The E.O. blocks all property and interests in property in the United States or within the possession or control of a U.S. person of any persons designated under its authority.  In addition, it prohibits transactions or dealings by U.S. persons or within the United States in blocked property, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of designated persons.
[c] (U) Twelve individuals and fifteen entities were originally named by the President on September 23, 2001. Executive Order 13268 of July 2, 2002 amended the Annex by adding one individual and one entity.



~~TOP SECRET~~ ▮▮▮

Exhibit 14

~~TOP SECRET~~ ██████████████

2) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to E.O. 13224 or determined to be subject to the E.O.; or

3) to be otherwise associated with those persons listed in the Annex to the E.O., or those persons determined to be subject to subsections 1(b), 1(c), or 1(d)(i) of the E.O.

(U) The term "financial, material or technological support" means any property, tangible or intangible, including but not limited to currency, financial instruments, securities, or any other transmission of value; weapons or related materiel; chemical or biological agents; explosives; false documentation or identification; communications equipment; computers; electronic or other devices or equipment; technologies; lodging; safe houses; facilities; vehicles or other means of transportation; or goods. "Technologies" as used in this definition means specific information necessary for the development, production, or use of a product, including related technical data such as blueprints, plans, diagrams, models, formulae, tables, engineering designs and specifications, manuals, or other recorded instructions.[d]

(U) The term "to be otherwise associated with" means to own or control; or to attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services.[e]

(U) Evidence presented in this memorandum and related exhibits provide reason to believe that the below person meets the criteria for designation as set forth in E.O. 13224.

(U) **IDENTIFYING INFORMATION**

| | |
|---|---|
| (U) **Individual**: | **KASSEM HEJEIJ**[f] [Exhibit 1, p. 1] |
| (U) AKA: | Qasim Muhammad Hujayj [Exhibit 17, p. 1] (See Exhibit 21 – ██ Declassification Approval) |
| (U) AKA: | Qasim Hajij [Exhibit 15, p. 1] |
| ~~(S~~ ████████████ | [Exhibit 3, para. 2] |
| ~~(S~~ ████████████ | [Exhibit 9, para. 2] |
| ~~(S~~ ████████████ | [Exhibit 9, para. 2] |
| (U) DOB: | ███ 1953 [Exhibit 17, p. 4] (See Exhibit 21 – Declassification Approval) |
| (U) Nationality: | Lebanon [Exhibit 17, p. 3] (See Exhibit 21 – ██ Declassification Approval) |
| (U) POB: | Lagos (Nigeria)[g] [Exhibit 17, p. 3] (See Exhibit 21 – ██ Declassification Approval) |
| (U) Passport: | RL0000432 (Lebanon) issued 31 Jan 2013, expires 31 Jan 2018 [Exhibit 17, pp. 3-4] (See Exhibit 21 – ██ Declassification Approval) |

---

[d] (U) 31 C.F.R. § 594.317
[e] (U) 31 C.F.R. § 594.316
[f] (U) This individual's name, spelled as "**KASSEM HEJEIJ**", is used throughout this evidentiary memorandum, although some exhibits will use alternative spellings or name variations, which are listed herein as AKAs.
(U) [g] ████████████ Lagos is located in Nigeria.

2

**TOP SECRET** ██████████████

   SDGT-12284 000

Exhibit 14

~~TOP SECRET~~ ███████████

(U) Title:[h]                          Chairman, Middle East and Africa Bank S.A.L.
                                       [Exhibit 1, p. 1]
(U) Gender:                            Male [Exhibit 1, p. 1]

## (U) BACKGROUND



## (U) BASIS FOR DESIGNATION OF KASSEM HEJEIJ

*(U//FOUO) KASSEM HEJEIJ provides financial, material, or technological support for, or financial or other services to or in support of, Hizballah, a person designated pursuant to E.O. 13224.*



---

[h] (U) This identifying title information will not be publicly published on OFAC's SDN List and is for internal reference only.
[i] (U) MEAB is more than 99 percent owned by the Hejeij family, according to Bankers' Almanac. [Exhibit 2, p. 2] **KASSEM HEJEIJ** serves as the bank's Chairman and co-founder, according to MEAB's website [Exhibit 1, p. 1], and he holds a 46.664 percent ownership stake in the bank according to Bankers' Almanac. [Exhibit 2, p. 2]
[j] (U) **Hizballah** was named an SDGT pursuant to E.O. 13224 on October 31, 2001, listed as an SDT in the Annex to E.O. 12947 on January 23, 1995, and designated on August 10, 2012 pursuant to E.O. 13582.
[k] (S ████████████████████████████████████████████████
███████████████████████ [Exhibit 4, para. 6; Exhibit 5, para. 5]
███████████████████████████████████████ [Exhibit 6,
paras. 2-6; Exhibit 7, paras. 2-3] ██████████████
████████████████████████████████████████
███ [Exhibit 6, paras. 2-6] ████████████████████████
[Exhibit 14, para. 3; Exhibit 20, paras. 2-4] ~~(TS~~
████████████████████████████████████████
[m] (S ████████████████████████████████████████████

3

~~TOP SECRET~~ ████████████

Exhibit 14

~~TOP SECRET~~ ████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[Exhibit 16, para. 2]

(S ███████████████████████████████████████
████████████████████

• (S ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[Exhibit 11, paras. 2-3]

• (S ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████[n]

[Exhibit 14, para. 3]

(S ███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[Exhibit 3, paras. 2-3]

████████████████████████████████████████

[Exhibit 9, para. 2; Exhibit 10, para. 3]
[n] (S ████████████████████████████████████

~~TOP SECRET~~ ████████████████████

4

SDGT-12284 0004

Exhibit 14



TOP SECRET

(TS

[Exhibit 19, p. 2; Exhibit 13, para. 1]

[Exhibit 19, pp. 2, 5]

(S

[Exhibit 9, para. 2]

[Exhibit 10,

[Exhibit 3, paras. 2-3; Exhibit 12, paras. 2-3]

(S

[Exhibit 8, paras. 2-3]

(S

° (U)
ᵖ (U)
�q (U)

5

TOP SECRET

SDGT-12284 0005

Exhibit 14

~~TOP SECRET~~ ████████████████████

████████████████████████████████████   [Exhibit 18, paras. 16, 18-19]

(U) **CONCLUSION**

(U//~~FOUO~~) Based on the foregoing information, there is reason to believe that **KASSEM HEJEIJ** meets the criteria for designation pursuant to E.O. 13224 for the following reason:

- **KASSEM HEJEIJ** provides financial, material, or technological support for, or financial or other services to or in support of, **Hizballah**, a person designated pursuant to E.O. 13224.

6

Hejeij 0145                                                    SDGT-12284 0006

Exhibit 14

~~TOP SECRET~~ █████████████████████

(U) **EXHIBIT LIST**

Exhibit 1     Middle East and Africa Bank Website, Board of Directors,
              http://www.meabank.com/about/board-of-directors, retrieved ████████ (U)
Exhibit 2     Bankers' Almanac, MEAB SAL Report, retrieved ████████ (U)
Exhibit 3     (S
Exhibit 4     (S
Exhibit 5     (S
Exhibit 6     (S
Exhibit 7     (S
Exhibit 8     (S
Exhibit 9     (S
Exhibit 10    (S
Exhibit 11    (S
Exhibit 12    (S
Exhibit 13    (TS
Exhibit 14    (S
Exhibit 15    Arab Decision, Lebanon/Commercial Banks/Middle East and Africa Bank S.A.L.,
              http://www.arabdecision.org/show_func_3_4_19_1_3_9329.htm, retrieved ████
              (U)
Exhibit 16    (S
Exhibit 17    (TS
Exhibit 18    (S
Exhibit 19    (TS
Exhibit 20    (S
Exhibit 21    Declassification Approval



7

~~TOP SECRET~~ ██████████████████████

Exhibit 15

**Ferrari & Associates, P.C.**

1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

June 11, 2018

**SENT VIA EMAIL AND FEDERAL EXPRESS: #8126 0278 0435**

ATTN: Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Freedman's Bank Building
Washington, D.C. 20220

Re:   **Request for Non-Privileged and Unclassified Summary of Otherwise Privileged
Information Contained in the Administrative Record[1]**
*Kassem Hejeij—SDGT-12284*

Dear Ms. Thomas:

On April 19, 2018, the United States Department of the Treasury's Office of Foreign
Assets Control ("OFAC") provided Kassem Hejeij ("Petitioner") with a copy of the unclassified
version of the administrative record underlying his designation pursuant to Executive Order
("E.O.") 13224. OFAC's provision of the unclassified version of the administrative record was
in response to Petitioner's request for disclosure of the administrative record. Petitioner had
requested such disclosure so as to obtain adequate notice as to the basis for his designation and to
ensure that he had a meaningful opportunity to respond to OFAC's allegations.

The administrative record disclosed by OFAC fails to accord Petitioner sufficient notice
as to the basis of his designation. Specifically, this version of the administrative record is almost
completely redacted, with the exception of identifying information. Most notably, the redactions
include the entire portion of the record titled "Basis for Designation." As a result, OFAC's

---

[1] Because this response contains business information and/or other information of a sensitive nature, undersigned
counsel respectfully requests that OFAC treat this correspondence confidentially. If OFAC believes that it is
required to release this document or any of the information contained herein to the public in accordance with the
Freedom of Information Act ("FOIA") or any other federal law, please notify undersigned counsel as soon as
possible. Undersigned counsel intends to provide additional information in support of this request for
confidentiality.

Exhibit 15

2018 JUN 15  AM 10: 48

TREASURY DEPARTMENT
FOREIGN ASSETS CONTROL

Hejeij 0162

Exhibit 15

disclosure of the administrative record provides no additional notice as to the reasons supporting Petitioner's designation, and is thus largely non-responsive to Petitioner's request for disclosure as to the factual basis of his designation.

Petitioner intends to address OFAC's allegations concerning his business ties and dealings. To do so, however, Petitioner requires adequate notice as to the basis of his designation so that he can either rebut the factual findings underlying that basis or change the circumstances supporting it. Such notice can be provided either through disclosure of the redacted portions of the administrative record or by disclosure of a non-privileged and unclassified summary of the classified and/or privileged information contained in the administrative record. In undersigned counsel's experience, OFAC has routinely provided designated parties with such summaries in those cases where it is unable to disclose the full administrative record.

For this reason, Petitioner respectfully requests that OFAC provide a non-privileged and unclassified summary of otherwise privileged information contained within the administrative record. Any such summary should provide Petitioner with the following factual information described in the redacted portions of the administrative record:

1) The identity of the "Hizballah organizational elements" Petitioner allegedly maintains "direct ties" to;

2) A description of the manner by which Petitioner allegedly maintains direct ties to Hizballah organizational elements;

3) The approximate date(s) upon which Petitioner established such purported direct ties to Hizballah organizational elements;

4) The name(s) of the bank(s) in Lebanon at which Petitioner has allegedly opened bank accounts on behalf of Hizballah;

5) The approximate date(s) upon which Petitioner allegedly opened bank accounts on behalf of Hizballah;

6) The identity of the Hizballah procurement companies for which Petitioner allegedly provided credit;

7) The approximate date(s) upon which Petitioner allegedly provided credit for Hizballah procurement companies;

Hejeij 0163

Exhibit 15

8) A description of the manner by which Petitioner allegedly provided credit for Hizballah procurement companies (e.g., through private loans, commercial or personal loans through a financial institution, etc.);

9) The identity of the particular infrastructure in Lebanon or Iraq used by Hizballah in which Petitioner allegedly invested in;

10) The approximate date(s) upon which Petitioner invested in infrastructure used by Hizballah;

11) The approximate date(s) upon which Hizballah began using the infrastructure that Petitioner purportedly invested in;

12) A description of the manner of Petitioner's alleged investment in infrastructure used by Hizballah (e.g., direct cash investment, extensions of banking products, purchase of equity, dealings in debt, etc.);

13) The identity of the oil ventures in Iraq in which Petitioner allegedly worked on with Ali Youseff Charara;

14) A description of the manner by which Petitioner allegedly worked on oil ventures in Iraq with Ali Youseff Charara;

15) The approximate date(s) upon which Petitioner allegedly began working on oil ventures in Iraq with Ali Youseff Charara; and

16) The identification of whether Petitioner is believed to have carried out any of the alleged activities supporting his designations in his personal capacity or in his prior capacity as the Chairman of the Middle East Africa Bank.

Due to the ongoing and substantial harms visited on Petitioner as a result of his continued designation, Petitioner requests that OFAC furnish a copy of a non-privileged and unclassified summary within thirty (30) days from the date of this letter. Absent disclosure of an unclassified summary or OFAC's identification as to when Petitioner can expect additional disclosures of the administrative record, Petitioner intends to pursue any legal remedies available to him in the U.S. District Court.

It is not Petitioner's intent to burden the agency with litigation, however, Petitioner can only successfully seek reconsideration of his designation if he has access to the factual and legal basis for that designation. The disclosure requested through this letter would provide such

3

Exhibit 15

information and afford Petitioner a meaningful opportunity to seek reconsideration of his designation.

    Please forward all correspondence related to this matter to:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

    Thank you for your consideration, and we look forward to this response.

Sincerely,

Erich C. Ferrari

4

Exhibit 16

 Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

June 11, 2018

**SENT VIA EMAIL AND FEDERAL EXPRESS: #8126 0278 0435**

ATTN: Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Freedman's Bank Building
Washington, D.C. 20220

Re:   **Request to Enter into an Agreement for Removal from OFAC's SDN List**[1]
      *Kassem Hejeij—SDGT-12284*

Dear Ms. Thomas,

On June 10, 2015, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Kassem Hejeij ("Petitioner") as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 ("E.O. 13224") for allegedly providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah—an entity designated pursuant to E.O. 13224.[2]

OFAC purportedly designated Petitioner for the following reasons:

1) Dealings with Adham Tabaja and his affiliated companies;
2) Opening bank accounts for Hizballah in Lebanon;
3) Providing credit to Hizballah procurement companies; and

---

[1] Because this response contains business information and/or other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence confidentially. If OFAC believes that it is required to release this document or any of the information contained herein to the public pursuant to the Freedom of Information Act ("FOIA") or any other federal law, please notify undersigned counsel as soon as possible. Undersigned counsel intends to provide additional information in support of this request for confidentiality.

[2] PRESS RELEASE, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. Dep't of Treasury, June 10, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.

Exhibit 16

RECEIVED
JUN 1 5 2018
OFAC

Hejeij 0168

Exhibit 16

4) Investing in infrastructure Hizballah uses in both Lebanon and Iraq.[3]

On October 2, 2017, Petitioner filed a request for reconsideration of his designation in accordance with OFAC's delisting procedures.[4] On March 12, 2018, OFAC sent Petitioner a questionnaire seeking information responsive a series of questions. While Petitioner is working diligently towards preparing responses to those questions, Petitioner also requests to enter into a Terms of Removal Agreement that would govern the rescission of Petitioner's designation and the removal of his name from OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List").[5]

This proposed agreement would condition OFAC's rescission of Petitioner's designation on any number of stipulations negotiated between the agency and Petitioner. Negotiating the terms of such an agreement will obviate the need for the continuous back and forth of the reconsideration process and directly drive to the heart of the matter by addressing changes in behavior necessary to negate OFAC's basis for designation. This would accomplish the objectives underpinning the designation without burdening the agency with the administrative processing of Petitioner's request for reconsideration. Moreover, it would offer Petitioner a more immediate path to relief.

For these reasons, Petitioner respectfully requests to enter into discussions regarding a proposed Terms of Removal Agreement with OFAC.

## I.    Terms of Removal Agreements

A Terms of Removal Agreement governs the conduct of designated individuals and entities upon their removal from OFAC's SDN List. It is undersigned counsel's understanding that OFAC has adopted such Terms of Removal Agreements with designated parties in the past.[6]

---

[3] Undersigned counsel is aware that OFAC has also designated another person under E.O. 13224, Ali Youssef Charara, for allegedly working on oil ventures in Iraq with Petitioner.

[4] 31 C.F.R. § 501.807.

[5] By proposing a Terms of Removal Agreement, Petitioner makes no representation regarding the validity of OFAC's factual basis for imposing Petitioner's designation. Petitioner's proposal to enter into a Terms of Removal Agreement is solely intended to help facilitate a mutually satisfactory resolution to this reconsideration matter, including through verifiable assurances to OFAC that Petitioner is not engaged in conduct of concern to the U.S. government.

[6] For instance, OFAC reportedly entered into a Terms of Removal Agreement with Deutsche Forfait—a German firm designated pursuant to E.O. 13382. Under this agreement, Deutsch Forfait agreed to the following conditions prior to its removal from OFAC's SDN List: (1) to refrain from business relations or other connections with SDN-listed parties; (2) to ensure that its shareholders do not maintain business relations or other connections with SDN-listed parties and that none of its shareholders are themselves SDN-listed parties; and (3) to implement a rigorous U.S. sanctions compliance program and to train its employees in the program's effective use. *See* DF Deutsche

Hejeij 0169

Exhibit 16

"The power and integrity of [its] sanctions derive not only from its ability to designate and add persons to the Specially Designated Nationals and Blocked Persons List (SDN List), but also from its willingness to remove persons from the SDN List consistent with the law."[7] According to OFAC, "[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior."[8] Sanctions are thus designed to isolate bad actors from the U.S. financial system and convince them that only a credible change in behavior will lead to the lifting of sanctions.

A Terms of Removal Agreement constitutes a potent monitoring system by which OFAC can ensure that a designee ceases their engagement in the conduct that led to their designation, while conditioning the rescission of their designation on their verified compliance with the conditions outlined in the proposed agreement. As such, a Terms of Removal Agreement is not merely consistent with the aims and objectives of OFAC's sanctions programs, but it may also prove a unique and effective invention by which to achieve those same U.S. policy aims and objectives.

## III.   Request for Terms of Removal Agreement

Petitioner proposes entering into a Terms of Removal Agreement with OFAC in order to ensure that all parties involved in this reconsideration matter achieve a satisfactory outcome. Specifically, the terms of removal agreement would provide OFAC with confidence that Petitioner will not engage in activities deemed anathema to U.S. interests, and that Petitioner will no longer be subject to U.S. sanctions and will be removed from the SDN List.

The terms of any such agreement would need to be negotiated between Petitioner and OFAC. As such, Petitioner seeks to discuss with OFAC any proposed conditions that the agency deems necessary, including, but not limited to, conditions limiting Petitioner's engagement with certain parties and terms requiring Petitioner to provide reports on his business activities. At the outset, and in a gesture of good-faith, Petitioner offers the following terms for OFAC's consideration:

1) Severing, and refraining from ever again entering into, any dealings of any nature whatsoever with Adham Tabaja and/or Ali Youssef Charara, or any entities under their ownership or control;

---

Forfait AG Removed from OFAC Sanctions List Without Having to Pay a Fine (Oct. 17, 2014), http://www.dfag.de/en/df-deutsche-forfait-ag-removed-from-ofac-sanctions-list-without-having-to-pay-a-fine/.
[7] Filing a Petition for Removal from an OFAC List, U.S. Dep't of Treasury, May 2, 2017, *available at* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx.
[8] *Id.*

Hejeij 0170

Exhibit 16

2) To not return to, or be employed in, any operational, executive, or managerial position in any financial institution for a five (5) year period; and

3) To not extend lines of credit, whether in a personal or professional capacity, to any companies for a five (5) year period.

Petitioner offers the above and seeks to engage in further discussions regarding such an agreement in order to provide the confidence necessary to warrant the rescission of his SDGT designation and removal from OFAC's SDN List.

## IV.    Conclusion

Petitioner respectfully requests to enter into a Terms of Removal Agreement with OFAC, and to immediately being discussing the terms and scope of such agreement. If OFAC refuses to enter into discussions regarding this proposed agreement, Petitioner requests that OFAC provide a written, reasoned explanation for its refusal to do so.

As discussed above, Petitioner believes that a Terms of Removal Agreement would satisfactorily resolve this reconsideration matter to the benefit of all parties and would serve to achieve OFAC's underlying policy objectives. By entering into a Terms of Removal Agreement, OFAC could gain confidence that Petitioner has and will continue to conform his conduct consistent with U.S. foreign policy objectives. Further, OFAC would save resources by not having to process the reconsideration request of an SDN who has already expressed a desire to accede to conditions necessary to negating the basis of his designation.

Please forward all correspondence relating to this request to:

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and Petitioner looks forward to your response.

Sincerely,

4

Hejeij 0171

Exhibit 16

Erich C. Ferrari

Hejeij 0172

Exhibit 20

| | |
|---|---|
| From: | OFAC.Reconsideration |
| To: | "Erich Ferrari" |
| Cc: | OFAC.Reconsideration |
| Subject: | RE: SDGT-12284 |
| Date: | Wednesday, October 17, 2018 11:08:00 AM |
| Attachments: | Hejeij-Unclassified_Summary_of_Administrative_Record.pdf |
| | SDGT-12284-Hejeij-Summary of Admin Record Cover Letter.pdf |

Mr. Ferrari:

Please find the attached correspondence concerning your client, Kassem Hejeij, pursuant to SDGT-12284.

Respectfully,

OFAC Reconsideration



Exhibit 20

### DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

Case ID SDGT-12284

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re: Kassem Hejeij

Dear Mr. Ferrari:

As you are aware, on June 10, 2015, the Office of Foreign Assets Control (OFAC) designated Kassem Hejeij as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

On October 2, 2017, you filed a request seeking a copy of the administrative record of Mr. Hejeij's designation. On April 19, 2018, OFAC provided a copy of the redacted administrative record of Mr. Hejeij's designation, the redacted portions of which contained classified or privileged information.

On June 11, 2018, you filed a request seeking a non-privileged and unclassified summary of the information contained in the administrative record. Providing this information requires multiple levels of internal review by OFAC and by our interagency partners in order to comply with OFAC's obligations to safeguard classified or privileged information, which delays the release of such information.

Please find enclosed the non-privileged and unclassified summary of information regarding the basis for Mr. Hejeij's designation. Should additional releasable information become available, it will be provided to you.

For the most direct response, please submit any follow up questions and correspondence to OFAC via the following e-mail address: OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, DC 20220

Exhibit 20

Sincerely,

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and
Corruption Division
Office of Foreign Assets Control

Exhibit 20

UNCLASSIFIED

(U) As of early, 2014, Kassem Hejeij and an individual whom OFAC has reason to believe is Adham Tabaja, were responsible for transferring funds from Hizballah companies in Iraq to Hizballah.

(U) As of mid 2014, Kassem Hejeij was an owner of Global Cleaners which provided millions of dollars per year to Hizballah. As OFAC noted in October 2016, Global Cleaners obtained lucrative contracts to provide sanitation services in Baghdad, Iraq.

(U) As of 2014, Hizballah had previously held investments in Global Cleaners as part of Baghdad's city government's agreement to award 80 of municipal contracts to Hizballah-owned companies.

(U) As of late 2013, Kassem Hejeij was working on behalf of Hizballah to manage commercial ventures in Iraq for various Lebanese companies.  These contracts included various energy-related ventures in Iraq as well as certain business activities in Africa and South America used to finance Hizballah.  The revenues were then remitted to Hizballah using accounts at various banks, and Hejeij was working to open Middle East Africa Bank (also known as MEAB) branches in Iraq for Hizballah.

(U) In mid-2014, Kassem Hejeij was working with the Iraqi Prime Minister's office to finalize paperwork for MEAB to begin banking operations in Iraq.

(U) In mid-2013, a Hizballah finance official met with Kassem Hejeij, and Hejeij agreed to make changes to bank accounts held by individuals, entities, or charitable institutions affiliated with Hizballah so as to hide ties between money laundering and Hizballah.  Specifically, Hejeij agreed to begin transferring accounts at MEAB that were registered to Hizballah-affilated individuals or entities to new accounts under different names.

Hejeij 0229

Exhibit 21



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID SDGT-12284

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re: Kassem Hejeij

Dear Mr. Ferrari:

As you are aware, on June 10, 2015, the Office of Foreign Assets Control (OFAC) designated Kassem Hejeij as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, and on October 2, 2017, you filed a request seeking a copy of the administrative record of Mr. Hejeij's designation.

In response to your request, on October 17, 2018, OFAC provided a non-privileged and unclassified summary of the information contained in the administrative record regarding Mr. Hejeij and stated that, should additional releasable information become available, it would be provided to you.

As such, please find enclosed additional non-privileged and unclassified information regarding the basis for Mr. Hejeij's designation. This, coupled with our response dated October 17, 2018, completes the releasable information contained in the administrative record.

For the most direct response, please submit any follow up questions and correspondence to OFAC via the following e-mail address: OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, DC 20220

Exhibit 21

Sincerely,

*Nikole Thomas*

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and
Corruption Division
Office of Foreign Assets Control

Exhibit 21

UNCLASSIFIED

(U) Kassem Hejeij has maintained direct ties with senior elements in Hezbollah, Hezbollah elements in Iraq, among others. He has provided support to Hezbollah for a number of years through Middle East and Africa Bank, including by investing in civilian infrastructure that Hezbollah uses in Lebanon and Iraq.

Exhibit 21

| | |
|---|---|
| From: | OFAC.Reconsideration |
| To: | "Erich Ferrari" |
| Cc: | OFAC.Reconsideration |
| Subject: | SDGT-12284 |
| Date: | Wednesday, November 28, 2018 11:39:51 AM |
| Attachments: | 12284_Additional Information.pdf |

Mr. Ferrari:

Please find attached correspondence concerning case ID SDGT-12284.

Respectfully,

OFAC Reconsideration



Exhibit 27
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

Ferrari & Associates, P.C.

February 22, 2019

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8132 1871 7427**

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
United States Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
Washington, D.C. 20220

Re:     **Supplemental Response to OFAC's March 12, 2018 Questionnaire**[1]
        *Kassem Hejeij—SDGT-12284*

Dear Ms. Thomas:

On June 10, 2015, the United States Department of the Treasury designated Kassem Hejeij as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 ("E.O. 13224").[2] That designation was based on allegations that Mr. Hejeij had ties to Hizballah organizational elements and provided support and services to that organization.[3] On October 2, 2017, Mr. Hejeij filed a request for reconsideration of his designation in accordance with OFAC's Procedures Governing Delisting from the Specially Designated Nationals and Blocked Persons List.[4] OFAC assigned Mr. Hejeij's reconsideration matter Case ID SDGT-12284.

On March 12, 2018, OFAC issued a questionnaire ("Questionnaire") seeking information and/or documents responsive to a series of questions relevant to OFAC's consideration of Mr. Hejeij's reconsideration request. On June 8, 2018, Mr. Hejeij provided initial responses to OFAC's questionnaire and detailed arguments as to why his designation should be rescinded. On October 18, 2018, OFAC issued a non-privileged and unclassified summary of information

---

[1] Because this response contains business information and/or other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence confidentially. If OFAC believes that it is required to release this document or any of the information contained herein to the public pursuant to the Freedom of Information Act ("FOIA") or any other federal law, please notify undersigned counsel as soon as possible. Undersigned counsel intends to provide additional information in support of this request for confidentiality.

[2] PRESS RELEASE, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. Dep't of Treasury, June 10, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.

[3] *Id.*

[4] 31 C.F.R. § 501.807.

Exhibit 27

regarding the basis for Mr. Hejeij's designation.  On November 28, 2018, OFAC supplemented this summary with additional information regarding the basis for the designation.

In light of these disclosures, Mr. Hejeij is supplementing his initial responses to OFAC's questionnaire with additional information and documents relevant to the reconsideration of his designation.

I.   **Supplemental Response to Questionnaire**

3.   Relationship with other Specially Designated Nationals and Blocked Persons: Please describe the type of relationship(s), including, but not limited to, financial or business relationship(s), your client currently has, or previously had, with the following individuals and entities.  With respect to entities, please describe the nature or title of each position, financial interest, or any other relationship(s) your client currently holds or previously held with any of the entities listed below, or any other entity owned or controlled by, or affiliated with the aforementioned individuals, HIZBALLAH, or any other entity or individual on the list of Specially Designated Nationals and Blocked Persons (SDN List).  A copy of the current SDN List can be found on OFAC's website at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.  If your client has ended his relationship(s) with any of the individuals or entities, please explain.

   b.   NABIL   MAHMOUD   ASSAF   (A.K.A.   NABIL   ASSAF;   A.K.A.   NABIL MUHAMMAD ASSAF)

   **RESPONSE:** Following further investigation, it was discovered that Nabil Mahmoud Assaf obtained loans from MEAB's Credit Committee during Mr. Hejeij's tenure as MEAB Chairman.  Mr. Hejeij understands that Nabil Mahmoud Assaf submitted request(s) for loans from MEAB during his tenure as Chairman which were approved by MEAB's Credit Committee following a determination that Nabil Mahmoud Assaf met the criteria for obtaining those banking facilities.

   It is Mr. Hejeij's understanding that those facilities were terminated upon Nabil Mahmoud Assaf's OFAC designation in February 2018 and that MEAB's provision of those loan(s) was not sanctionable at the time that they were extended to Nabil Mahmoud Assaf.

   c.   MUHAMMAD   BADR-AL-DIN   (A.K.A.   MOHAMED   BADREDDINE;   A.K.A. MOHAMMED BADREDDINE)

   **RESPONSE:** Following further investigation, it was discovered that Badr-al-Din obtained loans from MEAB's Credit Committee during Mr. Hejeij's tenure as MEAB Chairman.  Mr. Hejeij understands that Badr-al-Din submitted request(s) for loans

2

Exhibit 27

from MEAB during his tenure as Chairman which were approved by MEAB's Credit Committee following a determination that Badr-al-Din met the criteria for obtaining those banking facilities.

It is Mr. Hejeij's understanding that those facilities were terminated upon Badr-al-Din's OFAC designation in February 2018 and that MEAB's provision of the loan(s) was not sanctionable at the time that they were extended to Badr-al-Din.

g. ALI MUHAMMAD QANSU (A.K.A. ALI MOHAMED KANSO; A.K.A. ALI MOHAMED KANSOU; A.K.A. ALI QANSU)

**RESPONSE:** Following further investigation, it was discovered that Qansu obtained loans from MEAB's Credit Committee during Mr. Hejeij's tenure as MEAB Chairman. Mr. Hejeij understands that Qansu submitted request(s) for loans from MEAB during his tenure as Chairman which were approved by MEAB's Credit Committee following a determination that Qansu met the criteria for obtaining those banking facilities.

It is Mr. Hejeij's understanding that those facilities were terminated upon Qansu's OFAC designation in February 2018 and that MEAB's provision of those loan(s) was not sanctionable at the time that they were extended to Qansu.

h. JIHAD MUHAMMAD QANSU (A.K.A. JEHAD KANSO; A.K.A. MOHAMED KANSO; A.K.A. JIHAD KANSO; A.K.A. JIHAD KANSOU; A.K.A. JIHAD MOHAMAD KANSOU; A.K.A. JEHAD KANSU; A.K.A. JEHAD QANSAWH; A.K.A. JEHAD QANSO; A.K.A. JIHAD QANSU)

**RESPONSE:** Following further investigation, it was discovered that Qansu obtained loans from MEAB's Credit Committee during Mr. Hejeij's tenure as MEAB Chairman. Mr. Hejeij understands that Qansu submitted request(s) for loans from MEAB during his tenure as Chairman which were approved by MEAB's Credit Committee following a determination that Qansu met the criteria for obtaining those banking facilities.

It is Mr. Hejeij's understanding that those facilities were terminated upon Qansu's OFAC designation in February 2018 and that MEAB's provision of those loan(s) was not sanctionable at the time that they were extended to Qansu.

j. ABDUL LATIF SAAD (A.K.A. ABD-AL-LATIF SAD)

**RESPONSE:** Following further investigation, it was discovered that Saad obtained loans from MEAB's Credit Committee during Mr. Hejeij's tenure as MEAB

Exhibit 27

Chairman. Mr. Hejeij understands that Saad submitted request(s) for loans from MEAB during his tenure as Chairman which were approved by MEAB's Credit Committee following a determination that Saad met the criteria for obtaining those banking facilities.

It is Mr. Hejeij's understanding that those facilities were terminated upon Saad's OFAC designation in February 2018 and that MEAB's provision of those loan(s) was not sanctionable at the time that they were extended to Saad.

k.  ISSAM AHMAD SAAD (A.K.A. ISAM AHMAD SAAD; A.K.A. ISAM AHMAD SAD)

**RESPONSE:** Following further investigation, it was discovered that Saad obtained loans from MEAB's Credit Committee during Mr. Hejeij's tenure as MEAB Chairman. Mr. Hejeij understands that Saad submitted request(s) for loans from MEAB during his tenure as Chairman which were approved by MEAB's Credit Committee following a determination that Saad met the criteria for obtaining those banking facilities.

It is Mr. Hejeij's understanding that those facilities were terminated upon Saad's OFAC designation in February 2018 and that MEAB's provision of those loan(s) was not sanctionable at the time that they were extended to Saad.

r.  GLOBAL CLEANERS S.A.R.L. (a.k.a. GLOBAL CLEANERS, INC.)

**RESPONSE:** Mr. Hejeij's June 8, 2018 response to OFAC's Questionnaire noted that Middle East Africa Bank ("MEAB") provided certain banking facilities to Global Cleaners S.A.R.L. ("Global Cleaners") during Mr. Hejeij's tenure as Chairman but that he otherwise had no relationship with Global Cleaners and was unaware of the nature or use of Global Cleaners' account(s) at MEAB.

OFAC's recent disclosures have brought to Mr. Hejeij's attention that OFAC believes Mr. Hejeij was—as of mid-2014—an owner of Global Cleaners. In addition, OFAC has leveraged this belief to support its decision to designate Mr. Hejeij, as evidenced by OFAC's provision of an unclassified summary of classified or privileged information contained in the administrative record. OFAC's belief, however, is contradicted by the facts, and OFAC has offered no evidentiary support or reasoning to establish why it believes Mr. Hejeij held an ownership interest in Global Cleaners.

To rebut OFAC's belief in this respect, please find attached documents evidencing the historical ownership of Global Cleaners—all of which are publicly available in

Exhibit 27

the Commercial Register in the District of Mount Lebanon.[5]   These documents include a Comprehensive Statement of the Company's Current Status, which identifies all persons that have maintained an ownership share in, or a formal position with, Global Cleaners.[6]   In addition, they include the Minutes of an Extraordinary General Meeting of Global Cleaners, dated August 20, 2013, which identifies Global Cleaners' shareholders as of August 2013.[7]

Mr. Hejeij's name does not appear in either document, evidencing that Mr. Hejeij was not a shareholder in Global Cleaners and that OFAC's allegation is thus contradicted by the facts.   Moreover, none of the persons identified in either document acted as agent or nominee for Mr. Hejeij.

To the extent OFAC possesses information or documents showing otherwise—i.e., that Mr. Hejeij currently holds or previously held an ownership interest in, or formal position with, Global Cleaners—Mr. Hejeij respectfully requests that OFAC share the information or documents with him so that he has an opportunity to rebut or otherwise challenge the legitimacy of that information.

## II.   **Legal and Policy Considerations**

### A.   *Basis and Criteria for Designation*

Mr. Hejeij was designated by OFAC for allegedly providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah, a person designated under E.O. 13224.[8]   OFAC's press release further alleged that Mr. Hejeij maintains direct ties to Hizballah organizational elements, including through two specific means: 1) providing support to Adham Tabaja and his affiliated companies in Iraq; and 2) by facilitating the opening of bank accounts for Hizballah in Lebanon and/or extending credit to that organizations' procurement companies.[9]   Further, OFAC also alleged that Mr. Hejeij invested in infrastructure used by Hizballah in both Lebanon and Iraq.[10]

OFAC also disclosed an unclassified version of the administrative record underlying Mr. Hejeij's SDGT designation.   However, the entire substantive portion of the administrative record

---

[5] Exhibit A—Global Cleaners S.A.R.L. Commercial Register Information.
[6] *Id.*
[7] Exhibit B—Global Cleaners S.A.R.L. Minutes of August 20, 2013 Extraordinary General Meeting.
[8] A.R. at 0003. *See also* PRESS RELEASE, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. Dep't of Treasury, June 10, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0069.aspx.
[9] *Id.*
[10] *Id.*

Exhibit 27

titled "Basis for Designation" was redacted in that disclosure. Thus, OFAC's disclosure provided no additional detail as to the basis for Mr. Hejeij's designation.

Following Mr. Hejeij's filing of a civil lawsuit seeking additional disclosures regarding the basis for his designation, OFAC released a non-privileged and unclassified summary of information relied upon to support the designation. This summary identifies additional factual allegations underlying OFAC's decision to designate Mr. Hejeij as a SDGT. These allegations consist of the following:

- As of early 2014, Hejeij and an individual whom OFAC has reason to believe is Adham Tabaja were responsible for transferring funds from Hizballah companies in Iraq to Hizballah.

- As of mid-2014, Hejeij was an owner of Global Cleaners, which provided millions of dollars per year to Hizballah. Moreover, as of 2014, Hizballah had previously held investments in Global Cleaners as part of Baghdad's agreement to award 80 municipal contracts to Hizballah-owned companies.

- As of late 2013, Hejeij was working on behalf of Hizballah to manage commercial ventures in Iraq for various Lebanese companies. These contracts included various energy-related ventures in Iraq, as well as certain business activities in Africa and South America Hizballah used to finance Hizballah. The revenues were then remitted to Hizballah using accounts at various banks, and Hejeij was working to open Middle East Africa Bank branches in Iraq for Hizballah.

- In mid-2013, a Hizballah finance official met with Hejeij, and Hejeij agreed to make changes to bank accounts held by individuals, entities, or charitable institutions affiliated with Hizballah so as to hide ties between money laundering and Hizballah. Hejeij agreed to begin transferring accounts at Middle East Africa Bank that were registered to Hizballah-affiliated individuals or entities to new accounts under different names.

On November 28, 2018, OFAC issued supplemental information to its non-privileged and unclassified summary, which provided an additional basis for Respondent's designation:

- Hejeij has maintained direct ties with senior elements of Hezbollah, Hezbollah elements in Iraq, among others. Respondent has provided support to Hezbollah for a number of years through Middle East and Africa Bank, including by investing in civilian infrastructure that Hezbollah uses in Lebanon and Iraq.[11]

---

[11] The distinct spellings of "Hizballah" or "Hezbollah" reflect those found in OFAC's unclassified summaries.

Exhibit 27

The allegations contained in OFAC's non-privileged and unclassified summaries constitute the sum of the disclosed material underlying Mr. Hejeij's designation. If these allegations do not constitute the full and complete allegations, conclusions, and/or bases underlying the designation, Mr. Hejeij respectfully requests OFAC provide a full and complete list of the bases for his designation so as to provide him a meaningful opportunity to rebut the allegations underlying those bases.

B.  *Sufficiency of the Evidence*

OFAC's disclosures fail to provide evidentiary support for its allegations. As Mr. Hejeij has provided evidence contradicting OFAC's allegations, it appears that those allegations may be in error or may otherwise fail to support a lawful basis for designation. Second, even *assuming arguendo* that OFAC's allegations were at one time true, there has been a fundamental change in circumstances negating the basis for his designation, as Mr. Hejeij is no longer MEAB's Chairman; does not hold an interest in MEAB; and is not working through MEAB to provide support to U.S.-designated parties.

   i.  OFAC's allegations are contradicted by the arguments and evidence submitted by Mr. Hejeij

Mr. Hejeij contends that OFAC has failed to provide evidence supporting its allegations, nor has it proffered adequate reasoning to support how it has a reason to believe that Mr. Hejeij is engaged in conduct made sanctionable by E.O. 13224. Below, Mr. Hejeij responds to each of allegations as described in OFAC's summaries:

   (a)  As of early 2014, Hejeij and an individual whom OFAC has reason to believe is Adham Tabaja were responsible for transferring funds from Hizballah companies in Iraq to Hizballah.

It was solely through Mr. Hejeij's role as MEAB's Chairman that he dealt with Adham Tabaja. In that role, Mr. Hejeij was tasked with facilitating a customer relationship with Tabaja on behalf of MEAB, as Tabaja was an important customer for the bank and the bank sought to maintain and strengthen that relationship at that time. Tabaja's importance stemmed from his personal wealth, as well as his ownership of a number of major Lebanese companies. Mr. Hejeij understood that Tabaja and his companies maintained accounts at several Lebanese financial institutions so MEAB was not alone in seeking to nurture and strengthen a customer relationship with him.

While MEAB provided Tabaja and certain of his companies with banking facilities prior to Tabaja's designation, the opening and maintenance of accounts held by or on his or his companies' behalf would have been performed consistent with MEAB's internal procedures. This would have included, for instance, subjecting those accounts to the policies and procedures

Exhibit 27

found in MEAB's Anti-Money Laundering/Counter Terrorist Financing (AML/CFT) Compliance Manual and Procedures for Transfers Issued by MEAB Branches.[12]   Thus, any banking facilities provided to Tabaja or his companies would have been provided under the same internal rules which applied to all MEAB customers.

As Chairman, Mr. Hejeij was not involved in the intimate details regarding customers' use of their MEAB accounts.   His knowledge was limited to the fact that MEAB maintained banking accounts for or on behalf of Tabaja and certain of his companies, and Mr. Hejeij's own conduct was strictly limited to strengthening the customer relationship with Tabaja as he was an important businessman in Lebanon.

> (b) <u>As of mid-2014, Hejeij was an owner of Global Cleaners, which provided millions of dollars per year to Hizballah.   Moreover, as of 2014, Hizballah had previously held investments in Global Cleaners as part of Baghdad's agreement to award 80 municipal contracts to Hizballah-owned companies.</u>

As noted above, Mr. Hejeij is not listed on any of the documents identifying the past and current owners of Global Cleaners.   It is thus unclear how OFAC is supporting this allegation. The disclosures made to Mr. Hejeij offer no evidence to support that allegation and have not outlined the agency's reasoning for drawing that conclusion.

> (c) <u>As of late 2013, Hejeij was working on behalf of Hizballah to manage commercial ventures in Iraq for various Lebanese companies.   These contracts included various energy-related ventures in Iraq, as well as certain business activities in Africa and South America used to finance Hizballah.   The revenues were then remitted to Hizballah using accounts at various banks, and Hejeij was working to open Middle East Africa Bank branches in Iraq for Hizballah.</u>

During the relevant time period, Mr. Hejeij traveled to Iraq for the purpose of overseeing and effectuating the opening of two MEAB branches in Baghdad and Basra.   During his travels to Iraq, he visited religious sites in Najaf on certain occasions.

MEAB sought to open those branches to serve a burgeoning market, as Iraq was coming out of a decade of war and its financial sector held opportunities for the bank.   MEAB was one of many foreign banks during this time seeking to open branches in Iraq in order to serve an expanding customer base there.   MEAB's purpose in opening up the two branches in Iraq—and Mr. Hejeij's role in facilitating this—was to increase profits by serving a new customer base and

---

[12] *See* Exhibit C—Anti-Money Laundering/Counter Terrorist Financing (AML/CFT) Compliance Manual and Exhibit D—Procedures for Transfers Issued by MEAB Branches.

Hejeij 0263

Exhibit 27

facilitating foreign investment in Iraq. This is the same calculation that drove Standard Chartered Bank to open up at least three offices in Iraq at the same time.[13] Moreover, Lebanese banks were particularly well-placed to help facilitate domestic and foreign investment in Iraq, as a result of the significant cultural ties between the two countries.

To the extent that OFAC has reason to believe Mr. Hejeij's travel to Iraq or MEAB's opening branches in Iraq was for some other purpose, Mr. Hejeij respectfully requests that the agency provide him with its reasoning as to why it has concluded so, including the provision of any evidence supporting that conclusion.

> (d) In mid-2013, a Hizballah finance official met with Hejeij, and Hejeij agreed to make changes to bank accounts held by individuals, entities, or charitable institutions affiliated with Hizballah so as to hide ties between money laundering and Hizballah. Hejeij agreed to begin transferring accounts at Middle East Africa Bank that were registered to Hizballah-affiliated individuals or entities to new accounts under different names.

Given OFAC's lack of specificity and the significant passage of time since the purported meeting, Mr. Hejeij is unaware of what particular meeting involving "a Hizballah finance official" OFAC is referring to. Mr. Hejeij does not recall any interactions with any person holding themselves out to be an official representative of Hizballah, so if OFAC can be more specific as to the identity of the individual, the location of the meeting, or the timeframe in which it occurred, Mr. Hejeij may be able to directly respond to OFAC's allegation.

Despite the vagueness and historic nature of this allegation, Mr. Hejeij is aware that MEAB has performed internal and external audits since his resignation. This includes a financial audit undertaken by PricewaterhouseCoopers and Grant Thornton, neither of which have indicated—as far as Mr. Hejeij is aware—that Mr. Hejeij nor any other individual at MEAB engaged in the conduct alleged by OFAC.[14]

> (e) Hejeij has maintained direct ties with senior elements of Hezbollah, Hezbollah elements in Iraq, among others. Hejeij has provided support to Hezbollah for a number of years through Middle East and Africa Bank, including by investing in civilian infrastructure that Hezbollah uses in Lebanon and Iraq.

---

[13] See Sara Hamdan, Despite Challenges, Banks Look to Set Up Branches in Iraq, NEW YORK TIMES, April 3, 2013, available at https://www.nytimes.com/2013/04/04/world/middleeast/despite-challenges-banks-look-to-set-up-branches-in-iraq.html.
[14] See Exhibit E—PWC and Grant Thornton External Audit.

Hejeij 0264

Exhibit 27

In response to the Questionnaire, Mr. Hejeij noted that MEAB maintained banking facilities and accounts for Adham Tabaja and certain of his companies, including al-Inmaa Engineering and Contracting; Ali Youssef Charara; and Global Cleaners—all of whom were later designated for their relationship(s) to Hizballah.  However, MEAB provided services to these parties at a time when they were considered legitimate business people and companies in Lebanon and with the understanding that their use of MEAB banking facilities or accounts were strictly for legitimate business operations.

OFAC has not identified the senior elements of Hizballah nor the elements of Hizballah in Iraq with which Mr. Hejeij purportedly maintains direct ties.  If the alleged Hezbollah facilitators that Mr. Hejeij has been accused of having links to—Tabaja, al-Inmaa Engineering and Contracting, Charara, and Global Cleaners—are those elements OFAC is alluding to, then Mr. Hejeij's ties to them arose out of his role as Chairman at MEAB and the bank's provision of services to those parties.  OFAC has not identified any evidence nor offered any sufficient reason as to why it believes Hejeij has direct ties to any other purported senior elements of Hizballah.

ii. <u>Mr. Hejeij's departure and divestment from MEAB constitutes a change in circumstances negating the basis of his designation</u>

There has also been a change in circumstances negating the basis of designated Mr. Hejeij's designation—i.e., he is no longer MEAB's Chairman and does not maintain an interest in MEAB.  Specifically, Mr. Hejeij resigned from his position as MEAB's Chairman on June 15, 2015 and transferred all of his shares in the bank on June 18, 2015.  Those decisions were ratified by MEAB's Board of Directors and the Banque du Liban, respectively, and occurred more than three years ago.  Since that time, Mr. Hejeij has had no relationship with MEAB.

Further, Mr. Hejeij is aware that MEAB has ceased its relationships with OFAC-designated parties, including Adham Tabaja and Al-Inmaa Engineering and Contracting, by closing his and his companies accounts and seeking repayment of debts owed by Mr. Tabaja.  Thus, any relationship between OFAC-designated parties and MEAB that Mr. Hejeij may have facilitated during his time as Chairman of MEAB have been terminated for at least three years.  There has thus been a fundamental change in circumstances negating the basis for Mr. Hejeij's designation.

In addition, Hejeij notes that OFAC's non-privileged and unclassified summaries detail allegations that are more than four (4) years old.  Indeed, the latest-in-time alleged conduct OFAC relied upon for Mr. Hejeij's designation arise from his efforts to finalize paperwork for MEAB to begin banking operations in Iraq in mid-2014—more than four (4) years ago.  Even *assuming arguendo* that OFAC's allegations are true, OFAC has not provided evidence or reasoning to show that Mr. Hejeij provides financial, material, or technological support for, or financial or other services to or in support of, Hizballah on an ongoing basis.

Exhibit 27

### III.   **Conclusion**

For the reasons explained above, Mr. Hejeij does not meet the legal criteria for designation under E.O. 13224, as—at the very minimum—there has been a change in circumstances negating the basis of Mr. Hejeij's designation.   Accordingly, Mr. Hejeij respectfully requests OFAC take immediate steps to rescind his designation and remove his name from OFAC's SDN List.  If OFAC requires additional information and documentation necessary for its consideration of this matter, please inform undersigned counsel as soon as possible.

Please forward all correspondence relating to this submission to:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and we look forward to your response.

Sincerely,

Erich C. Ferrari

Hejeij 0266

Exhibit 27

# EXHIBIT

# A

Hejeij 0267

Exhibit 27

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF - Beirut

Commercial Register    Mount Lebanon (G)/General/2011/2024067
District of Mount Lebanon (G)

خبيرة لدى محكمة المحلف في بيروت
صيدلية من الدولية الرسمية والسفارات
الملا - شارع الجزائر – بناية ألارضي - بيروت

Date: 24/10/2018
Serial Nbr.: 2000113221

Comprehensive Statement of the Company's Current Status

## General Information

| | |
|---|---|
| Registration Nbr.: | 2024067 |
| Name: | GLOBAL CLEANERS S.A.R.L. |
| Additional name: | GLOBAL CLEANERS S.A.R.L. |
| Address: | Baabda – Chiyah – Mouzannar Center – 2nd Floor – Plot 10/5439 of Chiyah Land Zone |
| Establishment date: | 18/02/2011 |
| Registration date: | 21/02/2011 |
| Establishment district: | Mount Lebanon (G) |
| Current district: | Mount Lebanon (G) |
| Capital: | 5.000.000 LBP |
| Shares: | 100 |
| Duration of the Company: | 99 years |
| Register Type: | General |
| Status of the Company: | Existing |
| Legal form: | S.A.R.L. |

Page 1/7

Telefax: +961 1 753 353
Mob:+ 961 71 151 040

+961 1 753 353 تلكفاكس
+ 961 71 151 040 خلوي

Hejeji 0268

Exhibit 27

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF – Beirut

Commercial Register     Mount Lebanon (G)/General/2011/2024067     Date: 24/10/2018
District of Mount Lebanon (G)                                          Serial Nb.: 2000113221

خبيرة محلّفة لدى المحاكم في مطعم الترجمة
مصادقة من الدوائر الرسمية الرسمية والسفارات
الملا – شارع الجزائر – ارفيل – بناية بيرلا – بيروت

## General Information

**Type of Activities**    The Company performs all the following activities, jobs, and works in all of its branches in Lebanon and abroad for its own account or for the account of tiers, whether they were natural or legal persons, from the private or public sectors, Lebanese or foreigners, establishments, companies, or governments, within applicable laws and regulations:

**Cleaning works and undertakings and maintenance:**

- Perform all types of cleaning works and services, internal and external maintenance of private, public or governmental buildings, private companies and public utilities, factories, hotels, cleaning private and public roads, emplace garbage cans, and perform all required activities to do the above.
- Conclude all types of contracts
   Private agreements and undertakings, contracting with ministries, individuals, companies in Lebanon and abroad on cleaning jobs, employment of local and foreign workers, perform projects and services directly or indirectly related to this sector that have not been mentioned.
- Import and purchase all equipment, machines, vehicles, and trucks



Page 2/7

Telefax: +961 1 753 353
Mob: + 961 71 151 040

هاتف: 961 1 753 353+
خلوي: 961 71 151 040+

Hejeji 0269

Exhibit 27

خبيرة محلفة لدى المحاكم في اللبنانية
مصادقات من الدوائر الرسمية والسفارات
الملا – شارع أليغريا – بيروت – بناية لا بيرلا – طابق أرضي
زينة فوزي ضهوي

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF – Beirut

Commercial Register     Mount Lebanon (G)/General/2011/2024067
District of Mount Lebanon (G)

Date: 24/10/2018
Serial Nb.: 2000113221

**General Information**

**Type of Activities**   related to this sector.

- Manage and invest in cleaning and maintenance projects for local and foreign establishments and companies, adhere, merge and unite to work in unison, participate in bids and undertakings, and carry out the said projects in Lebanon and abroad.
- Execute and manage the processing of construction wastes and rubble, and make use of the same in Lebanon and abroad.
- Execute all types of cleaning undertakings and bids to all parties in Lebanon and abroad.
- Perform all types of cleaning services to protect the environment from pollution and improve it.
- Remove rubble and transport debris
- Cooperate with groups that perform similar activities or help them achieve their objects in Lebanon and abroad.

Page 3/7

Telefax: +961 1 753 353
Mob: + 961 71 151 040

هاتف: +961 1 753 353
خليوي: +961 71 151 040

Hejeij 0270

Exhibit 27

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF - Beirut

Commercial Register
District of Mount Lebanon (G)

خبيرة محلفة لدى المحاكم في اللبنانية
مصادقات من الدوائر الرسمية والسفارات
الملا - شارع الجزائر - بناية بيرلا - الطابق الأرضي - بيروت

Mount Lebanon (G)/General/2011/2024067
Date: 24/10/2018
Serial Nb.: 2000113221

<u>General Information</u>

<u>Type of Activities</u>

Page 4/7

Telefax: +961 1 753 353
Mob:+ 961 71 151 040

هاتف/فاكس: +961 1 753 353
خلوي: +961 71 151 040

Hejeji 0271

Exhibit 27

زينة فؤاد دحوي
خبيرة محلّفة لدى المحاكم في بيروت
مصادقة من الدوائر الرسمية والسفارات
المللا – شارع ألجيريا – بناية برلا – طابق أرضي – بيروت

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF - Beirut

Date: 24/10/2018

Commercial Register    Mount Lebanon (G)/General/2011/2024067

Serial Nb.: 2000113221

District of Mount Lebanon (G)

| Nb/Name | Nationality | Relationship | Stocks | Shares | Percentage | Beginning date |
|---|---|---|---|---|---|---|
| Persons | | | | | | |
| Ahmad Jawad Shanash Fartoussi | Iraqi | Founder | 0 | 0 | 0 | 21/02/2011 |
| Hassan Mohamad Faour | Lebanese | Attorney | 0 | 0 | 0 | 18/09/2013 |
| Raed Hamid Taher Abou Aini | Iraqi | Founder | 0 | 0 | 0 | 21/02/2011 |
| Adnan Mahmoud Kawtharani | Lebanese | Shareholder | 0 | 4 | 0 | 18/09/2013 |
| Issam Ahmad Saad | Lebanese | Authorized Signatory jointly and severally | 0 | 0 | 0 | 18/09/2013 |
| | | Shareholder | 0 | 5 | 0 | 18/09/2013 |
| | | Manager | 0 | 0 | 0 | 18/09/2013 |
| Mohamad Adham Tabaja | Lebanese | Shareholder | 0 | 43 | 0 | 18/09/2013 |
| | | Manager | 0 | 0 | 0 | 18/09/2013 |
| Maysam Mohsen Obeid Al Zaydi | Iraqi | Founder | 0 | 0 | 0 | 21/02/2011 |
| | | Shareholder | 0 | 48 | 0 | 18/09/2013 |
| | | Authorized Signatory jointly and severally | 0 | 0 | 0 | 18/09/2013 |

Page 5/7

Exhibit 27

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF - Beirut

Commercial Register                Mount Lebanon (G)/General/2011/2024067
District of Mount Lebanon (G)

Date: 24/10/2018
Serial Nb.: 2000113221

**Persons**

**Records and Signals**

- On 23/07/2018, an incoming reference was registered at our office from the Executive Bureau of Beirut under Nb. 1180/2017, requesting to broaden the precautionary seizure, applicant Middle East and Africa Bank (MEAB).

Company against which the seizure is to be executed, FANTASY WORLD S.A.R.L and Co., with a certified true copy of the precautionary seizure decision of 21/06/2018 of the shares owned by detainee Mr. Mohamad Adham Tabaja in the Company, included in the file under a number from the first party upon the second party.

**Representation**

No commercial representation contracts in the company file

**Contracts**

No Contracts

**Notes** With reservation regarding the ministry of finance signals that have not been recorded in all the Company files in general due to the volume of claims.

Page 6/7

Telefax: +961 1 753 353
Mob:+ 961 71 151 040

Exhibit 27

زينة فوزي ضهوي
خبيرة محلفة لدى المحاكم في الترجمة
مترجمة محلفة من الدوائر الرسمية والسفارات
الملا – شارع الجزائر – بناية بيرلا – أرضي – بيروت

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Alegria Str. – Perla Bldg – GF - Beirut

Commercial Register
District of Mount Lebanon (G)

Mount Lebanon (G)/General/2011/2024067

Date: 24/10/2018
Serial Nb.: 2000113221

The present statement was delivered in accordance with the Commercial Register of Mount Lebanon (G) database on 24/10/2018.

**Certified True Copy delivered on 24/10/2018**

**Chief Clerk of the Commercial Register of Baabda - Mount Lebanon**
**Liliane Matta**
(Signature and Seal)

Page 7/7

* *Sworn translation delivered on 26/10/2018*

Telefax: +961 1 753 353
Mob: + 961 71 151 040

تلفاكس: +961 1 753 353
خليوي: + 961 71 151 040

Hejeij 0274



Exhibit 27



التاريخ ٢٤/١٠/٢٠١٨
الرقم التسلسلي ٢٠٠٠١١٣٢٢١

السجل التجاري
محافظة جبل لبنان (ج)                جبل لبنان (ج)/عام/٢٠١١/٦٧.٢٠٢٤

إفادة شاملة عن الوضع الحالي

معلومات عامة

| | | |
|---|---|---|
| رقم التسجيل : | ٢٠٢٤.٦٧ | |
| الإسم : | شركة غلوبال كلينرز ش.م.م | |
| الاسم الاضافي : | GLOBAL CLEANERS SARL | |
| العنوان : | بعبدا – الشياح – سنتر مزنر – الطابق الثاني – القسم ٥٤٣٩/١٠ الشياح العقارية | |
| تاريخ التأسيس : | ٢٠١١/٠٢/١٨ | |
| تاريخ السجل : | ٢٠١١/٠٢/٢١ | |
| محافظة التأسيس : | جبل لبنان (ج) | |
| المحافظة الحالية : | جبل لبنان (ج) | |
| رأس المال : | ٥٠٠٠٠٠٠٠ | ليرة لبنانية |
| تقسيم : | ١٠٠ | |
| مدة الشركة : | ٩٩ سنة | |
| نوع السجل : | عام | |
| وضع الشركة : | Sقائمة | |
| الشكل القانوني : | ش.م.م | |

Report Name : COMPANY_FILE

صفحة ١/٧

التاريخ ٢٤/١٠/٢٠١٨
الرقم التسلسلي ٢٠٠٠١١٣٢٢١

السجل التجاري
محافظة جبل لبنان (ج)                جبل لبنان (ج)/عام/٢٠١١/٦٧.٢٠٢٤



معلومات عامة

نوع النشاط

تقوم الشركة بمزاولة كل من النشاطات والمهن والاعمال التالية في جميع فروعها في لبنان والخارج لحسابها الخاص او لحساب الغير سواء أكانوا اشخاص طبيعيين او
معنويين من القطاع الخاص او العام ، لبنانيين او اجانب ، مؤسسات شركات او دول ، وذلك ضمن حدود الانظمة والقوانين المرعية الاجراء :
اعمال وتعهدات التنظيف والصيانة :
– القيام بكافة الخدمات واعمال التنظيف المتنوعة والصيانة الداخلية والخارجية للمباني الخاصة والعامة او الحكومية والشركات الخاصة وذات
الصفة العامة ، والمصانع ، والفنادق ، وتنظيف الطرق الخاصة والعامة ، ووضع مستوعبات للنفايات ، وجميع الاعمال اللازمة من اول ذلك .
– ابرام جميع العقود
والاتفاقات والتعهدات الخاصة والتعاقد مع الوزارات والافراد والشركات في لبنان وخارجه على اعمال التنظيف وتوظيف العمال المحليين والأجانب والقيام
بالمشاريع
والخدمات التي تتم بصورة مباشرة او غير مباشرة الى هذا القطاع والتي اغفل ذكرها .
– استيراد وشراء كافة التجهيزات والآليات والسيارات والشاحنات التي تتم

http://srvba.ba.cr.moj/reports/rwservlet/getjobid97267?server=rep_srvBA_FRHome1٠٢٠١٨/١٠/٢٤

Hejeij 0275



Exhibit 27

COMPANY_FILE
Report Name

صفحة ٢/٧

السجل التجاري

محافظة جبل لبنان (ج)

جبل لبنان (ج)/عام/٢٠١١/٢٠٢٤٠٦٧

التاريخ ٢٤/١٠/٢٠١٨
الرقم التسلسلي ٢٠٠١١٣٢٢١

معلومات عامة

نوع النشاط

بصلة الى هذا القطاع .

– ادارة واستثمار مشاريع التنظيف والصيانة القائمة لمؤسسات وشركات محلية واجنبية ، والانضمام والتوحد للعمل سويا بمصلة مشتركة
والاشتراك في المناقصات والالتزامات وتنفيذ هذه المشاريع في لبنان وخارجه .

– تنفيذ وإدارة معالجة النفايات الإنشائية والاستفادة منها .

– القيام بتنفيذ
كافة أعمال النقل والتجميع للقمامة والنفايات والأتكاض والاستفادة منها داخل لبنان وخارجه .

– القيام بتنفيذ كافة أنواع التعهدات ومناقصات النظافة لجميع
الجهات داخل لبنان وخارجه .

– تنفيذ كافة انواع وأعمال وخدمات التنظيف وحماية البيئة وتحسينها من التلوث .

– القيام بتنفيذ أعمال ازالة الردم ونقل المخلفات .

التعاون مع الهيئات التي تزاول اصنالا شبيهة بأعمالها او التي تساعدها في تحقيق أغراضها داخل او خارج لبنان .

COMPANY_FILE
Report Name

صفحة ٢/٧

السجل التجاري

محافظة جبل لبنان (ج)

جبل لبنان (ج)/عام/٢٠١١/٢٠٢٤٠٦٧

التاريخ ٢٤/١٠/٢٠١٨
الرقم التسلسلي ٢٠٠١١٣٢٢١



معلومات عامة

نوع النشاط

Hejeij 0276



Exhibit 27
Page 1 of 4

| | | COMPANY_FILE | | | | | | |
|---|---|---|---|---|---|---|---|---|

Report Name

٧/٤ صفحة

السجل التجاري
محافظة جبل لبنان (ع)

جبل لبنان (ع)/عام/٢٠١١/٠٦٧ ٢٠٢٤

التاريخ ٢٤/١٠/٢٠١٨
الرقم التسلسلي ٢٠٠٠١١٣٢٢١

المساهمون

| نوع العلاقة | الرقم / الاسم | الجنسية | نوع العلاقة | الأسهم | الحصص | النسبة | تاريخ البداية |
|---|---|---|---|---|---|---|---|
| أ/ الأشخاص | | | | | | | |
| | احمد جواد شاكر الفريجوسي | عراقي | مؤسس | . | . | ٠,٠٠ | ٢٠١١/٠٢/٢١ |
| | حسن محمد ناعور | لبناني | محامي | . | . | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | رائد حميد طاهر ابو عني | عراقي | مؤسس | . | . | ٠,٠٠ | ٢٠١١/٠٢/٢١ |
| | عدنان محمود كيزاني | لبناني | شريك | . | ٤ | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | عصام احمد سعد | لبناني | مفوض توقيع بالاتحاد والانفراد | . | . | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | | | شريك | . | ٥ | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | | | مدير | . | . | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | محمد ادهم طباجة | لبناني | شريك | . | ٤٣ | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | ميثم محسن عبيد الزيدي | عراقي | مدير | . | . | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | | | مؤسس | . | . | ٠,٠٠ | ٢٠١١/٠٢/٢١ |
| | | | شريك | . | ٤٨ | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |
| | | | مفوض توقيع بالاتحاد والانفراد | . | . | ٠,٠٠ | ٢٠١٣/٠٩/١٨ |

---

| | | COMPANY_FILE | | | | | | |
|---|---|---|---|---|---|---|---|---|

Report Name

٧/٥ صفحة

السجل التجاري
محافظة جبل لبنان (ع)

جبل لبنان (ع)/عام/٢٠١١/٠٦٧ ٢٠٢٤

التاريخ ٢٤/١٠/٢٠١٨
الرقم التسلسلي ٢٠٠٠١١٣٢٢١

| نوع العلاقة | الرقم / الاسم | الجنسية | نوع العلاقة | الأسهم | الحصص | النسبة | تاريخ البداية |
|---|---|---|---|---|---|---|---|
| الأشخاص | | | | | | | |



وقائع واشارات

- بتاريخ ٢٣/٠٧/٢٠١٨ سجل لدينا ورد من دائرة تنفيذ بيروت برقم ٢٠١٧/١١٨٠ طلب توسيع دائرة الحجز الاحتياطي طالب الحجز بنك الشرق الاوسط وافريقيا

المطلوب الحجز بوجهها شركة FANTASY WORLD SARL وارفاقها مع صورة طبق الاصل عن القرار تاريخ ٢٠١٨/٦/٢١ لالقاء الحجز الاحتياطي على الحصص العائدة

ملكيتها المحجوز شده محمد ادهم طباجه في الشركة شنت الملف صادر عن محكمة برقم من الطرف الاول على الطرف الثاني

التمثيل

لا توجد اية عقود تمثل تجاره. ف. ملف الشركة

Hejeij 0277

Exhibit 27



العقود
لا توجد اية عقود
الملاحظات
مع التحفظ بالنسبة لاشارات وزارة المالية التي لم يتم تدوينها في مجمل ملفات الشركات عموما نظرا لكثافة الطلبات

| COMPANY_FILE : | | |
|---|---|---|
| Report Name | ٧ / ٦ | صفحة |

| | السجل التجاري |
|---|---|
| التاريخ ٢٤/١٠/٢٠١٨ | جبل لبنان (ع)/عام/٢٠١١/٢٠٢٤٠٦٧(ع) | محافظة جبل لبنان (ع) |
| الرقم التسلسلي ٢٠٠٠١١٣٢٢١ | | |

اعطيت هذة الافادة وفق قاعدة البيانات الموجودة في السجل التجاري

جبل لبنان (ع) في تاريخ ١٨/١٠/٢٤

٢٤ تشرين الأول ٢٠١٨

رئيس القلم

| COMPANY_FILE : | | |
|---|---|---|
| Report Name | ٧ / ٧ | صفحة |

Exhibit 27

# EXHIBIT

# B

Zeina F. Dahwi
Certified Public Translator
Traductrice Assermentée
Malla – Algeria Str. - Perla Bldg. – GF - Beirut

خبيرة محلّفة لدى المحاكم في الترجمة
مصادقات من الدوائر الرسمية والسفارات
الملا – شارع الجزائر – بناية بيرلا - أرضي - بيروت

Exhibit 27

## Minutes of the Extraordinary General Meeting
## of Global Cleaners S.A.R.L
## Held on 20/08/2013

At exactly nine o'clock in the morning on Tuesday the 20th of August 2013, the Extraordinary General Meeting of Global Cleaners S.A.R.L. registered at the Commercial Register of Baabda under Nb. /2024067/ was convened at the head office of the Company.

After drafting and verifying the attendance list, quorum was present with the attendance of all shareholders representing the total capital of the company as follows:

- Maysam Mohsen Obeid Al Zaydi          - /48/ out of /100 / shares
- Mohamad Adham Tabaja                  - /43/ out of /100/ shares
- Issam Ahmad Saad                      - /5/ out of /100/ shares.
- Adnan Mahmoud Kawtharani              - /4/ out of /100/ shares.

The session was presided over by Mr. Maysam Mohsen Obeid Al Zaydi, the authorized signatory of the Company, who declared that the agenda shall be as follows:

1- Approve the transfer Contract.
2- Determine the shares of each shareholder.
3- Amend the Articles of Association of the Company.
4- Appoint Mr. Maysam Mohsen Obeid Al Zaydi and Mr. Issam Ahmad Saad as the authorized Managers to sign on behalf of the Company, severally and jointly, and approve the request of shareholder Mr. Adnan Mahmoud Kawtharani to be released from his responsibility as Manager of the Company.

**Clause 1**: The General Meeting decided to ratify the Transfer Contract registered at the office of the Notary Public of Ghobeiry, Manal Yahfoufi, under Nb. /10132/2013 on 15/07/2013, after shareholder Mr. Maysam Mohsen Obeid Al Zaydi sold his shares amounting to /44/ shares, and shareholder Mr. Hussein Abdel Wahed Sayer Al Taei of all his shares amounting to /4/ shares to Mr. Mohamad Adham Tabaja and Mr. Issam Ahmad Saad.

**The decision was unanimously approved with the raise of hands**

**Clause 2:** The Company shares became as follows:

| Shareholder | Share/100 | Amount in LBP |
|---|---|---|
| Maysam Mohsen Obeid Al Zaydi | 48 | 2,400,000 |
| Mohamad Adham Tabaja | 43 | 2,150,000 |
| Issam Ahmad Saad | 5 | 250,000 |
| Adnan Mahmoud Kawtharani | 4 | 200,000 |
| Total | 100 | 5,000,000 |

**The decision was unanimously approved with the raise of hands**

Telefax: +961 1 753 353
Mob: + 961 71 151 040

تلفاكس: 353 753 1 +961
خلبوي: 040 151 71 961 +

Exhibit 27

Zeina F. Dahwi                                           رئيسة فوزي ضحوي
Certified Public Translator                     خبيرة محلّفة لدى المحاكم في الترجمة
Traductrice Assermentée                   مصادقات من الدوائر الرسمية والسفارات
Malla – Algeria Str. - Perla Bldg. – GF - Beirut      الملا – شارع الجزائر - بناية بيرلا - أرضي - بيروت

**Clause 3:** The General Meeting decided to ratify the decision of appointing Mr. Maysam Mohsen Obeid Al Zaydi and Mr. Issam Ahmad Saad as the Authorized Managers to sign on behalf of the Company severally and jointly, and to approve the request of Mr. Adnan Mahmoud Kawtharani to be released from his responsibility as Manager of the Company. **The decision was unanimously approved with the raise of hands**

There being no further items to discuss, the session was closed at the date set above in the introduction and the participants signed the minutes of meeting and asked the Company Lawyer, Mr. Hassan Faour, to register the same at the commercial register of the company.

**Chairman/Shareholder**                          **Shareholder**
Maysam Mohsen Obeid Al Zaydi                Mohamad Adham Tabaja
(Signature)                                                   (Signature)

**Shareholder**                                           **Shareholder**
Adnan Mahmoud Kawtharani                      Issam Ahmad Saad
(Signature)                                                   (Signature)

Sworn translation delivered on 25/10/2018



Telefax: +961 1 753 353                                                    تلفاكس: +961 1 753 353
Mob: + 961 71 151 040                                                    خلوي: 040 151 71 961 +

Exhibit 27

محضر الجمعية العمومية الغير عادية
لشـــركة غلوبال كلينرز ش.ذ.م.م
المنعقدة بتاريخ ٢٠١٣/٨/٢٠

١ ٢ SEP 2013

تمام الساعة التاسعة صباح يوم الثلاثاء الواقع في ٢٠١٣/٨/٢٠، عقدت الجمعية العمومية الغير عادية
لشركة غلوبال كلينرز ش.ذ.م.م. والمسجلة في السجل التجاري في دبيا برقم ٦٧/٢٠٢٤٠، اجتماعا للشركاء في
مقر الشركة الرئيسي.

بعد تنظيم قائمة حضور والتدقيق فيها، تبين ان النصاب القانوني مكتمل بحضور جميع الشركاء مالكي
الحصص المكونة لرأسمال الشركة وهم:

- ميثم محسن عبيد الزيدي          - ٤٨/حصة/حصة من اصل ١٠٠/ حصة.
- محمد أدهم طباجة                - ٤٣/حصة/حصة من اصل ١٠٠/ حصة.
- عصام أحمد سعد                  - ٥/ حصة/حصة من اصل ١٠٠/ حصة.
- عدنان محمود كوثراني            - ٤/ حصة من اصل ١٠٠/ حصة.

ترأس الجلسة الشريك السيد ميثم محسن عبيد الزيدي المفوض بالتوقيع عن الشركة وصرح بان جدول الاعمال
هو التالي:
١- الموافقة على عقد التفرغ.
٢- تحديد حصص الشركاء.
٣- تعديل نظام الشركة.
٤- تعيين السيدين ميثم محسن عبيد الزيدي وعصام أحمد سعد المديرين المفوضين بالتوقيع عن الشركة
بالاتحاد و الانفراد، وقبول طلب الشريك السيد عدنان محمود كوثراني اعفائه من من ادارة الشركة.

البند الاول: قررت الجمعية العمومية التصديق على عقد التفرغ المسجل لدى كاتب عدل الاستاذ السيد
الاستاذ السيد حيدري والمسجل برقم /٦٣٣٣.........٢٠١٣، تاريخ ٢٠١٣/٧/١٥، بعد بيع الشريكين السيد
ميثم محسن عبيد الزيدي لحصصه البالغة ٤٤/ سهما، والسيد حسين عبد الواحد ساير الطائي لكامل حصصه
البالغة ٤/ من السادة محمد أدهم طباجة و عصام أحمد سعد.

صدق هذا القرار بالاجماع بعد رفع الايدي.

البند الثاني: ان حصص الشركة اصبحت وفقا للشكل التالي:

| الشريك | الحصة من اصل ١٠٠/ | المبلغ ل.ل. |
|---|---|---|
| ميثم محسن عبيد الزيدي | ٤٨ | ٢,٤٠٠,٠٠٠ |
| محمد أدهم طباجة | ٤٣ | ٢,١٥٠,٠٠٠ |
| عصام أحمد سعد | ٥ | ٢٥٠,٠٠٠ |
| عدنان محمود كوثراني | ٤ | ٢٠٠,٠٠٠ |
| المجموع | ١٠٠ | ٥,٠٠٠,٠٠٠ |

صدق هذا القرار بالاجماع بعد رفع الايدي.

البند الثالث: قررت الجمعية العمومية التصديق على قرار تعيين السيدين ميثم محسن عبيد الزيدي وعصام
احمد سعد المديرين المفوضين بالتوقيع عن الشركة بالاتحاد والانفراد، وقبول طلب الشريك السيد عدنان
محمود كوثراني اعفائه من ادارة الشركة.

صدق هذا القرار بالاجماع بعد رفع الايدي.

ولما لم يعد هناك من امور لبحثها، رفعت الجلسة بالتاريخ والزمان المدون في مقدمة الاجتماع وبعد ان وقع
الحاضرون على محضر الاجتماع وطلبوا من محامي الشركة الاستاذ حسن ناعور تسجيله في السجل التجاري
الخاص للشركة.

| رئيس الجلسة/ الشريك | الشريك | الشريك | الشريك |
|---|---|---|---|
| ميثم محسن عبيد الزيدي | محمد أدهم طباجة | عدنان محمود كوثراني | عصام أحمد سعد |

Hejeij 0282

Exhibit 27

# EXHIBIT

# C

Exhibit 27

MEAB S.A.L.
Middle East & Africa Bank S.A.L.

Anti-Money Laundering/Counter Terrorist Financing (AML/CFT) Compliance Manual:

Approval of the Board of Directors:

Addendum to the Minutes of the Board's Meeting held on 24/10/2013

Hejeij 0284

Exhibit 27

The staff involved with the implementation of the transaction should identify the customer, regardless of the value of the transaction, in case he notices that many transactions are performed against amounts that are less than the minimum required, or reach or exceed the total of 10.000$ or its equivalent, in its account or in several accounts pertaining to the same person, or if in doubt regarding the attempt of a customer to proceed to money laundering and terrorism financing.

When due diligence procedures are not appropriately performed towards customers and real beneficiaries, the account should not be opened and the transaction should not be processed. The matter should also be referred to the "Special Investigation Commission" established by virtue of Law Nb. 318 of 20/04/2001.

The bank should continuously apply due diligence measures for its customers including the holders of accounts opened before the enactment of Law Nb. 318 of 20/04/2001, in terms of modifying or adding information to the KYC Form, which may incur changes to the customer's position, particularly in case of doubt regarding the accuracy or truthiness of the previously declared information or in case subsequent changes occur to the customer or the economic right holder's identity.

**Transactions Monitoring Duty**

1- The **Middle East and Africa Bank** should inquire about the money source and destination, the transaction object, the beneficiary's and economic right holder's identity, from the customer, when the intended transaction includes the following characteristics:

  a- When the transaction is performed in unusual complicated circumstances, the bank should evaluate such circumstances not only with regards to the transaction's type and nature only, but to its apparent objective.

  b- When the transaction seems to not have an economic justification or a project's objective, especially in case of difference between the transaction and the professional activity of the customer, or even between the transaction and the customer's habits and personality.

  c- When one of the transaction's parties is a citizen or a resident in countries that do not apply the FATF recommendations or insufficiently implement the same.

2- The Middle East and Africa Bank S.A.L. should immediately notify the Governor of Bank of Lebanon in his capacity as the President of the Special Investigation Commission, in case it had affirmations or doubts that the financial transaction performed or attempted to be performed is related to money laundering, terrorism financing, terrorist acts or terrorist organizations, particularly when:

Exhibit 27

- It has doubts that cannot be detached regarding the truthiness of the written declaration submitted by the customer on the economic right holder's identity or when he gives untrue or inaccurate information concerning this identity.
- It appears to that bank that it was misled during the identification of the customer's or economic right holder's identity and such doubts remain to exist concerning the information submitted by the customer.
- The transfers or checks are returned either directly or based upon the request of the concerned parties, namely the corresponding banks, due to falsification or doubts on suspicious transactions.

The Middle East and Africa Bank should take into consideration, without limitation, the following indications to money laundering.

1- Exchange of great quantities of small coins against larger ones of the same currencies or in different currencies.
2- Large or recurring currency exchange transactions (Cambio) from cash monies.
3- Activation the customer's into deposits of large amounts of money or recurring deposits of amounts which total reaches a certain limit or a great unjustified volume with proportion to the apparent activities.
4- Activation of account principally to transfer large amounts of money to foreign countries or receipt of large transfers therefrom while the staff in charge sees that the customer's activity does not justify such transactions.
5- Considerable or recurring transactions related to the activity of a foreign offshore client which the staff considers to be not proportional to the volume of activities.
6- Exchanging large amounts of money with electronic transfer requests or bank checks.
7- Change in the pattern of deposit transactions for a customer who is exempt from filling the CTS Form.
8- Performing considerable monetary transactions by the customer, including deposits and withdrawals without sufficient personal identification.
9- Receipt or disbursement of checks payable to the holder issued in a foreign country or withdrawn to the order of a person and endorsed by persons preceding the depositor, or checks with different amounts not related to commercial transactions or alleged to be profits of gains from gambling.
10- Existence of cash deposits and/or bank transfers followed by direct and diverse withdrawals.
11- Existence of many accounts for one of the customers whose nature of activities does not justify the same, or performing many monetary transfers between and through these accounts.
12- Existence of monetary deposits and/or bank transfers in periods during which the customer's activity does not produce such amount of money.
13- Deposit of bank or touristic checks in an account in the name of a company or institution which nature of work does not justify the same.

Hejeij 0286

Exhibit 27

14- Existence of monetary deposits and/or bank transfers which seem to be unusual with regards to the branch's location.

15- Unusual E-Banking transactions.

16- Transfers between an exchange company and other accounts mainly those pertaining to one of their owners, partners, shareholders, managers, authorized signatories or family members (descendants and ascendants) especially of this is followed by withdrawal operations.

**Dealing with exchange companies**

When accepting a check withdrawn from any exchange company, or when executing any bank operation at the request of any exchange company in favor of any of its customers, whether directly or indirectly, and in case the check's or operation's value exceeds 10.000$ or its equivalent, the bank should make the following procedures:

1- Make sure that it received the notice provided for in article nine of the applied regulation of the Law on regulating the exchange profession attached to the Basic Decision Nb. 7933 of 27/06/2001, related to the required information about the operation included in the check or the banking operation, particularly in terms that it states that it is issued to inform about whether the exchange company received cash money or not, the source and destination of the money and the identity of the beneficiary and the economic right holder.

2- Keep the said notice for five years.

Exhibit 27

# EXHIBIT

# D

Hejeij 0288

Exhibit 27

MEAB S.A.L.
Middle East and Africa Bank S.A.L.

### Transfers Issued by MEAB Branches

**Work Procedures:**

**Branch Specific:**

- The branch employee receives the application to perform a transfer either by the presence of the client at the branch, or by email or fax, and in the last two cases, the bank contacts the client for confirmation.
- The said employee performs due diligence of the transfer requested to be carried out, and makes sure its source is not suspicious.
- The Head Officer of transfers shall:
  - Make sure the address of the source of the transfer (client) is listed on the transfer notice clearly and in full, and verify the said address to avoid the mention of a few details or names that might seem suspicious and consider the terms **Abroad** or **N/A** as unsatisfactory.
  - List the address of the beneficiary of the transfer clearly and in detail, and make sure it does not contain suspicious names, which contradicts Anti-Money Laundering and Counter-Terrorism bank policies, and governmental circulars and laws.
  - Clarify the object of the issued transfer (the commercial relation the transfer stems from) on the transfer application and data system, and document it with the required paperwork (bill, contract,...) proving the authenticity of the relation the transfer stems from, specifying the transfer number, the type of items which fees are to be settled by virtue of the transfer in case it was a commercial transfer (e.g.: purchase of food products, purchase of shoes, ...), in accordance with the volume and nature of the client's commercial activity, and consider the use of expressions such as (to finance an account or settle dues...) as unsatisfactory, unless in cases that require so, such as the client is transferring an amount from his account to another one of his accounts at another bank,...
  - Limit the issued transfers between the client and the beneficiary, and abstain from issuing transfers requested by tiers (otherwise the verification department shall investigate the case). Forbid the issuance of transfers upon the request of tiers without mentioning their names.
  - Verify the name of the beneficiary on the black list kept at the bank, and verify the names of the persons whose names might be listed on the grid of transfer object, the beneficiary's bank, as well as the name of the ordering institution.
  - Abide by the transfer application form the bank adopts, and have it signed by the branch verification officer to guarantee the authenticity of the adopted formalities.

Exhibit 27

- Register the transfers via the data system on the client's account as follows:
  TRANSFERS → OUTWARD TRANSFERS

- The employee inserts the account number of the client requesting a transfer from his/her account, the amount, the target country, and all the above-mentioned information required from the client



- The employee shall contact the treasury department to cease the currency conversion if need be.
- The above terms and conditions shall be respected.
- The vice-director shall verify the transfers and perform the validation. The following is thus registered:

### Concerning the Approval of Procedures

| Date | Approval |
|---|---|
| 08/01/2014 | The commercial financing department verified and approved the procedures |
| 04/03/2014 | Approval of the Board of Directors |

Exhibit 27

# EXHIBIT

# E

Hejeij 0291



Exhibit 27



# INDEPENDENT AUDITORS' REPORT
# TO THE SHAREHOLDERS OF MEAB S.A.L.

## REPORT ON THE FINANCIAL STATEMENTS

We have audited the accompanying financial statements of MEAB S.A.L. ('the Bank') which comprise the balance sheet as at 31 December 2015 and the statements of comprehensive income, changes in equity and cash flows for the year then ended, and a summary of significant accounting policies and other explanatory notes.

## MANAGEMENT'S RESPONSIBILITY FOR THE FINANCIAL STATEMENTS

Management is responsible for the preparation and fair presentation of these financial statements in accordance with the International Financial Reporting Standards (IFRSs), and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

## AUDITORS' RESPONSIBILITY

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## OPINION

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Bank as of 31 December 2015, and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards (IFRSs).

PricewaterhouseCoopers          Grant Thornton

Beirut, Lebanon
26 August 2016



**Ferrari & Associates, P.C.**

Exhibit 28
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

March 13, 2019

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8132 1871 7276**

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
United States Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, D.C. 20220
Email: OFAC.Reconsideration@treasury.gov

Re:   **Supplemental Letter Regarding OFAC's November 28, 2018 Disclosure of**
      **Additional Information Regarding the Basis of Designation**
      *Kassem Hejeij—SDGT-12284*

Dear Ms. Thomas,

On November 28, 2018, the United States Department of the Treasury's Office of
Foreign Assets Control ("OFAC") disclosed additional releasable information regarding the basis
for Kassem Hejeij's designation under Executive Order ("E.O.") 13224. This information
supplemented OFAC's prior disclosure of a non-privileged and unclassified summary of
information contained in the administrative record. Specifically, OFAC's additional information
alleges that Mr. Hejeij maintained direct ties with senior elements in Hezbollah and Hezbollah
elements in Iraq and provided support to Hezbollah for a number of years through Middle East
and Africa Bank ("MEAB"), including by "investing in civilian infrastructure that Hezbollah
uses in Lebanon and Iraq."

Mr. Hejeij has reviewed this disclosure and now requests OFAC provide clarification as
to the information contained in that disclosure so as to ensure that Mr. Hejeij understands the
bases and conclusions for his designation to which the disclosure correlates and has a meaningful
opportunity to respond to it.

## I.   **Request for Clarification**

First, OFAC's November 2018 disclosure does not describe the nature of Mr. Hejeij's
alleged direct ties with senior elements in Hezbollah nor how those "direct ties" correlate or
support the designation criteria of E.O. 13224 for which Mr. Hejeij is designated.

Case 1:19-cv-01921-TFH   Document 34-1   Filed 04/29/20   Page 155 of 184

Exhibit 28

Second, OFAC has provided only a single example as to the nature of Mr. Hejeij's support to Hezbollah—i.e., that Mr. Hejeij, acting through MEAB, invested in civilian infrastructure that Hezbollah uses in Lebanon and Iraq. OFAC's disclosure, however, does not explain how those investments were or are in support of Hezbollah nor how the allegation itself could support a conclusion that Mr. Hejeij provides support to Hezbollah. For example, it is unclear whether OFAC is alleging that Hezbollah simply uses infrastructure in which purportedly Mr. Hejeij invested in the same manner as the general public or if OFAC has evidence demonstrating that Mr. Hejeij invested in the infrastructure specifically for Hezbollah's exclusive use. Further, it is unclear what, if anything, Mr. Hejeij could do to prevent Hezbollah from using infrastructure that Mr. Hejeij previously invested in via MEAB.

Given the numerous questions that OFAC's recent disclosure raise, Mr. Hejeij seeks clarification as to the following:

1. Does OFAC allege that Mr. Hejeij provided "direct ties to senior elements of Hezbollah" via his former position as Chairman of MEAB? Were Mr. Hejeij's alleged ties to "senior elements of Hezbollah" ties made in their official capacities or in their personal capacities?

2. To which "senior elements of Hezbollah" did Mr. Hejeij maintain direct ties in Lebanon and Iraq? What does OFAC consider to be a "senior element of Hezbollah?" When did Mr. Hejeij maintain these ties? Does OFAC believe that Mr. Hejeij maintains these ties on an ongoing basis?

3. Does OFAC allege that Mr. Hejeij—acting through MEAB—specifically targeted investments in civilian infrastructure with the knowledge that such infrastructure would be used by Hezbollah?

4. What was the nature of the civilian infrastructure—e.g., roads, bridges, housing projects, etc.? How many infrastructure projects used by Hezbollah does OFAC allege Mr. Hejeij invested in?

5. Does OFAC regard all investment in Lebanese or Iraqi civilian infrastructure that Hezbollah may use as sanctionable under E.O. 13224? Or does OFAC adopt the view that investment in civilian infrastructure in areas under the control of Hezbollah is sanctionable? Does OFAC view investment in civilian infrastructure with knowledge that the infrastructure will be used exclusively or primarily by Hezbollah as sanctionable conduct?

Hejeij 0294

Exhibit 28

OFAC's response to these questions or its reissuance of a non-privileged and unclassified summary to include information responsive to these inquiries will allow Mr. Hejeij to understand the allegations underlying his designation so that he can meaningfully respond to them.

As courts examining OFAC designations have routinely explained, "constitutionally sufficient" notice should allow a designee to understand the allegations against it so they can meaningfully respond to those allegations.[1] That notice must ensure that the designated party knows the conduct for which the designation was undertaken so that it can explain its conduct or respond to the allegations.[2] This obligation includes providing reasonable access to the evidence that the government is using against the designated party.[3]

In cases where OFAC provides unclassified summaries to ensure that their sources and/or national security are not compromised, the United States Court of Appeals for the District of Columbia has found that those disclosures should provide designees with the 'who,' 'what,' 'when' and 'where' of the allegations OFAC has made against them.[4] Failure to do so—i.e., basing a designation on redacted evidence—limits the designee's opportunity to prove or cross-examine on that evidence, thereby creating an especially high risk of erroneous deprivation.[5]

OFAC's allegation that Mr. Hejeij—while acting in his role as MEAB's Chairman—maintained direct ties to senior elements of Hezbollah and provided support to Hezbollah for a number of years does not provide sufficient detail as to the 'who,' 'what,' 'when' and where' of the allegations. Thus, OFAC's disclosure fails to provide Mr. Hejeij a meaningful opportunity to respond to OFAC's allegations. Accordingly, Mr. Hejeij respectfully requests that OFAC respond to the questions above or reissue its non-privileged and unclassified summary with information responsive to those questions.

Thank you for your consideration, and we look forward to your response. If you have any questions or require clarification as to this request, please contact undersigned counsel to your convenience.

Sincerely,

---

[1] *Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 901 (N.D. Ohio 2009) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)).

[2] *Id.*

[3] *Id.*

[4] *Fares v. Smith*, No. 17-5075 at 15 (D.C. Cir. Aug. 18, 2018) (quoting *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001)) (citing *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 982-83 (9th Cir. 2011)).

[5] *Id.* at 14 (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196-97 (D.C. Cir. 2001); *Al Haramain*, 686 F.3d at 980; *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995)).

3

Exhibit 32

 **TOP SECRET**

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**(U) Case ID:** SDGT-4039

**(U) MEMORANDUM FOR JOHN E. SMITH** *Q,Smith 6/5/15*
**ACTING DIRECTOR**
**OFFICE OF FOREIGN ASSETS CONTROL**

**(U) FROM:**     Arthur D. McGlynn     *5/11/15*
Deputy Assistant Secretary
Office of Intelligence and Analysis

**(U//FOUO) SUBJECT:**     Designation Pursuant to E.O. 13224: **KASSEM HEJEIJ**[a]

**(U) INTRODUCTION**

(U) On September 23, 2001, President Bush declared a national emergency pursuant to the International Emergency Economic Powers Act ("IEEPA"), and issued Executive Order 13224 ("E.O. 13224" or "the E.O.") to address grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the September 11, 2001, terrorist attacks in New York, Pennsylvania, and at the Pentagon. The E.O. imposes economic sanctions on persons who have committed, pose a significant threat of committing, or support terrorism.[b]

(U) President Bush identified, in the Annex to E.O. 13224, 13 individuals and 16 entities as subject to the economic sanctions.[c] As amended, the E.O. authorizes the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General, to designate persons determined:

1) to be owned or controlled by, or to act for or on behalf of, those persons listed in the Annex to the E.O., or those persons determined to be subject to subsections 1(b), 1(c), or 1(d)(i) of the E.O.;

---

[a] (U) The name of the person proposed for designation in this evidentiary will appear in **BOLD CAPITAL** font. Additionally, the names of persons previously designated as Specially Designated Global Terrorists (SDGTs) pursuant to E.O. 13224 and Specially Designated Terrorists (SDTs) pursuant to E.O. 12947 will appear in **Bold Title lower case font**.

[b] (U) The E.O. blocks all property and interests in property in the United States or within the possession or control of a U.S. person of any persons designated under its authority. In addition, it prohibits transactions or dealings by U.S. persons or within the United States in blocked property, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of designated persons.

[c] (U) Twelve individuals and fifteen entities were originally named by the President on September 23, 2001. Executive Order 13268 of July 2, 2002 amended the Annex by adding one individual and one entity.



**TOP SECRET**

Exhibit 32

TOP SECRET ██████████████████████████

2) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to E.O. 13224 or determined to be subject to the E.O.; or

3) to be otherwise associated with those persons listed in the Annex to the E.O., or those persons determined to be subject to subsections 1(b), 1(c), or 1(d)(i) of the E.O.

(U) The term "financial, material or technological support" means any property, tangible or intangible, including but not limited to currency, financial instruments, securities, or any other transmission of value; weapons or related materiel; chemical or biological agents; explosives; false documentation or identification; communications equipment; computers; electronic or other devices or equipment; technologies; lodging; safe houses; facilities; vehicles or other means of transportation; or goods. "Technologies" as used in this definition means specific information necessary for the development, production, or use of a product, including related technical data such as blueprints, plans, diagrams, models, formulae, tables, engineering designs and specifications, manuals, or other recorded instructions.[d]

(U) The term "to be otherwise associated with" means to own or control; or to attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services.[e]

(U) Evidence presented in this memorandum and related exhibits provide reason to believe that the below person meets the criteria for designation as set forth in E.O. 13224.

## (U) IDENTIFYING INFORMATION

| | |
|---|---|
| (U) **Individual:** | **KASSEM HEJEIJ**[f] [Exhibit 1, p. 1] |
| (U) AKA: | Qasim Muhammad Hujayj [Exhibit 17, p. 1] (See Exhibit 21 – ██ Declassification Approval) |
| (U) AKA: | Qasim Hajij [Exhibit 15, p. 1] |
| (S) ████████████████████████ | [Exhibit 3, para. 2] |
| (S) ████████████████████████ | [Exhibit 9, para. 2] |
| (S) ████████████████████████ | [Exhibit 9, para. 2] |
| (U) DOB: | 1953 [Exhibit 17, p. 4] (See Exhibit 21 – Declassification Approval) |
| (U) Nationality: | Lebanon [Exhibit 17, p. 3] (See Exhibit 21 – ██ Declassification Approval) |
| (U) POB: | Lagos (Nigeria)[g] [Exhibit 17, p. 3] (See Exhibit 21 – ██ Declassification Approval) |
| (U) Passport: | RL0000432 (Lebanon) issued 31 Jan 2013, expires 31 Jan 2018 [Exhibit 17, pp. 3-4] (See Exhibit 21 – ██ Declassification Approval) |

---

[d] (U) 31 C.F.R. § 594.317
[e] (U) 31 C.F.R. § 594.316
[f] (U) This individual's name, spelled as **"KASSEM HEJEIJ"**, is used throughout this evidentiary memorandum, although some exhibits will use alternative spellings or name variations, which are listed herein as AKAs.
(U) [g] ████████████████████████████████████ Lagos is located in Nigeria.

TOP SECRET ██████████████████████████

Exhibit 32

~~TOP SECRET~~ ████████████████

(U) Title:[h]                     Chairman, Middle East and Africa Bank S.A.L.
                                  [Exhibit 1, p. 1]
(U) Gender:                       Male [Exhibit 1, p. 1]

## (U) BACKGROUND



## (U) BASIS FOR DESIGNATION OF KASSEM HEJEIJ

*(U//FOUO) KASSEM HEJEIJ provides financial, material, or technological support for, or financial or other services to or in support of, Hizballah, a person designated pursuant to E.O. 13224.*



---

[h] (U) This identifying title information will not be publicly published on OFAC's SDN List and is for internal reference only.
[i] (U) MEAB is more than 99 percent owned by the Hejeij family, according to Bankers' Almanac. [Exhibit 2, p. 2] **KASSEM HEJEIJ** serves as the bank's Chairman and co-founder, according to MEAB's website [Exhibit 1, p. 1], and he holds a 46.664 percent ownership stake in the bank according to Bankers' Almanac. [Exhibit 2, p. 2]
[j] (U) **Hizballah** was named an SDGT pursuant to E.O. 13224 on October 31, 2001, listed as an SDT in the Annex to E.O. 12947 on January 23, 1995, and designated on August 10, 2012 pursuant to E.O. 13582.



3

~~TOP SECRET~~ ████████████████

Exhibit 32

~~TOP SECRET~~ 

[Exhibit 16, para. 2]

(S

• (S

[Exhibit 11, paras. 2-3]

• (S

[Exhibit 14, para. 3]

(S

[Exhibit 3, paras. 2-3]



[Exhibit 9, para. 2; Exhibit 10, para. 3]

(S

4

~~TOP SECRET~~

Exhibit 32

~~TOP SECRET~~ ████████████████

(TS ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████ [Exhibit
19, p. 2; Exhibit 13, para. 1]████████
████████████████ [Exhibit 19, pp. 2, 5]

(S ████████████████████████████████████████
██████████████████████████ o ██████████████
████████████████████████████ [Exhibit 9, para. 2] .
████████████████████████████ [Exhibit 10,
██████████████████████████████████████
[Exhibit 3, paras. 2-3; Exhibit 12, paras. 2-3]

(S ████████████████████████████████████████
██████████████ p ██████████████████████████
████████ q ██████████████████ [Exhibit 8, paras. 2-
3]

(S ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

o (U) ████████████████████████████████
p (U) ████████████████████████████████
q (U) ████████████████████████████████

5

~~TOP SECRET~~ ████████████████

Exhibit 32

**TOP SECRET**

[Exhibit 18, paras. 16, 18-19]

(U) **CONCLUSION**

(U//FOUO) Based on the foregoing information, there is reason to believe that **KASSEM HEJEIJ** meets the criteria for designation pursuant to E.O. 13224 for the following reason:

- **KASSEM HEJEIJ** provides financial, material, or technological support for, or financial or other services to or in support of, **Hizballah**, a person designated pursuant to E.O. 13224.

6

**TOP SECRET**

Exhibit 32

~~TOP SECRET~~ ████████████████████

## (U) EXHIBIT LIST



Exhibit 1    Middle East and Africa Bank Website, Board of Directors,
             http://www.meabank.com/about/board-of-directors, retrieved ████ (U)
Exhibit 2    Bankers' Almanac, MEAB SAL Report, retrieved ████ (U)
Exhibit 3    (S)
Exhibit 4    (S)
Exhibit 5    (S)
Exhibit 6    (S)
Exhibit 7    (S)
Exhibit 8    (S)
Exhibit 9    (S)
Exhibit 10   (S)
Exhibit 11   (S)
Exhibit 12   (S)
Exhibit 13   (TS)
Exhibit 14   (S)
Exhibit 15   Arab Decision, Lebanon/Commercial Banks/Middle East and Africa Bank S.A.L.,
             http://www.arabdecision.org/show_func_3_4_19_1_3_9329.htm, retrieved ████
             (U)
Exhibit 16   (S)
Exhibit 17   (TS)
Exhibit 18   (S)
Exhibit 19   (TS)
Exhibit 20   (S)
Exhibit 21   Declassification Approval

Hejeij 0315

Exhibit 37

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

March 15, 2019

Case ID SDGT-12284

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re: Supplemental Letter Regarding OFAC's November 28, 2018 Disclosure of Additional Information Regarding the Basis of Designation of Kassem Hejeij.

Dear Mr. Ferrari:

This letter responds to your March 13, 2019 letter requesting clarification of the non-privileged and unclassified information that OFAC provided to you on October 17, 2018 and November 28, 2018 regarding the bases for Mr. Kassem Hejeij's designation. As noted in our November 28, 2018 response, the supplementary information provided in that letter, coupled with our response dated October 17, 2018, completes the releasable information contained in the administrative record.

Mr. Hejeij's request for reconsideration remains under review, and OFAC is considering the additional information provided by you on March 12, 2019 (dated February 22, 2019).

For the most direct response, please submit any follow up correspondence to OFAC via the following e-mail address: OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, DC 20220

Sincerely,

Hagan Barnett
Acting Assistant Director
Counterterrorism, Human Rights, and
Corruption Division
Office of Foreign Assets Control

Hejeij 0338



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

March 15, 2019

Case ID SDGT-12284

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re: Supplemental Letter Regarding OFAC's November 28, 2018 Disclosure of Additional
Information Regarding the Basis of Designation of Kassem Hejeij.

Dear Mr. Ferrari:

This letter responds to your March 13, 2019 letter requesting clarification of the non-privileged
and unclassified information that OFAC provided to you on October 17, 2018 and November 28,
2018 regarding the bases for Mr. Kassem Hejeij's designation. As noted in our November 28,
2018 response, the supplementary information provided in that letter, coupled with our response
dated October 17, 2018, completes the releasable information contained in the administrative
record.

Mr. Hejeij's request for reconsideration remains under review, and OFAC is considering the
additional information provided by you on March 12, 2019 (dated February 22, 2019).

For the most direct response, please submit any follow up correspondence to OFAC via the
following e-mail address: OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, DC 20220

Sincerely,

Hagan Barnett
Acting Assistant Director
Counterterrorism, Human Rights, and
Corruption Division
Office of Foreign Assets Control



**Ferrari & Associates, P.C.**

1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

March 13, 2019

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8132 1871 7276**

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption Division
United States Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, D.C. 20220
Email: OFAC.Reconsideration@treasury.gov

REC
MAR 2 0 2019
OFAC

Re: **Supplemental Letter Regarding OFAC's November 28, 2018 Disclosure of Additional Information Regarding the Basis of Designation**
*Kassem Hejeij—SDGT-12284*

Dear Ms. Thomas,

On November 28, 2018, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") disclosed additional releasable information regarding the basis for Kassem Hejeij's designation under Executive Order ("E.O.") 13224. This information supplemented OFAC's prior disclosure of a non-privileged and unclassified summary of information contained in the administrative record. Specifically, OFAC's additional information alleges that Mr. Hejeij maintained direct ties with senior elements in Hezbollah and Hezbollah elements in Iraq and provided support to Hezbollah for a number of years through Middle East and Africa Bank ("MEAB"), including by "investing in civilian infrastructure that Hezbollah uses in Lebanon and Iraq."

Mr. Hejeij has reviewed this disclosure and now requests OFAC provide clarification as to the information contained in that disclosure so as to ensure that Mr. Hejeij understands the bases and conclusions for his designation to which the disclosure correlates and has a meaningful opportunity to respond to it.

### I.    Request for Clarification

First, OFAC's November 2018 disclosure does not describe the nature of Mr. Hejeij's alleged direct ties with senior elements in Hezbollah nor how those "direct ties" correlate or support the designation criteria of E.O. 13224 for which Mr. Hejeij is designated.

Second, OFAC has provided only a single example as to the nature of Mr. Hejeij's support to Hezbollah—i.e., that Mr. Hejeij, acting through MEAB, invested in civilian infrastructure that Hezbollah uses in Lebanon and Iraq. OFAC's disclosure, however, does not explain how those investments were or are in support of Hezbollah nor how the allegation itself could support a conclusion that Mr. Hejeij provides support to Hezbollah. For example, it is unclear whether OFAC is alleging that Hezbollah simply uses infrastructure in which purportedly Mr. Hejeij invested in the same manner as the general public or if OFAC has evidence demonstrating that Mr. Hejeij invested in the infrastructure specifically for Hezbollah's exclusive use. Further, it is unclear what, if anything, Mr. Hejeij could do to prevent Hezbollah from using infrastructure that Mr. Hejeij previously invested in via MEAB.

Given the numerous questions that OFAC's recent disclosure raise, Mr. Hejeij seeks clarification as to the following:

1. Does OFAC allege that Mr. Hejeij provided "direct ties to senior elements of Hezbollah" via his former position as Chairman of MEAB? Were Mr. Hejeij's alleged ties to "senior elements of Hezbollah" ties made in their official capacities or in their personal capacities?

2. To which "senior elements of Hezbollah" did Mr. Hejeij maintain direct ties in Lebanon and Iraq? What does OFAC consider to be a "senior element of Hezbollah?" When did Mr. Hejeij maintain these ties? Does OFAC believe that Mr. Hejeij maintains these ties on an ongoing basis?

3. Does OFAC allege that Mr. Hejeij—acting through MEAB—specifically targeted investments in civilian infrastructure with the knowledge that such infrastructure would be used by Hezbollah?

4. What was the nature of the civilian infrastructure—e.g., roads, bridges, housing projects, etc.? How many infrastructure projects used by Hezbollah does OFAC allege Mr. Hejeij invested in?

5. Does OFAC regard all investment in Lebanese or Iraqi civilian infrastructure that Hezbollah may use as sanctionable under E.O. 13224? Or does OFAC adopt the view that investment in civilian infrastructure in areas under the control of Hezbollah is sanctionable? Does OFAC view investment in civilian infrastructure with knowledge that the infrastructure will be used exclusively or primarily by Hezbollah as sanctionable conduct?

OFAC's response to these questions or its reissuance of a non-privileged and unclassified summary to include information responsive to these inquiries will allow Mr. Hejeij to understand the allegations underlying his designation so that he can meaningfully respond to them.

As courts examining OFAC designations have routinely explained, "constitutionally sufficient" notice should allow a designee to understand the allegations against it so they can meaningfully respond to those allegations.[1] That notice must ensure that the designated party knows the conduct for which the designation was undertaken so that it can explain its conduct or respond to the allegations.[2] This obligation includes providing reasonable access to the evidence that the government is using against the designated party.[3]

In cases where OFAC provides unclassified summaries to ensure that their sources and/or national security are not compromised, the United States Court of Appeals for the District of Columbia has found that those disclosures should provide designees with the 'who,' 'what,' 'when' and 'where' of the allegations OFAC has made against them.[4] Failure to do so—i.e., basing a designation on redacted evidence—limits the designee's opportunity to prove or cross-examine on that evidence, thereby creating an especially high risk of erroneous deprivation.[5]

OFAC's allegation that Mr. Hejeij—while acting in his role as MEAB's Chairman—maintained direct ties to senior elements of Hezbollah and provided support to Hezbollah for a number of years does not provide sufficient detail as to the 'who,' 'what,' 'when' and where' of the allegations. Thus, OFAC's disclosure fails to provide Mr. Hejeij a meaningful opportunity to respond to OFAC's allegations. Accordingly, Mr. Hejeij respectfully requests that OFAC respond to the questions above or reissue its non-privileged and unclassified summary with information responsive to those questions.

Thank you for your consideration, and we look forward to your response. If you have any questions or require clarification as to this request, please contact undersigned counsel to your convenience.

Sincerely,

---

[1] *Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 901 (N.D. Ohio 2009) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)).

[2] *Id.*

[3] *Id.*

[4] *Fares v. Smith*, No. 17-5075 at 15 (D.C. Cir. Aug. 18, 2018) (quoting *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001)) (citing *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 982-83 (9th Cir. 2011)).

[5] *Id.* at 14 (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196-97 (D.C. Cir. 2001); *Al Haramain*, 686 F.3d at 980; *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995)).

Erich C. Ferrari

Hejeij 0373



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID SDGT-12284

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re: Kassem Hejeij

Dear Mr. Ferrari:

As you are aware, on June 10, 2015, the Office of Foreign Assets Control (OFAC) designated Kassem Hejeij as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, and on October 2, 2017, you filed a request seeking a copy of the administrative record of Mr. Hejeij's designation.

In response to your request, on October 17, 2018, OFAC provided a non-privileged and unclassified summary of the information contained in the administrative record regarding Mr. Hejeij and stated that, should additional releasable information become available, it would be provided to you.

As such, please find enclosed additional non-privileged and unclassified information regarding the basis for Mr. Hejeij's designation. This, coupled with our response dated October 17, 2018, completes the releasable information contained in the administrative record.

For the most direct response, please submit any follow up questions and correspondence to OFAC via the following e-mail address: OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, DC 20220

Sincerely,

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and
Corruption Division
Office of Foreign Assets Control

Hejeij 0375

UNCLASSIFIED

(U) Kassem Hejeij has maintained direct ties with senior elements in Hezbollah, Hezbollah elements in Iraq, among others. He has provided support to Hezbollah for a number of years through Middle East and Africa Bank, including by investing in civilian infrastructure that Hezbollah uses in Lebanon and Iraq.

UNCLASSIFIED



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID SDGT-12284

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re: Kassem Hejeij

Dear Mr. Ferrari:

As you are aware, on June 10, 2015, the Office of Foreign Assets Control (OFAC) designated Kassem Hejeij as a Specially Designated Global Terrorist (SDGT) pursuant to Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

On October 2, 2017, you filed a request seeking a copy of the administrative record of Mr. Hejeij's designation. On April 19, 2018, OFAC provided a copy of the redacted administrative record of Mr. Hejeij's designation, the redacted portions of which contained classified or privileged information.

On June 11, 2018, you filed a request seeking a non-privileged and unclassified summary of the information contained in the administrative record. Providing this information requires multiple levels of internal review by OFAC and by our interagency partners in order to comply with OFAC's obligations to safeguard classified or privileged information, which delays the release of such information.

Please find enclosed the non-privileged and unclassified summary of information regarding the basis for Mr. Hejeij's designation. Should additional releasable information become available, it will be provided to you.

For the most direct response, please submit any follow up questions and correspondence to OFAC via the following e-mail address: OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Ave, N.W. (Freedman's Bank Building)
Washington, DC 20220

Sincerely,

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and
Corruption Division
Office of Foreign Assets Control

UNCLASSIFIED

(U) As of early, 2014, Kassem Hejeij and an individual whom OFAC has reason to believe is Adham Tabaja, were responsible for transferring funds from Hizballah companies in Iraq to Hizballah.

(U) As of mid 2014, Kassem Hejeij was an owner of Global Cleaners which provided millions of dollars per year to Hizballah. As OFAC noted in October 2016, Global Cleaners obtained lucrative contracts to provide sanitation services in Baghdad, Iraq.

(U) As of 2014, Hizballah had previously held investments in Global Cleaners as part of Baghdad's city government's agreement to award 80 of municipal contracts to Hizballah-owned companies.

(U) As of late 2013, Kassem Hejeij was working on behalf of Hizballah to manage commercial ventures in Iraq for various Lebanese companies. These contracts included various energy-related ventures in Iraq as well as certain business activities in Africa and South America used to finance Hizballah. The revenues were then remitted to Hizballah using accounts at various banks, and Hejeij was working to open Middle East Africa Bank (also known as MEAB) branches in Iraq for Hizballah.

(U) In mid-2014, Kassem Hejeij was working with the Iraqi Prime Minister's office to finalize paperwork for MEAB to begin banking operations in Iraq.

(U) In mid-2013, a Hizballah finance official met with Kassem Hejeij, and Hejeij agreed to make changes to bank accounts held by individuals, entities, or charitable institutions affiliated with Hizballah so as to hide ties between money laundering and Hizballah. Specifically, Hejeij agreed to begin transferring accounts at MEAB that were registered to Hizballah-affilated individuals or entities to new accounts under different names.

UNCLASSIFIED



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID SDGT-12284

**APR 1 9 2018**

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004

Re: Kassem Hejeij

Dear Mr. Ferrari:

This is in response to your letter dated October 2, 2017, to the Office of Foreign Assets Control
(OFAC) requesting disclosure of, and access to, your client's administrative record associated
with his designation as a Specially Designated Global Terrorist (SDGT) pursuant to Executive
Order 13224 of September 23, 2011 ("Blocking Property and Prohibiting Transactions with
Persons Who Commit, Threaten to Commit, or Support Terrorism").

Processing such a request requires extensive and multiple levels of internal review by OFAC to
comply with U.S. government regulations regarding the protection of classified, privileged, and
otherwise non-releasable information. Enclosed, please find bates stamped pages SDGT 12284
000001 – 000021, which includes the redacted administrative record upon which the designation
was based, as well as the U.S. Department of the Treasury press release issued on the day of
designation. The redacted portions of the administrative record contain classified, privileged, or
otherwise non-releasable information. Should additional unclassified, non-privileged, or
otherwise releasable information become available, it will be provided under separate cover.

Please refer to case ID SDGT-12284 in all correspondence. For the most expedient response,
please direct all questions and correspondence to OFAC via the following email:
OFAC.Reconsideration@treasury.gov. You may also write, call, or fax OFAC at the following:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Annex)
> Washington, DC 20220
>
> Telephone: 202-622-2420
> Fax: 202-622-5390

1

Hejeij 0387

Thank you for your cooperation.

Sincerely,

Nikole Thomas
Assistant Director
Counterterrorism, Human Rights, and Corruption
Office of Foreign Assets Control

Enc.

2

Hejeij 0388

**TOP SECRET** 



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220.

(U) **Case ID**: SDGT-4039

(U) **MEMORANDUM FOR JOHN E. SMITH** ~~GSmith~~ 6/5/15
**ACTING DIRECTOR**
**OFFICE OF FOREIGN ASSETS CONTROL**

(U) **FROM:**  Arthur D. McGlynn ████  5/22/15
Deputy Assistant Secretary
Office of Intelligence and Analysis

(U//~~FOUO~~) **SUBJECT:**  Designation Pursuant to E.O. 13224: **KASSEM HEJEIJ**[a]

(U) **INTRODUCTION**

(U) On September 23, 2001, President Bush declared a national emergency pursuant to the International Emergency Economic Powers Act ("IEEPA"), and issued Executive Order 13224 ("E.O. 13224" or "the E.O.") to address grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the September 11, 2001, terrorist attacks in New York, Pennsylvania, and at the Pentagon. The E.O. imposes economic sanctions on persons who have committed, pose a significant threat of committing, or support terrorism.[b]

(U) President Bush identified, in the Annex to E.O. 13224, 13 individuals and 16 entities as subject to the economic sanctions.[c] As amended, the E.O. authorizes the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General, to designate persons determined:

1) to be owned or controlled by, or to act for or on behalf of, those persons listed in the Annex to the E.O., or those persons determined to be subject to subsections 1(b), 1(c), or 1(d)(i) of the E.O.;

---

[a] (U) The name of the person proposed for designation in this evidentiary will appear in **BOLD CAPITAL** font. Additionally, the names of persons previously designated as Specially Designated Global Terrorists (SDGTs) pursuant to E.O. 13224 and Specially Designated Terrorists (SDTs) pursuant to E.O. 12947 will appear in **Bold Title** lower case font.

[b] (U) The E.O. blocks all property and interests in property in the United States or within the possession or control of a U.S. person of any persons designated under its authority. In addition, it prohibits transactions or dealings by U.S. persons or within the United States in blocked property, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of designated persons.

[c] (U) Twelve individuals and fifteen entities were originally named by the President on September 23, 2001. Executive Order 13268 of July 2, 2002 amended the Annex by adding one individual and one entity.

**TOP SECRET** 

Hejeij 0389

2) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to E.O. 13224 or determined to be subject to the E.O.; or

3) to be otherwise associated with those persons listed in the Annex to the E.O., or those persons determined to be subject to subsections 1(b), 1(c), or 1(d)(i) of the E.O.

(U) The term "financial, material or technological support" means any property, tangible or intangible, including but not limited to currency, financial instruments, securities, or any other transmission of value; weapons or related materiel; chemical or biological agents; explosives; false documentation or identification; communications equipment; computers; electronic or other devices or equipment; technologies; lodging; safe houses; facilities; vehicles or other means of transportation; or goods. "Technologies" as used in this definition means specific information necessary for the development, production, or use of a product, including related technical data such as blueprints, plans, diagrams, models, formulae, tables, engineering designs and specifications, manuals, or other recorded instructions.[d]

(U) The term "to be otherwise associated with" means to own or control; or to attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services.[e]

(U) Evidence presented in this memorandum and related exhibits provide reason to believe that the below person meets the criteria for designation as set forth in E.O. 13224.

## (U) IDENTIFYING INFORMATION

| | |
|---|---|
| (U) **Individual**: | **KASSEM HEJEIJ**[f] [Exhibit 1, p. 1] |
| (U) AKA: | Qasim Muhammad Hujayj [Exhibit 17, p. 1] (See Exhibit 21 – ██ Declassification Approval) |
| (U) AKA: | Qasim Hajij [Exhibit 15, p. 1] |
| (S██ | [Exhibit 3, para. 2] |
| (S██ | [Exhibit 9, para. 2] |
| (S██ | [Exhibit 9, para. 2] |
| (U) DOB: | 1953 [Exhibit 17, p. 4] (See Exhibit 21 – Declassification Approval) |
| (U) Nationality: | Lebanon [Exhibit 17, p. 3] (See Exhibit 21 – ██ Declassification Approval) |
| (U) POB: | Lagos (Nigeria)[g] [Exhibit 17, p. 3] (See Exhibit 21 – ██ Declassification Approval) |
| (U) Passport: | RL0000432 (Lebanon) issued 31 Jan 2013, expires 31 Jan 2018 [Exhibit 17, pp. 3-4] (See Exhibit 21 – ██ Declassification Approval) |

---

[d] (U) 31 C.F.R. § 594.317
[e] (U) 31 C.F.R. § 594.316
[f] (U) This individual's name, spelled as "**KASSEM HEJEIJ**", is used throughout this evidentiary memorandum, although some exhibits will use alternative spellings or name variations, which are listed herein as AKAs.
(U) [g] ██████████ Lagos is located in Nigeria.

2

TOP SECRET

(U) Title:[h]                                    Chairman, Middle East and Africa Bank S.A.L.
                                                 [Exhibit 1, p. 1]
(U) Gender:                                      Male [Exhibit 1, p. 1]

## (U) BACKGROUND



## (U) BASIS FOR DESIGNATION OF KASSEM HEJEIJ

(U//FOUO) *KASSEM HEJEIJ provides financial, material, or technological support for, or financial or other services to or in support of, Hizballah, a person designated pursuant to E.O. 13224.*

---

[h] (U) This identifying title information will not be publicly published on OFAC's SDN List and is for internal reference only.
[i] (U) MEAB is more than 99 percent owned by the Hejeij family, according to Bankers' Almanac. [Exhibit 2, p. 2] **KASSEM HEJEIJ** serves as the bank's Chairman and co-founder, according to MEAB's website [Exhibit 1, p. 1], and he holds a 46.664 percent ownership stake in the bank according to Bankers' Almanac. [Exhibit 2, p. 2]
[j] (U) **Hizballah** was named an SDGT pursuant to E.O. 13224 on October 31, 2001, listed as an SDT in the Annex to E.O. 12947 on January 23, 1995, and designated on August 10, 2012 pursuant to E.O. 13582.
[k] (S

[Exhibit 4, para. 6; Exhibit 5, para. 5]

[Exhibit 6,

paras. 2-6; Exhibit 7, paras. 2-3]

[Exhibit 6, paras. 2-6]

[Exhibit 14, para. 3; Exhibit 20, paras. 2-4]

[m] (S

3

TOP SECRET



**TOP SECRET**

[Exhibit 16, para. 2]

[Exhibit 11, paras. 2-3]

[Exhibit 14, para. 3]

[Exhibit 3, paras. 2-3]

[Exhibit 9, para. 2; Exhibit 10, para. 3]

**TOP SECRET**

4

TOP SECRET



(TS █████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████ [Exhibit
19, p. 2; Exhibit 13, para. 1]]
[Exhibit 19, pp. 2, 5]

(S █████████████████████████████████
█████████████████████████████████
█████████████████████ [Exhibit 9, para. 2]
█████████████████████████████ [Exhibit 10,
██████████████████████████████████
[Exhibit 3, paras. 2-3; Exhibit 12, paras. 2-3]

(S █████████████████████████████████
██████████████████████████████████
█████████████████ [Exhibit 8, paras. 2-3]

(S █████████████████████████████████
██████████████████████████████████
██████████████████████████████████

----
° (U) ████████████████████████████
ᵖ (U) ████████████████████████████
ᑫ (U) ████████████████████████████

5

TOP SECRET

**TOP SECRET**

[Exhibit 18, paras. 16, 18-19]

(U) <u>**CONCLUSION**</u>

(U//FOUO) Based on the foregoing information, there is reason to believe that **KASSEM HEJEIJ** meets the criteria for designation pursuant to E.O. 13224 for the following reason:

- **KASSEM HEJEIJ** provides financial, material, or technological support for, or financial or other services to or in support of, **Hizballah,** a person designated pursuant to E.O. 13224.

**TOP SECRET**

6

**TOP SECRET** ████████████

## (U) **EXHIBIT LIST**



| | |
|---|---|
| Exhibit 1 | Middle East and Africa Bank Website, Board of Directors, http://www.meabank.com/about/board-of-directors, retrieved ████ (U) |
| Exhibit 2 | Bankers' Almanac, MEAB SAL Report, retrieved ████ (U) |
| Exhibit 3 | |
| Exhibit 4 | |
| Exhibit 5 | |
| Exhibit 6 | |
| Exhibit 7 | |
| Exhibit 8 | |
| Exhibit 9 | |
| Exhibit 10 | |
| Exhibit 11 | |
| Exhibit 12 | |
| Exhibit 13 | |
| Exhibit 14 | |
| Exhibit 15 | Arab Decision, Lebanon/Commercial Banks/Middle East and Africa Bank S.A.L., http://www.arabdecision.org/show_func_3_4_19_1_3_9329.htm, retrieved ████ (U) |
| Exhibit 16 | |
| Exhibit 17 | |
| Exhibit 18 | |
| Exhibit 19 | |
| Exhibit 20 | |
| Exhibit 21 | Declassification Approval |

**TOP SECRET** ████████████

7